# EXHIBIT 1 Pt. I

| | |
|---|---|
| IN THE MATTER OF THE<br>CONSOLIDATED ARBITRATION<br><br>- between -<br><br>UNICO MARINE SERVICES LLC,<br>Claimant,<br><br> -and-<br><br>JMB SHIPPING ATB 205, LLC<br>(under a Bareboat Charter Party dated May 5, 2021<br>Tug BELLA and Barge B-205 -<br>formerly Tug LINDA LEE BOUCHARD and UMS 205),<br><br>JMB SHIPPING ATB 220, LLC<br>(under a Bareboat Charter Party dated May 12, 2021<br>Tug MORENA and Barge B-220 -<br>formerly Tug MORTON S. BOUCHARD JR. and UMS 220),<br><br>JMB SHIPPING ATB 284, LLC<br>(under a Bareboat Charter Party dated May 12, 2021<br>Tug RUBIA and Barge B-284 -<br>formerly Tug DENISE A. BOUCHARD and UMS 284),<br>Respondents. | Before:<br>Dick Corwin, Chair<br>Louis P. Sheinbaum<br>George J. Tsimis<br><br>Final Award<br><br>November 13, 2025 |

For Unico Marine Services LLC:

> By Lennon, Murphy & Phillips, LLC
> Patrick F. Lennon, Esq.
> Kevin J. Lennon, Esq.
> Steven R. Winters, Esq.
> Keith W. Heard, Esq.

For JMB Shipping ATB 284, LLC,
JMB Shipping ATB 220, LLC, and
JMB Shipping ATB 205, LLC:

> By Holland & Knight LLP
> Vincent J. Foley, Esq.
> Marie Larsen, Esq.
> Francesca Morris, Esq.

**I. INTRODUCTION**

Unico Marine Services LLC (hereinafter "Unico" or "Claimant") in May 2021 entered into three bareboat charters (hereinafter "the BC" individually or "the BCs," collectively) each of which concerned an Articulated Tug Barge ("ATB") unit consisting of a tug and a barge then owned by entities within the Bouchard Transportation Company (hereinafter "Bouchard"). In August 2021 via a Section 363 bankruptcy sale, a JMB Capital Partners Lending LLC bid prevailed at auction for 29 vessels (tugs and barges) from Bouchard including those already bareboat chartered to Unico. Thereafter, JMB Shipping LLC entities (JMB Shipping ATB 205 LLC, JMB Shipping ATB 220 LLC, and JMB Shipping ATB 284 LLC, hereinafter collectively "JMB") assumed each of the BCs with Unico.

Within the first ten days of October 2021, before expiry of the initial 6-month term of each BC, (a) Unico returned ATB 284 to JMB and (b) JMB caused the arrest of ATB 205 in Louisiana and the arrest of ATB 220 in Florida.

Various disputes underlie the collapse of the parties' arrangements with (a) timeliness of payment of monthly charter hire by Unico a prime issue with respect to ATB 205 and ATB 220, (b) whether JMB acted in bad faith and engaged in unfair dealing via communications with an owner/charterer of ATBs (with which Unico was negotiating charters) thereby preventing Unico Marine from realizing the benefits of its BCs, (c) whether, when Unico took delivery of ATB 205, the ATB 205 was unseaworthy or had a latent defect which caused a failure of its cargo heating system necessitating removal of cargo, delay and extensive repairs/repair time, (d) whether JMB properly or improperly withdrew the ATB 205 and the ATB 220 under those BCs and adhered to BC requirements concerning notices related to alleged untimely/non-payment of hire by Unico, and (e) a plethora of issues concerning seaworthiness, repairs, spare parts, and expenses incurred by the parties under the BCs.

Each party claims damages with millions of dollars alleged to have been lost.

*A. The Parties*

JMB Shipping LLC was part of a private family-owned firm based in California which made investments in companies via equity and loans, and purchased assets inside and outside of bankruptcies. JMB Shipping LLC formed JMB Shipping ATB 205 LLC, JMB Shipping ATB 220 LLC, and JMB Shipping ATB 284 LLC to acquire those particular ATBs at the Bouchard bankruptcy auction.

Unico Marine Services LLC, located in Houston, was formed as a subsidiary of Unico Commodities LLC (also in Houston and owned by Mr. Ricardo Valentini). Unico Commodities was formed (under a different name) in 2012, traded in petroleum products, buying and selling and chartering vessels to deliver them to customers (and owning/operating a small vessel for a few years up to 2015). Unico Marine was a "new" company when it entered into the BCs.

## B. The Proceedings

On October 12, 2021, Houston lawyers for Unico appointed LeRoy Lambert as an arbitrator in connection with disputes under the BC for ATB 205 and the BC for ATB 220, and on October 14, 2021, New Orleans lawyers for JMB appointed George Tsimis as an arbitrator for those disputes. On that same day, New Orleans lawyers for JMB also appointed George Tsimis as an arbitrator for disputes under the BC for ATB 284. On October 17, 2021, Dick Corwin advised counsel that he had accepted appointment as the third arbitrator in the ATB 205 and 220 arbitrations.

On October 28, 2021, Unico, through its newly appointed New York lawyers, appointed Louis Sheinbaum as an arbitrator in the ATB 205 and 220 arbitrations, after Mr. Lambert had stepped down from the Panel on October 26, 2021. Unico also appointed Mr. Sheinbaum as an arbitrator in the ATB 284 dispute. On October 29, 2021, Dick Corwin advised counsel that he had accepted appointment as the third arbitrator in the ATB 284 arbitration.

After disclosures and supplementary disclosure in the ATB 205 arbitration, as of December 2, 2021, the three panels effectively/explicitly were accepted by the parties. On December 14, 2021 the parties advised of their agreement that the three arbitrations were to be consolidated pursuant to Section 2 of the Society of Maritime Arbitrtors, Inc. ("SMA") Rules.

In February 2022, the Panel provided supplementary disclosures based upon JMB's New Orleans' lawyer's advice of involvement of lawyers in New York.

In early March 2022, pursuant to the Panel's request, the parties submitted a Summary of the Facts and Claims covering the disputes under each of the three BCs.

In advance of a scheduling conference (virtual) with the parties, in view of advice of JMB's New Orleans lawyers of appointment of new lead counsel in New York the Panel provided further supplementary disclosures. The scheduling meeting concerned setting deadlines for discovery, requests for summary relief in the form of a partial final award, pre-award security, deposition testimony and hearings, discussion of key elements of the issues concerning each of the BCs, a preliminary issue as to Real Party in Interest, and alleged claims by Unico of JMB's breaches of the implied warranty of "good faith and fair dealing" under the three BCs. The parties agreed to a schedule and provided the Panel with docket sheets concerning the arrest by JMB of each of the ATBs, as well as an escrow agreement concerning security of some $14 million dollars securing claims of Unico as to ATB 205 and 220.

Given that the issue of "good faith and fair dealing" was not discussed in Unico's earlier submitted Claim Statement, the Panel requested and the parties submitted a Claim Statement concerning the implied duty of "good faith and fair dealing."

In April 2022, JMB requested a Partial Final Award ("PFA") requiring Unico to post $4 million dollars as security for JMB's claims against Unico and for $500,000 security for attorneys' fees and costs and a finding that Unico should not be permitted to pursue its claims in the absence of posting security, and for a PFA dismissing Unico's claims should Unico not post security which

the panel orders to be posted. Referring to litigation in federal courts between the parties in New York, Florida, and Louisiana and to the scheduling agreement providing for summary relief requests to be made in June, Unico argued it need not respond until discovery/discovery disputes were resolved and, in any event, no earlier than June 2022.

The Panel requested the parties to provide information concerning the status of the federal court proceedings and relevant rulings and set dates for submission of Unico's opposition to JMB's security request. Arguing that the dates/schedule the Panel set with respect to JMB's security request prejudiced Unico, Unico requested reconsideration. On consideration, the Panel set out the rationale for its scheduling/requests, which it re-confirmed. A request for a brief extension to submit a reply yielded further argument which the Panel resolved.

The parties thereafter engaged in exchanges concerning documents relevant to assessing amounts JMB claimed as the basis for its security request. In May 2022, just before Unico was to submit a response to JMB's security demand, the parties agreed to resolve the issue of security for each other's claims as follows: (a) JMB released security previously provided by Unico in the amounts of $8.4 million for ATB 220 and $5.6 million for ATB 205, respectively, and discontinued litigation in New York federal courts pending against Unico Marine and Unico Commodities; and (b) the parties waived any right to seek security against one another in the consolidated arbitration proceedings (or by arrest or attachment of property) prior to the issuance of final awards on each claim.

In April 2022, the parties, in response to the other's requests for documents concerning disputes under each of the three ATBs, objected to many of the requests on varying grounds and asked the Panel to address and resolve these issues. The Panel ruled on each and directed the parties to meet in order to eliminate objections and narrow any remaining issues upon which the Panel need rule. In June 2022, the Panel and parties' counsel met (virtually) for argument on the discovery disputes, and two weeks later, the Panel issued its written rulings resolving them.

In June 2022, JMB submitted its Memorandum and exhibits in support of an application for a Final Award holding that Unico breached the ATB 284 BC entitling JMB to $601,374.16 damages plus interest, attorneys' fees, and costs.

In July 2022, Unico requested that the Panel issue 15 subpoenas with some seeking documents (via custodians of those records) and others seeking testimony spread amongst several states. In the latter part of July 2022, the Panel issued rulings concerning (a) disputes as to timing and arguments concerning discovery bearing upon JMB's request for a Final Award, (b) JMB's objections regarding issuance of requested subpoenas, and (c) handling of outstanding disagreements as to discovery/production of documents already agreed upon but now disputed.

JMB submitted its Memorandum and cited authorities opposing Unico's application for subpoenas arguing that, under the Federal Arbitration Act ("FAA"), the Panel is without authority to issue pre-hearing subpoenas for document discovery or for pre-hearing discovery or for witnesses beyond 100 miles from New York City and for additional reasons. In August 2022, Unico submitted its Memorandum and supporting evidence in response, spurring dispute as to the previously agreed schedules for discovery, leading to the Panel's ruling concerning the

dispute. The parties then submitted further extensive arguments concerning their positions as to scheduling with particular emphasis on when Unico need submit a response to JMB's request for a Final Award as to ATB 284 BC, pending further discovery and/or development of facts including via subpoena or beforehand.

In August 2022, JMB submitted a Supplemental Response to Unico's subpoena request and, in turn, Unico submitted a Reply to JMB's Supplemental Response.

The Panel issued a ruling setting out its decision as to the date for the submission of Unico's opposition to the ATB 284 application of JMB including detail as to points to be covered concerning the need for discovery and/or particular subpoenas and requesting dates for hearings.

The parties agreed to two hearing dates with a key fact witness from each party to then testify, and Unico submitted its Opposition Memorandum (with exhibits) to JMB's request for a Final Award on the ATB 284, followed by a Request for an Order regarding JMB's objections to Unico's second set of discovery requests.

In September 2022, Unico submitted an Application for a Final Award as to the ATB 220 with a request for $11,550,463 in damages plus interest, attorneys' fees, and costs.

The parties provided declarations and exhibits in advance of their witnesses testifying during three days of September hearings, and in advance of the hearings, the parties agreed: (a) no further submissions as to their applications for Final Awards as to ATBs 220 and 284 would be made until after the close of hearings and evidence, (b) the parties agreed to the issuance of certain of the requested subpoenas and requested the Panel's rulings as to others, and (c) the parties agreed to the resolution of certain document requests and to the issuance of certain subpoenas if not otherwise resolved with the subpoena for production of the logbooks from ATB 205 being an on-going issue. During the ensuing weeks, JMB withdrew objections to the issuance of various subpoenas at issue. However, continuing issues regarding subpoenas to Centerline and the scope of same (including claimed confidential information) and the scope and time frame of other subpoenas continued to be the subject of extensive written argument by both parties.

The Panel issued a ruling setting out its decision as to the scope and time frame for each of the eleven subpoenas at issue and dealing with confidentiality issues as to a subpoena to Centerline.

In October 2022, the Panel issued 14 subpoenas, in accord with the Panel's prior rulings, as requested by Unico and three subpoenas requested by JMB (and agreed by Unico).

The Panel held a virtual status hearing requested by the parties to resolve open issues, any remaining discovery disputes, the issuance of further subpoenas at the request of Unico, and to schedule and set hearing dates.

The discussions and efforts to resolve disputes led to extensive written arguments spanning several weeks of November 2022 concerning the issuance of subpoenas and requests for production of information concerning maintenance and repair records, logbooks, and a computer

5

hard drive of ATB 205. During a virtual meeting in mid-November, the parties were encouraged to resolve these disputes, and later in November, the parties reported that they had reached a resolution including the sharing of expenses related to the computer hard drive. The Panel subsequently issued a subpoena, which was agreed by the parties and directed to the Plan Administrator of Bouchard (in bankruptcy) for records and communications concerning ATB 205.

In November 2022, Counsel to Centerline (its custodian of records and chief executive officer M. Godden having been subpoenaed) advised that Centerline would not produce a witness on the return date of the subpoena. Unico advised Centerline that Unico was reserving all rights concerning enforcement of the subpoena, following which, after further consideration, Centerline's counsel confirmed Centerline would not comply with the subpoena contending that the documents sought were privileged and that none of the information sought was unique to Mr. Godden and that Unico should exhaust "less intrusive discovery methods" in order to obtain the same information which Mr. Godden would have. Unico disputed Centerline's objections and reserved the right to compel compliance and suggested conferring to resolve the issues.

In December 2022, Unico requested that, in view of delay, the Panel set a date for JMB to submit its opposition to Unico's application for a Final Award on the ATB 220. Communications arguing opposing points of view ensued.

A virtual status hearing was held for the Panel to hear the parties concerning scheduling issues and hearings and to rule on these issues. Thereafter, the Panel issued a ruling setting deadlines and hearing dates.

Unico requested that the Panel issue a Confidentiality Order in line with a request by subpoenaed broker Braemer. The Panel directed the parties to work out and resolve this issue through a mutually agreed wording for a Confidentiality Agreement.

At the end of January 2023, after encountering difficulties in scheduling the testimony of former ATB 205 crew members, a subpoenaed tankerman testified at a virtual hearing.

In early February 2023, JMB submitted a Report and annexed documents of its expert on ATB 220 damages mitigation, following which disputes arose between the parties as to the timing of the submission relative to the hearing for the expert's testimony.

On February 9, 2023, Centerline's counsel advised the Panel (with copy to JMB and Unico) that (a) Centerline had produced certain documents in response to the subpoena *duces tecum* directed to it while maintaining Centerline's objection to various elements of the subpoena, (b) neither Centerline nor its CEO Godden objected to providing testimony via video conference so long as sufficient notice of the hearing date would be provided, and (c) Centerline maintained objection to providing confidential information/trade secrets concerning charter hire rates charged to its customers.

In response, Unico advised the Panel that it reserved its right to have a custodian from Centerline testify to authenticate records, and that Unico intended to proceed with Mr. Godden's virtual

6

testimony (requesting Panel dates for same). Unico also took issue with claims of confidentiality/trade secrets with suggestion by Unico that rulings on Centerline's objections would be appropriate. Centerline responded advising that the FAA requires a petition be made to the federal court to compel, via the Panel's subpoena, confidential/trade secret information.

On February 14, 2023, the Panel wrote to Centerline's counsel and Unico requesting that (a) Unico submit a new subpoena *duces tecum* addressed to the correct corporate entity and, if necessary, a new subpoena to Centerline's M. Godden to appear and testify should Centerline so require, (b) Unico work with Centerline's counsel to select one of several offered dates for Mr. Godden's testimony (provided Centerline did not require a new subpoena), (c) JMB consider agreeing to authenticity of documents so as eliminate need for Centerline's custodian to testify, (d) Centerline and Unico agree to a confidentiality agreement failing which the panel would issue a Protective Order to cover confidential information whether documentary or by testimony. JMB agreed to authentication by affidavit to which the Panel agreed.

On February 22, 2023, Centerline's counsel provided several March 2023 dates when Mr. Godden was available to testify (virtually) and noted Centerline's continuing objection to producing information as to rates of charter hire charged to its customers.

The Panel advised Centerline that the suggested hearing dates for Mr. Godden's testimony should be agreed with Unico and inquired of Centerline whether, if a Confidentiality order was in place, Centerline would provide charter rate information. In response, Centerline advised that confidentiality agreements with its customers prevented it from doing so, save for being obligated to do so by court order.

The Panel requested Unico to advise what steps, if any, Unico would have the Panel take to secure the testimony of Mr. Godden and, if still desired, to obtain charter rate information from Centerline. While reserving its right to enforce the originally issued subpoena to Mr. Godden, Unico requested that a new subpoena be issued for production of the charterparties into which Centerline had entered for ATBs 205, 220 and 284 with Centerline customers and advised that if Centerline did not comply with that subpoena then Unico would obtain a court order compelling Centerline to do so. On February 24, 2025, the Panel issued the subpoenas that Unico had requested to which, after service upon Centerline, Centerline objected in line with its earlier objections.

Centerline did not appear at the hearing in Seattle, which was attended, remotely, by the parties' counsel (including Unico's local Seattle counsel) and the Panel. The subpoenas were marked as exhibits at that virtual hearing.

Some days before JMB's ATB 220 damages/mitigation expert was to testify in mid-February 2023, Unico requested hearing dates for an expert to testify as to damages concerning the three ATBs under the terminated BCs. JMB promptly responded stating JMB would not present its damages expert to testify so as to permit (and require) Unico to identify its damages expert and provide its expert report.

The Panel directed the parties to immediately confer to resolve differences as to their experts and briefing. The parties conferred and advised that they were unable to resolve these differences. In lieu of having JMB's expert's testimony at the hearing, the Panel met virtually with the parties. The Panel issued directives to the parties to resolve and agree schedules for the number of hearing days needed to complete the submission of testimony and all evidence as to each BC dispute.Thereafter, the parties advised the Panel (and each other) of the identity of their witnesses and the number of hearing days needed totaling some 15 to 20 hearing days.

On February 7, 2023, Unico presented sealed settlement offers concerning the disputes regarding the BCs for ATBs 205 and 220. JMB declined these sealed offers. Unico then provided these offers to the Panel chair in sealed envelopes to be opened once the Panel deliberated and decided the disputes regarding the ATBs 205 and 220.

After a procedural hearing was held concerning hearing dates and the submission of testimony and evidence, the Parties and the Panel identified more than 20 potential dates in the range of February to May 2023.

At the outset of March 2023, Unico requested that the Panel direct JMB to immediately courier the ATB 205 computer hard drive and send a link to the ATB 205 logbooks. JMB and Unico exchanged arguments and positions regarding these requests by Unico. The Panel issued requests and rulings on the following day resolving the dispute.

In mid-March 2023, the Panel held a virtual scheduling meeting with the Parties to review and confirm hearing dates and witness availability.

In early April 2023, the Panel advised the parties of possible hearing dates in June to hear testimony from experts/metallurgists as per request of the parties.

Soon thereafter, Unico requested that the Panel direct JMB to pay 50% of the costs associated with a subpoenaed entity (Rose Cay) gathering documents and information responsive to a subpoena. The Panel requested further particulars from the parties and, having heard the parties' arguments, the Panel ruled in writing that it declined to order JMB to pay 50% of the $2,500 in expenses, but the Panel stated that it would consider these expenses for allocation when rendering a Final Award.

In late April 2023, Unico suggested that JMB had discarded/lost the logbook of ATB 205 and had unilaterally conducted destructive testing of metal remnants of an ATB 205 pump can casing with result that Unico would be applying for a spoliation of evidence ruling and would seek adverse inferences as to both situations. JMB responded briefly, arguing to the contrary, with Unico, in turn, advising that Unico would make its arguments in its spoliation application.

On May 2 and 3, 2023, three virtual scheduling hearings were held with the parties which also covered issues related to production of certain documents per subpoena and the ATB 205 pump can casing (and a viewing of the pump can casing in Brooklyn) and issues related to an expert's report. The Panel issued a recap of hearing dates with witnesses and available dates into July and ordered that, absent good cause, fact witness testimony would not be accepted after June 28th

and that expert witness and rebuttal witness testimony had to be completed no later than July 2023.

Unico produced the report of an engineering expert in advance of a hearing for the expert's testimony. JMB (as follow-up to the above referenced scheduling hearings) objected to alleged late production of the expert's report and requested that the Panel direct Unico to immediately produce documents identified in the report as "Basis for Opinions," failing which JMB requested adjournment the hearing be adjourned and expert be recalled to resume testimony at a further hearing.

Unico responded with clarifications as to certain documents (which did not exist), production of other documents, and references to already produced documents.

The parties, after exchanging arguments concerning the production of exhibits in advance of and at the hearings, reached agreement for, essentially, production 48 hours in advance of use at a hearing absent exigent circumstances.

JMB arranged for the Panel to view the ATB 205 pump can casing (in pieces) at Socotec, a facility of its metallurgists in Brooklyn, on May 25, 2023. Unico provided photographs of the pieces and objected to the inspection given its spoliation concerns and reserved its right to attend and objected to any testing of the pieces of the pump can casing. Discussion concerning the viewing of the pump can casing was held during a hearing followed by the Panel recapping/providing to the parties all writings provided to it concerning suggested spoliation of the pump can casing (including JMB's metallurgist's proposed protocol for evaluation). In response, Unico detailed the bases for its objections to "further unilateral testing" and reiterated its intention to seek a spoliation order from the Panel and requested a Ruling concerning destructive testing and Unico's objection to same.

On May 23, 2023, the Panel ruled that, until the Panel received an application from Unico, it would not consider the spoliation issue, that the Panel had no comment/viewpoint as to the JMB's metallurgist's "proposed protocol" and would leave to Unico whether to comment concerning the protocol, whether to confer with JMB concerning the proposed protocol, and whether to participate in the May 25th viewing or any testing of the pump can casing.

On May 25th, the Panel attended at JMB's metallurgist's facility in Brooklyn to view the pump can casing/its pieces with JMB's counsel and metallurgist/s attending. Unico's counsel and its metallurgist attended remotely. Explanations were provided during the viewing to orient the Panel as to at what it was viewing vis-a-vis the pump can casing when intact. The Panel marked a hand-drawn document of the pump can casing as a Panel Exhibit.

In the midst of multiple hearings in June-July 2023 for testimony of fact and expert witnesses, Unico requested that the Panel issue an Order directing (a) JMB to produce documents which JMB, Unico asserted, volunteered to produce from a witness (Edward Eastlack who had been a maritime consultant involved with ATB 205 before and after JMB assumed ownership of ATB 205), in lieu of the Panel issuing a subpoena (at Unico's earlier request) for documents and

testimony of Mr. Eastlack; (b) that Unico be permitted to re-examine any witness on topics related to such documents; and (c) that JMB bear all costs for any continued testimony.

JMB objected to such an order as documents post-JMB's ownership of ATB 205 were produced while documents pre-JMB ownership were Bouchard documents and were generated within a period of time subject to ongoing litigation and the existence of a contract with Mr. Eastlack containing a confidentiality agreement. JMB also argued that such documents would have been/could have been within the scope of subpoenas issued as to Bouchard and the repair facility where the ATB 205 was located while owned by Bouchard.

The Panel, after considering the arguments of the parties, issued a Ruling that, rather than directing JMB to produce documents from Eastlack, the Panel instead was issuing a subpoena for the pre-August 5, 2021 documents with Unico to insert a return date as agreed by JMB or, if not agreed, a return date of August 29th, and that any ruling by the Panel regarding the re-examination of witnesses would be decided after consideration of the specific request made by Unico.

On July 7, 2023, Unico applied for a Spoliation Order with supporting memoranda and multiple exhibits requesting that the Panel (a) preclude JMB from offering evidence of results of metallurgical/scientific testing of the ATB 205 pump can casing, and (b) draw inferences adverse to JMB ATB 205's "missing" logbook including that the logbook would contain information adverse to JMB's position concerning the "bake-in" of the ATB 205 thermal heating system. Unico also objected to JMB presenting testimony in July by its metallurgist, arguing whether to hear the testimony should be decided after decision of the Spoliation application. Extensive written arguments were presented by the parties concerning moving ahead with expert metallurgical testimony.

On July 13, 2023, the Panel Ordered that: (a) JMB's metallurgical expert promptly testify only as to the issues raised concerning alleged spoliation, (b) Unico provide any response via testimony of its metallurgist or affidavit, and (c) that further written submissions concerning Unico's application be submitted on dates set by the Panel.

The Panel, in the light of a request for clarification from JMB, advised that JMB could opt to submit an affidavit from its metallurgist in lieu of testimony as to spoliation. In August 2023, JMB submitted its metallurgist's declaration and exhibits regarding spoliation (and, upon inquiry by Unico, JMB confirmed the pump can casing pieces were as they were when viewed by the Panel) and its Memorandum in response to the Spoliation Application with appendices.

Unico submitted a Reply with a Declaration (with statements concerning removal of the pump can casing) and a metallurgist's letter responding to JMB's metallurgist's declaration. On September 11, 2023, the Panel issued a Ruling as to Unico's Spoliation Application which, in significant part, found and held:

1. While in the control and/or custody of JMB, the condition and state, if not the nature, of the pump can area of fracture were clearly altered in many ways.

2. Because on the then record the Panel was not able to reach any conclusion as to whether, or to what extent - if any - the altered state and condition of the pump can area of fracture preclude, limit and/or adversely impact additional examination or metallurgical testing that may be performed, the Panel reserved ruling as to whether any adverse inference - due to the change in state and condition of the pump-can - would be warranted to when issuing the Final Award.

3. JMB's failure to preserve the missing ATB 205 logbook was unreasonable and involves a sufficient degree of fault to warrant that when deliberating and issuing a Final Award the Panel, based upon its weighing of the significance and import of relevant credible evidence, consider the nature and extent of any adverse inference against JMB "with respect to the contents of the logbook of the B-205," including whether the logbook "would have had information and evidence concerning the 'bake in' of the [B-205] thermal heating system adverse to JMB's position" and whether "the missing B-205 logbook contained evidence that would be favorable to Unico Marine, and prejudicial to JMB."

The Panel further directed (a) that the parties' experts confer, and (b) that a protocol for testing be developed with attendance of interested persons permitted, to be followed by (c) written reports from each party with opinions and conclusions and any findings as to the extent, if any, the "altered state" of the pump-can casing impacted the further testing, and (d) the Panel then would hear expert testimony from the metallurgists.

Later that September, scheduling issues developed concerning the timing of testing and the ability of metallurgist/s to attend, etc., which led to a September 29th Unico request that the Panel immediately sort out the impasse as an alternative lab to that where the pump-can pieces were located had to be reserved that day for testing. Having considered the multiple emails and arguments, the Panel ruled that the testing take place as per the schedule of the testing facility where the pump-can pieces were located.

The parties exchanged "main reports" and "rebuttal" reports on metallurgical issues. Various disputes ensued thereafter as to timing and handling of requests for particular metallurgical information and dates in January 2024 for hearings for testimony of the metallurgical experts, with Unico suggesting (a) Unico would forego hearings for cross examining metallurgists beyond what was in their reports and (b) earlier and virtual hearings. The parties disagreed on other issues and exchanged multiple emails, including a request that the Panel rule as to a date to hear testimony from JMB's metallurgist.

The Panel subsequently issued a Ruling setting hearing dates for the presentation of testimony on metallurgical issues and the manner in which such testimony would be heard from the witnesses, and, upon inquiry, provided to the Parties clarity as to the expected subjects the metallurgists would be expected to cover.

Scheduling difficulties delayed the hearings for testimony of the metallurgical experts until February 2024. The parties agreed to a schedule for exchange of Main and Reply briefs and a date for the close of evidence.

Unico submitted an exhibit from its metallurgical expert bearing upon testimony by JMB's metallurgical expert. JMB submitted 26 exhibits as to which Unico objected and urged that they not be referenced in the Briefs; and the Panel issued a Ruling extending the deadline for receipt of evidence to provide Unico time to submit any responsive evidence which, upon Unico's request, the Panel further extended. Additional exhibits submitted by both parties led to objections.

The Panel issued a Ruling detailing decisions accepting and rejecting each of the exhibits amongst the ten that JMB submitted.

On April 9, 2024, Unico requested an emergency hearing to explore issues, which according to Unico, arose as a result of the reported sale of JMB Shipping to Centerline. Unico moved to obtain an Order from the Panel directing JMB to provide information and documents concerning the reported sale of JMB Shipping. JMB responded with arguments and explanations which JMB urged required denial of Unico's request. Unico submitted further argument and explanation for its request. The Panel ordered that each party provide responses to specific questions/requests for information addressed to each party.

The Panel directed new dates for the exchange of post-hearing briefs, and thereafter asked for responses from Unico to further questions bearing upon the need for the emergency hearing requested by Unico. Having Unico's responses, the Panel requested JMB to provide responses regarding certain information concerning the involved business entities. The parties exchanged multiple emails arguing their respective positions with Unico requesting discovery as to documentation concerning the corporate transactions.

On April 22, 2024, the Panel issued a ruling finding that because Unico's requests fell outside of what the Panel believed to be appropriate, reasonable, or necessary at the briefing stage of these proceedings (and, at least in part, because Unico's requests concerned entities that were not party to the arbitration or processes the arbitration was concerned), Unico's request for an emergency hearing or documentary discovery was denied.

Unico requested (with reference to Section 9 of the SMA Rules) that, in view of disclosure by JMB of information concerning non-arbitral parties and Unico's understanding that Centerline Logistics Corporation was involved with the arbitration, the Panel provide supplementary disclosures which disclosures the Panel then provided.

The Parties exchanged Main Briefs in early May 2024 and Reply Briefs in the latter part of June 2024.

Promptly after the exchange of Reply Briefs JMB requested that the Panel exclude from the arbitral record Appendices 1, 2 and 3 which accompanied Unico's Reply Brief and exclude references in Unico's Reply Brief to the content of the Appendices.

The parties exchanged multiple lengthy emails arguing their respective positions.

In mid-July 2024, the parties submitted Declarations of counsel to support the parties' claims for attorneys' fees and expenses and, later in July, Replies were submitted.

Unico Requested the Panel to strike and ignore the portion of JMB's Reply (by counsel's Declaration) concerning Sealed Settlement offers. The Panel declined the offer of JMB to submit a response to Unico's objection to a portion of JMB's Reply Declaration.

At the end of July 2024, the Panel issued a Ruling (a) denying JMB's request to exclude from the arbitral Appendices 1-3 and references to it, (b) agreeing to consider a JMB submission addressing (1) Unico arguments in its Reply Brief concerning Appendices 1 through 3 and (2) the prejudice JMB believed would result from the Panel's denial of JMB's request.

On August 8, 2024, JMB made a Letter Submission concerning Unico's Reply Brief – Appendices 1-3.

On August 21, 2024, the Panel declared the proceedings closed and confirmed the Panel had agreed to not request Unico provide a Reply to JMB's Letter Submission concerning Appendices 1-3.

During the arbitration, there were nineteen hearings with testimony presented from 14 witnesses (almost evenly split between expert and fact witnesses). Hundreds of exhibits were introduced. The arbitral record is extensive.

On September 8, 2024, the Panel requested that the parties confer and advise it whether they preferred the Panel to issue a separate Award for each of the three consolidated arbitrations or to issue a "consolidated award" with three Awards each separate from the other within the consolidated Award.

The parties advised that the Panel should "render one decision to address all of the claims, counterclaims, and issues in the consolidated proceeding, but the decision should include a final award for all claims and counterclaims under each of the bareboat charters to reflect the different parties to each of the three contractual disputes."

At the end of September 2024, the Panel requested that JMB supplement its Declaration in support of its claim for attorneys' fees by apportioning the total amongst the three consolidated arbitrations. In early October 2024, JMB provided an allocation via percentages for each of the three arbitrations to be applied to the total claim for attorneys' fees.

Unico requested the opportunity to respond, and the Panel Ruled that Unico could respond only concerning JMB's apportionment percentages and that if Unico's response went beyond apportionment then the Panel would request JMB to make a further submission.

In mid-October 2024, Unico submitted a Declaration by its counsel addressing JMB's apportionment.

In November 2024, the Panel requested that the parties provide Briefs containing "argument as to decisions concerning option/s to extend and calculation of damages - in other words we request a more fulsome treatment of this topic" citing references in the parties already submitted

briefs to SMA Award No. 2427 (*In re M/V "Oak Pearl"*) concerning option/s to extend and calculation of damages.

In early December 2024, the parties submitted supplemental Submissions on Charterparty Extensions and Damages and later in December 2024 the parties submitted Reply submissions on the issue.

The Panel met to deliberate many times over the ensuing months, exchanged emails and memoranda concerning issues and concerning content from the arbitral record and from the many briefs and memoranda submitted by the parties during the arbitration. In the latter part of June 2025, the Panel advised the parties that the Panel had been deliberating and had continued to exchange memoranda and emails as part of its deliberation with the aim of moving toward preparation of the final award.

As can be gleaned from the above summary of the Proceedings (which omits discussion of many rulings and procedural matters), counsel for Unico and for JMB each vigorously and professionally advocated for their clients and thoroughly put forward their clients' evidence and arguments.

### C. Contractual Arrangements: The Bareboat Charters and the Parent (Unico Commodities) Company Guarantee

Although in most respects the three BCs have identical terms, differences exist.

Immediately below we set out particulars of each ATB and for each ATB include terms (relevant to the disputes) from the BC for that ATB when those terms differ from the terms for one or the other or both of the two other ATBs. We then set out the terms common to the three BCs which relate to the parties' disputes and followed by relevant terms of a "Parent [Unico Commodities] Company Guarantee."

#### 1. The ATB 220 BC

The BC for ATB 220 was entered into on May 12, 2021. Unico took possession of ATB 220 on June 28/29, 2021 (date of Protocol of Acceptance and Delivery "The Charterer does hereby accept delivery of the [220] subject to the terms of the Agreement.") at pier #7 in Caddells' shipyard in Brooklyn, New York.

BC terms particular to ABT 220 include:

Quote
VESSEL (Tug and Barge as a unit):
Tug *Morton S. Bouchard Jr.*, 130'x38'x22'. . . built in 2016.
Barge B. No. 220, 400'x78'x34'. . . 110,000 bbl. capacity, Clean Oil capable, built in 1999.
* * *
VALUATION: Tug: $20.0 million. Barge: $25.0 million.
* * *

5. TERM:

(a) Base: The base term of this AGREEMENT shall be from the date of delivery (estimated to be on or about June 1, 2021) for a period of approximately six (6) months, ending on November 30, 2021. The first option period shall be from December 31[**sic**], 2021 ending on May 31, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing base period.
* * *

(c) Additional Option Periods: CHARTERER shall have an option to exercise five (5) additional six (6) month option terms, ending respectively on or about, November 30 2022, May 31, 2023, November 30, 2023, May 31, 2024 and November 30, 2024, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing period. In all cases, the term is subject to earlier termination in accordance with the terms of this AGREEMENT.
* * *

6. CHARTER HIRE:

For the base term and first option period, if exercised by CHARTERER, of this AGREEMENT, Charter Hire shall be $6,500.00 USD per calendar day or part thereof, payable monthly in advance on the first day of each month, or if the 1st falls on a non-banking day, the last banking day of the previous month, by CHARTERER to OWNERS, commencing on the date of delivery of the VESSEL to CHARTERER. . . . .

Unquote

### 2. The ATB 284 BC

The BC for ATB 284 was entered into on May 12, 2021. Unico took possession of ATB 284 on June 28/29, 2021 (date of Protocol of Acceptance and Delivery "The Charterer does hereby accept delivery of the [284] subject to the terms of the Agreement.") at pier #7 in Caddell's shipyard in Brooklyn, New York.

BC terms particular to ATB 284 include:

Quote

VESSEL (Tug and Barge as a unit):

Tug *Denise A Bouchard*, 112'x35'x17'. . . built in 2014.

BargeB. No. 284, 399'x74'x28'. . . 80,000 bbl. capacity, Clean Oil capable, built in2009.
* * *

VALUATION: Tug: $20.0 million. Barge: $28.0 million.
* * *

5. TERM:

(a) Base: The base term of this AGREEMENT shall be from the date of delivery (estimated to be on or about June 1, 2021) for a period of approximately six (6) months, ending on November 30, 2021. The first option period shall be from December 1, 2021 ending on May 31, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing base period.
* * *

(c) Additional Option Periods: CHARTERER shall have an option to exercise five (5) additional

six (6) month option terms, ending respectively on or about, November 30 2022, May 31, 2023, November 30, 2023, May 31, 2024 and November 30, 2024, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing period. In all cases, the term is subject to earlier termination in accordance with the terms of this AGREEMENT.
* * *

6. CHARTER HIRE:

For the base term and first option period, if exercised by CHARTERER, of this AGREEMENT, Charter Hire shall be $9,500.00 USD per calendar day or part thereof, payable monthly in advance on the first day of each month, or if the 1st falls on a non-banking day, the last banking day of the previous month, by CHARTERER to OWNERS, commencing on the date of delivery of the VESSEL to CHARTERER. . . . .
Unquote

### 3. The ATB 205 BC

The BC for ATB 205 was entered into on May 5, 2021. Unico took possession of ATB 205 on August 18, 2021 (date of Protocol of Acceptance and Delivery "The Charterer does hereby accept delivery of the [205] subject to the terms of the Agreement.") at a pier in Staten Island, New York.

BC terms particular to ATB 205 include:

Quote
VESSEL (Tug and Barge as a unit):
Tug *Linda Lee Bouchard*, 130'x38'x22'. . . built in 2006.
Barge B. No. 205, 430'x79'x34'. . . 110,000 bbl. capacity, Asphalt / Black Oil capable, built in 2006.
* * *

VALUATION: Tug: $30.0 million USD. Barge: $25.0 million USD.
* * *

5. TERM:

(a) Base: The base term of this AGREEMENT shall be from the date of delivery (estimated to be on or about June 30, 2021) for a period of approximately six (6) months, ending on December 31, 2021. The first option period shall be from January 1, 2022 ending on June 30, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing base period.
* * *

(c) Additional Option Periods: CHARTERER shall have an option to exercise five (5) additional six (6) month option terms, ending respectively on or about, December 31 2022, June 30, 2023, December 31, 2023, June 30, 2024 and December 31, 2024, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing period. In all cases, the term is subject to earlier termination in accordance with the terms of this AGREEMENT.
* * *

6. CHARTER HIRE:

For the base term and first option period, if exercised by CHARTERER, of this AGREEMENT, Charter Hire shall be $8,600.00 USD per calendar day or part thereof, payable monthly in advance on the first day of each month, or if the 1st falls on a non-banking day, the last banking day of the previous month, by CHARTERER to OWNERS, commencing on the date of delivery of the VESSEL to CHARTERER. . . .
Unquote

Amendment (dated May 12, 2021) of ATB 205 BC:
Quote
The text of Section 18 of the [BC] shall be amended to read as follows:
18. ASSIGNMENT AND SUBCHARTER:
CHARTERER shall neither assign [nor novate] this AGREEMENT nor sub-bareboat the VESSEL. CHARTERER may time, voyage or spot charter the VESSEL, and issue contracts of affreightment, provided the CHARTERER remains fully responsible for the obligations of this AGREEMENT.
Unquote

      *4. Relevant (selected) BC clauses common to the BCs for ATBs 205, 220 and 284:*

3. PORT OF DELIVERY
The OWNERS shall deliver the VESSEL at New York Harbor, New York, New York . . . .
4. PORT OF REDELIVERY:
The CHARTERER shall re-deliver the VESSEL at New York Harbor, New York, New York, USA on or about the dates set forth herein at such readily accessible safe berth or mooring as mutually agreed by the parties hereto.
The CHARTERER shall keep the OWNERS informed of the VESSEL'S itinerary for the voyage leading up to redelivery and shall serve the OWNERS with written approximate/definite notices of the VESSELS re-delivery at 45, 30, 15 and 3 days prior to such re-delivery.
* * *
5. TERM
* * *
(e) OWNERS shall use commercially reasonable efforts to deliver the VESSEL on or about June 1, 2021; however, in the event that the OWNERS cannot deliver the VESSEL on or before July 31, 2021, CHARTERER shall have the right, but not the obligation, to terminate this AGREEMENT.
* * *
6. CHARTERHIRE
* * *
(a) The CHARTERER shall pay hire due to OWNERS punctually in accordance with the terms of this AGREEMENT. If the CHARTERER fails to make punctual payment of hire due, the OWNERS shall give the CHARTERERS three (3) banking days written notice to rectify the failure, and when so rectified within those three (3) banking days following the OWNERS' notice, the payment shall stand as punctual.
* * *
7. SEAWORTHINESS/SURVEY
(a) The OWNERS warrant that at the time of delivery the VESSEL shall be seaworthy and in every respect ready in tanks, hull, machinery and equipment for the service intended under this

AGREEMENT and in accordance with the specifications provided in Exhibit A. Should any latent defect, that could not be reasonably discovered during the joint survey set forth in Article 7(c) below, pre-existing delivery render the VESSEL unseaworthy within one (1) year of delivery of the vessel, the VESSEL shall be deemed off hire until OWNERS, at their sole cost and expense, resolve the issue and make the VESSEL in every respect ready in tanks, hull, machinery and equipment for the service intended under this AGREEMENT and the VESSEL returned to the location where the VESSEL was put off hire, unless otherwise agreed.
(b) Prior to and following execution of this AGREEMENT, CHARTERER shall have reasonable opportunity to inspect the VESSEL to confirm the OWNERS' work to make the VESSEL seaworthy and, in every respect, ready in tanks, hull, machinery and equipment for the intended service.
(c) Prior to delivery, CHARTERER and OWNERS shall appoint a mutually acceptable qualified marine surveyor to determine and provide written reports on the condition of the VESSEL (including exterior hull and internal inspection of the void tanks to establish the existence, or lack thereof, of any significant indentations; and, tank compartments to establish the condition of the tank-bottom of the VESSEL) together with its equipment, appliances, machinery, spares and all consumable stores on board at the times of delivery and redelivery hereunder. It is agreed between the parties hereto that the survey reports shall be taken as conclusive evidence of the condition of the VESSEL and its equipment on delivery and redelivery.
(d) The CHARTERER and the OWNERS respectively shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the VESSEL at the then current market prices at the points of delivery and redelivery, respectively. The CHARTERER shall ensure that all spare parts listed in the inventory and used during the Term are replaced at its expense prior to redelivery of the VESSEL. OWNERS shall have the right at any time after giving reasonable notice to CHARTERER and without unduly interfering with the VESSEL's commercial operations, to inspect or survey the VESSEL or to instruct a duly authorized surveyor to carry out such survey on its behalf.
(e) In the event that the survey conducted in preparation for delivery under Article 7(c)and/or the inspections of OWNERS' and/or CHARTERER's employees and agents conducted simultaneously thereto, discover a condition that is unacceptable to CHARTERER, then the OWNER of that particular vessel shall repair or correct such condition at its expense. However: if the cost to repair or correct such condition is so onerous as to materially affect the OWNERS' anticipated financial return, then such OWNERS shall, at their sole option, have the right, but not the obligation to terminate this AGREEMENT without further liability. In like manner, if the repair or correction as proposed or as executed by OWNERS is not in accordance with generally accepted marine standards or is not approved by the applicable regulatory body or OWNERS' classification society, then CHARTERER shall have the right, but not the obligation, to terminate this AGREEMENT without further liability.
* * *

8. DELIVERY AND ACCEPTANCE
Subject to determination under Articles 5(c) and 7(a), the VESSEL shall be delivered by OWNERS and accepted by CHARTERER at the place indicated in Article 3. The delivery of the VESSEL by OWNERS to the CHARTERER and the acceptance of the VESSEL by CHARTERER, subject to any reasonably undiscoverable latent defect as described in Article 7(a), shall establish conclusively that CHARTERER has inspected or has caused to be inspected

(or has elected to waive inspection) the VESSEL and has found the VESSEL to be clean, tight, staunch, strong, and in all respects seaworthy, and in all respects fit for the work and service intended by CHARTERER.
* * *

9. OPERATION, MANAGEMENT AND CONTROL

OWNERS, upon delivery, shall relinquish complete possession, direction and control of the VESSEL over to CHARTERER; and throughout the term of this AGREEMENT, CHARTERER shall have the full use and exclusive possession, direction and control of the VESSEL. This AGREEMENT shall not constitute a transfer of OWNERS' ownership of the VESSEL and CHARTERER shall be regarded as the owner *pro hac vice* solely with respect to liability to any third party.
* * *

10. MAINTENANCE

During the term of this AGREEMENT, CHARTERER, at its sole cost and expense, shall maintain, service, repair and preserve the VESSEL and its equipment in accordance with good commercial maintenance practices . . . and in substantially the same condition as when received from the OWNER, ordinary wear and tear excepted. . . . .
* * *

16. REDELIVERY

Upon expiration or termination or cancellation of this AGREEMENT, or upon default of CHARTERER resulting in termination of this AGREEMENT, CHARTERER shall, at its sole cost and expense, redeliver the VESSEL to OWNERS at OWNERS' designated place of redelivery, and said VESSEL shall be redelivered to the OWNERS in the same good order and condition as that in which the VESSEL was delivered, ordinary wear and tear excepted. Necessary cleaning of the VESSEL, and the removal and disposal of all debris and pumpable cargo from the VESSEL, shall be the responsibility of CHARTERER at CHARTERER's sole cost and expense. For the avoidance of any doubt, notwithstanding any terms herein to the contrary, on redelivery, the VESSEL tanks to be returned in substantially the same condition as they were on delivery, ordinary wear and tear excepted.

17. COMPLIANCE WITH LAWS, TAXES, FINES, ETC.

During the term of this AGREEMENT, CHARTERER, at its sole cost and expense, shall cause the VESSEL to at all times comply with all applicable federal, state, regional, county and municipal statutes, ordinances, rules and regulations pertaining to the use, employment, possession, operation, navigation, maintenance, management or the work of the VESSEL, and CHARTERER shall have on board the VESSEL, when required thereby, valid certificates showing such compliance. CHARTERER shall pay and discharge all taxes, assessments, excises, levies, duties, port charges, wharfage charges, waterway tolls, pilotage and harbor fees, fines, penalties and any other governmental charges (whether federal, state, regional, county or municipal) lawfully imposed upon CHARTERER or upon the VESSEL; and CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement o f attorneys' fees and costs) OWNERS and the VESSEL against any and all claims, demands, causes of action, judgments, liens, and liabilities for such taxes, assessments, excises, levies, duties, port charges, wharfage charges, waterway tolls, pilotage and harbor fees, fines, penalties or other governmental charges in any way connected with the VESSEL or its use, employment, possession, operation, navigation, maintenance, management or work by CHARTERER. . . .

## 18. ASSIGNMENT AND SUBCHARTER

CHARTERER shall neither assign nor novate this AGREEMENT nor sub-bareboat the VESSEL. CHARTERER may time, voyage or spot charter the VESSEL, and issue contracts of affreightment, provided the CHARTERER remains fully responsible for the obligations of this AGREEMENT.

## 19. LIENS AND MORTGAGES

(a) Neither CHARTERER nor any other person shall have the right, power or authority to create, incur or permit to be placed or imposed upon the VESSEL any lien or encumbrance whatsoever. CHARTERER shall not cause or permit any lien or encumbrance against the VESSEL or any arrest or seizure or detainment of the VESSEL, and CHARTERER, at its sole cost and expense, shall immediately remove or cause to be removed any such lien, arrest, seizure or detainment, unless such claim of lien is reasonably challenged and substitute security posted to permit the release of the VESSEL from such arrest, seizure or detainment. . . .
* * *

## 20. TERMINATION AND DEFAULT

If CHARTERER shall fail to pay any charter hire due for more than three (3) banking days after the due date thereof (subject to notice and cure period), or if CHARTERER shall fail to perform or comply with any other material provision of this AGREEMENT, particularly, but not limited to CHARTERER's obligations under Article 15 (upon Notice and ten (10) calendar days' cure period), then OWNERS may, at their option, withdraw the VESSEL from the service of the CHARTERER and terminate this AGREEMENT by giving written notice to CHARTERER, without prejudice to any claim for damages suffered or to be suffered by reason of the CHARTERER's default (including reimbursement of attorneys' fees and costs) which OWNERS might otherwise have had against CHARTERER in the absence of such withdrawal; and upon giving such notice or at any time thereafter, OWNERS may retake possession of the VESSEL, wherever found, without prior demand and without legal process, and for that purpose OWNERS and/or their authorized representatives, including any court appointed custodians or substitute custodians, may enter upon any dock, pier, fleet or other premises where the VESSEL may be or may take possession thereof.

If OWNERS shall fail to perform or comply with any provision of this AGREEMENT, particularly, but not limited to OWNERS' obligations under Article 15 herein, then CHARTERER may, at its option, after written notice to OWNERS and an opportunity for OWNERS to cure the default within ten (10) days of such notice, redeliver or abandon the VESSEL and terminate this AGREEMENT by giving written notice to OWNERS, without prejudice to any claim for damages suffered or to be suffered (including reimbursement of attorneys' fees and costs) by reason of the OWNERS' default which CHARTERER might otherwise have had against OWNERS in the absence of such redelivery or abandonment.
* * *

## 23. NOTICES

All Notices and other communications under this AGREEMENT shall be in writing and shall be by mail (certified-return receipt requested) addressed as follows:
If notice is to CHARTERER:
Unico Marine
3773 Richmond Avenue, Suite 565
Houston, Tx, 77046

Attn. Riccardo Valentini
Email: rvalentini@unico-commodities.com
If notice is to OWNERS:
[name of relevant barge owner]
Tug [name of relevant ATB tug owner]
c/o Bouchard Transportation Co., Inc.
58 South Service Road, Suite 150
Melville, New York 11747
Attn: Matthew Ray
Email: mray@pppllc.com
* * *

24. APPLICABLE LAW/FORUM SELECTION/INTEGRATION
The terms and conditions of this AGREEMENT, and the rights and obligations of the parties
hereunder, shall be governed by and construed in accordance with the general maritime law of
the United States; and any controversy, claim, dispute, or demand arising out of this
AGREEMENT shall be brought in arbitration in accordance with the rules of the Society of
Maritime Arbitrators, Inc. in New York, NY before a panel of three arbitrators. A party wishing
to refer a dispute to arbitration shall appoint its arbitrator and send a notice of appointment in
writing to the other party requiring the other party to appoint its own arbitrator within 14
calendar days after receipt of the notice. The two arbitrators so chosen shall choose a third
arbitrator. The award of two of the three arbitrators so chosen shall be binding on both parties.
No prior written or oral understanding shall control and this AGREEMENT contains the entire
understanding between the parties hereto regarding the charter memorialized herein.

25. DUE DILIGENCE
OWNERS shall have the right to conduct a financial and safety management system due
diligence examination of CHARTERER to ensure that CHARTERER has the financial
wherewithal to meet its financial and safety management obligations under this AGREEMENT
prior to entering into this AGREEMENT. CHARTERER agrees to cooperate in such
examination and produce and provide all reasonable, non-propriety documentation or other
information requested.

26. EMPLOYMENT OF BOUCHARD CREW MEMBERS
CHARTERER agrees to offer employment to Bouchard crewmembers to man and operate the
VESSEL on the following basis. CHARTERER will solicit and accept applications for
employment from Bouchard crewmembers, particularly those with experience on the VESSEL.
CHARTERER will review and process all such applications received by it in accordance with its
standard hiring practices and protocols. Applicants who are deemed to be qualified and
acceptable to CHARTERER will be offered employment. . . .

27. ADDITIONAL CLAUSES
(a) On or before delivery of the VESSEL to CHARTERER, 0WNER will furnish to
CHARTERER a United States Coast Guard Certificate of Inspection ("COI"), a Certificate of
Class (with a remaining duration that is acceptable to CHARTERER) and Load Line Certificate;
* * *

(f) Brokerage commission of 2.5% commission payable to Braemar ACM Shipbroking Inc.,
Houston TX on all bare boat hire paid is to be paid by CHARTERER and deducted from Charter
Hire.

### 5. Relevant (Selected) Clauses from Unico's Parent Company Guarantee

This Guarantee is made this 14th day of June, 2021 by Unico Commodities LLC, Inc. . . . ("Parent Company"), in favour of [Owners of ATBs 205, 220 and 284] ("the Owners"). WHEREAS

Unico Marine, a wholly owned subsidiary of Parent Company . . .("Charterer") and the Owners have entered into bareboat charterparties dated May 5 and 12, 2021 . . . ("the Charterparties") . . . IT IS AGREED [that]

1. The Parent Company hereby irrevocably and unconditionally guarantees, for the benefit of the Owners, the performance of each and every obligation arising on the part of the Charterer under the Charterparties respectively.

2. The Parent Company hereby irrevocably and unconditionally agrees, for the benefit of the Beneficiary, to make payment to the Owners in respect of any monies owed but not paid when due by the Charterer to the Owners respectively as obliged under the Charterparties.

3. If the Charterer fails to pay such sums due under the Charterparties by the time required, the Owner(s) shall notify the Parent Company of such non-payment and demand in writing payment of the said amount. The Parent Company shall cause such payment to be made to the respective Owner(s) within five (5) business days of receipt of such demand.

4. The rights and remedies of the Owner(s) under this Guarantee shall be cumulative and not exclusive of any rights or remedies which it would otherwise have in law, in admiralty, in equity and/or under the terms of the aforementioned Charterparties, and no failure or delay by the Owner(s), in exercising any such rights shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

5. Any demand hereunder may be delivered or sent by mail to Parent Company at its registered office at 3773 Richmond Avenue, Suite 565, Houston, TX 77046, attention Riccardo Valentini, with copy by email to rvalentini@unico-commodities.com or to such other address and/or addressed to such other officers as may be provided in writing by the Parent Company to the Owners for such purpose and shall be deemed to have been made when such notice is received by the Parent Company.

6. This Guarantee shall be governed by and construed in accordance with the laws of New York and each of the Parent Company and the Owners irrevocably agree that the state or federal courts located in New York, NY shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Guarantee.

*[Signatures]*

## II. SUMMARY OF THE FACTS

### A. Facts Common to ATBs 205, 220 and 284

In September 2020, Bouchard retained Portage Point Partners ("PPP") as a restructuring advisor before, the same month, seeking relief under Chapter 11 of the U.S. Bankruptcy Code in federal court at which time Bouchard owned some 49 vessels (a mix of tugs and barges) which were not in commercial service though some were crewed, others laid-up, some abandoned. In February

2021, the Court appointed M. Ray, Managing Partner of PPP, as Chief Restructuring Officer of Bouchard, and PPP's S. Shenker became Deputy Restructuring Officer of Bouchard. From March through May 2021, Bouchard-PPP made efforts to carry out repairs and return to service Bouchard vessels and ATBs with some of those efforts extending into August 2021.

In April 2021, Bouchard-PPP, via S. Shenker and maritime counsel, negotiated bareboat charter/s with tug and barge operator Vane Brothers with its broker Braemar, but the deal was not concluded because the American Bureau of Shipping would not class the Bouchard vessels. In May 2021, using the bareboat charter terms first negotiated with Vane Brothers, broker Braemar (whose R. Jurewicz testified) was involved in negotiations between Bouchard-PPP, via S. Shenker and maritime counsel, and Unico's R. Valentini to bareboat charter Bouchard ATBs 205, 220 and 284. Shenker negotiated the key business terms and economic points (charter hire, charter term, rights and remedies under default, delivery of the ATBs, valuation) and Bouchard-PPP's retained maritime counsel handled legal terms and documentation.

The BCs were agreed/entered into on May 5th (ATB 205) and May 12th (ATBs 220 and 284).

The discussions of the arrangements initially concerned only ATB 205 in which Unico/Valentini was particularly interested. When broker Braemar/Jurewicz then presented ATBs 220 and 284, Unico/Valentini again became interested, particularly in ATB 220, but because Bouchard-PPP/Shenker would not agree to, for example, a bareboat charter of ATB 220 to Unico without ATB 284 also being included, ATBs 220 and 284 were viewed as a "package deal." Broker Braemar/Jurewicz observed that although each of the bareboat charters originally were separately negotiated, PPP/Shenker "lump summed" ATB 220 (including 110,000 Bbl. barge) and ATB 284 (including 80,000 Bbl. barge) with charter hire at $15,000/day, but when Shenker provided the contracts, he "made a mistake" by setting the ATB 220/*110,000 Bbl.* at $6,500/day in one BC and the ATB 284/*80,000 Bbl.* at $9,500/day in another BC, thereby making the ATB 220 an attractive deal for Unico and the ATB 284 a less attractive deal for Unico at an uneconomical rate. Unico made a strategic business decision to bareboat charter the ATB 284 in order to get ATB 220.

Near the end of May 2021, the U.S. Bankruptcy Court authorized and approved Bouchard to bareboat charter the three ATBs to Unico, and Bouchard initiated a process to auction its assets. On June 9th, the Court set dates for bids (July 16th) and an auction (July 19th) of the Bouchard vessels that Bouchard-PPP controlled (which totaled 47 vessels at that time).

Beginning in May, Bouchard-PPP carried out a "Know Your Customer" ("KYC") process, largely after the early-mid May signing of the BCs, to ascertain the bona fides of Unico which, amongst other things, revealed that Unico was a newly formed subsidiary of Unico Commodities. Obtaining "due diligence" documents from Unico took a while, and there were short falls in what was provided with result that - before delivery of any of the ATBs to Unico - Bouchard-PPP required a parent guarantee "to ensure some sort of financial safety and stability given that [Bouchard-PPP] found out that Unico Marine was actually a new entity and had no financials."

On June 14, 2021, Unico Commodities provided a "Parent Company Guarantee" in favor of Bouchard who was the registered Owner of ATBs 205, 220 and 284 at that time.

In anticipation of the July 2021 auction, Bouchard-PPP/Shenker engaged with potential bidders, and, at Shenker's request, Unico agreed Shenker could provide the unredacted copies of the Bouchard-Unico BCs for the three ATBs to competitors operating tugs and barges in the Jones Act/U.S. Coastwise trade including Centerline, Rose Cay, Marathon and, seemingly as well, Vane Brothers (as well as to Hartree, a financial entity) – the three ATBs were included in the 47 vessels to be auctioned.

Shenker communicated by telephone and/or email and/or in-person communications with Centerline (Godden and Paige and "Rachel") and Rose Cay (Parker and Parrott and Bixby) and Marathon as part of each of those companies performing due diligence inquiry before, potentially, bidding on any of the 47 Bouchard vessels to be auctioned.

For the July 19, 2021 auction of Bouchard assets, a "stalking horse" bidder (Hartree), Centerline, and JMB Capital Partners Lending LLC ("JMB Capital") were the only bidders for the group of Bouchard vessels which included ATBs 205, 220 and 284 then under BCs with Unico. JMB Capital's $115.3 million bid was successful for 29 units: 17 tugs and 12 barges which included the ATBs 205, 220 and 284.

Rose Cay's bid was successful for some 18 units (split about evenly between tugs and barges). Although the auction arrangements were such that the successful bidder for ATBs 205, 220 and 284 did not have to take ATBs 205, 220 and 284 with the Bouchard-Unico BCs (which would have been cancelled), JMB Shipping opted to do so, and through its counsel, advised Unico on July 20th.

On August 5th, the U.S. Bankruptcy Court authorized the sale of the 29 units and assets to JMB, and under a Transition Services Agreement between Bouchard and JMB Shipping, from August 5 to September 3, 2021, PPP provided services to JMB Shipping.

On August 12th, JMB Shipping advised Unico that, as of August 5th, the ATBs were acquired by JMB Shipping. JMB Shipping LLC entities (JMB Shipping ATB 205 LLC, JMB Shipping ATB 220 LLC and JMB Shipping ATB 284 LLC) assumed each of the BCs with Unico. This left JMB Shipping with 14 other tugs and 9 other barges with which to deal.

In July, August, September and October 2021, PPP's Shenker was in communication with Centerline. After the July auction and/or end August/early September 2021, JMB negotiated a bareboat charter with Centerline for a vessel, sold vessels to Centerline, and bareboat chartered an ATB to Centerline.

On June 28/29, 2021, Unico took delivery from Bouchard of ATBs 220 and 284, signing Protocols of Acceptance and Delivery accepting delivery subject to the terms of the BCs at pier #7 in Caddell Drydock & Repair Company shipyard ("Caddell's") in Brooklyn.

On July 27, 2021 Bouchard-PPP presented to Unico invoices for charter hire for August for ATBs 220 and 284. Payment was not received when due (Friday, July 30 – as the hire due date of the first day of the month, 1st of August, was not a banking day, hire was due the last banking day of the prior month), and Bouchard-PPP/Shenker emailed Unico/Valentini on August 1st and August 3rd requesting that Unico remit payment. Unico paid the hire.

On August 23, 2021, JMB/Shenker emailed to Unico invoices for the September charter hire for ATBs 205, 220 and 284.

On August 24th in an SMS text, Unico/Valentini advised JMB/Shenker: "Steven we are [having] problems moving the 284. Is too expensive and there are too many 80k bbl on the market that sell below our daily cost. We would return it sept 1st and concentrate on 205 and 220. The timing on the 205 didn't help the cash flow of marine and we cannot get more funds out from my trading unit into marine. . . ."

JMB/Shenker responded: "[T]he idea of 'returning it on September 1st' is a bit of a disconnect from your contract. The 220 and 284 were also a combination deal, otherwise the rate on the 220 would've been higher. I would suggest you work on a constructive proposal that I can work with you and the owners on rather than suggesting a default on your contractual duties."

Valentini then SMSed: ". . . If you can lower the rate to 5k on the 284 and you guys can negotiate insurance directly and pass us the cost it will be substantially lower than what we are paying - but at this rate I am not competitive hence will have to return it . . . ." Shenker responded: ". . . you have a contractual duty on the 284 with a term through the first 6 months and a corporate guarantee from your parent trading company. My suggestion to you is if you want to negotiate a new deal with the owners, you don't open the conversation by threatening to return a boat that you have a contractual duty on."

On August 31st, JMB/Shenker emailed Unico reminding Unico that payment of the invoices was due "tomorrow." In a responsive August 31st SMS message to JMB/Shenker, Unico/Valentini advised that Unico "may have one/two days delay on the payment" as Unico was awaiting payment to it by two other companies. JMB/Shenker and Unico/Valentini exchanged a series of SMS messages concerning the payment situation. Hire for ATB 205 was remitted by Unico at the end of day Friday, September 3rd.

On September 7th, JMB emailed Unico advising that the September charter hire for ATBs 220 and 284 was still awaited, and Unico/Valentini responded that Unico "had some delay with payments coming from our clients."

JMB's Chief Investment Officer V. Tandon then emailed Unico/Valentini: "Per Section 6(a) of each of the attached agreements, this email shall serve as formal notice of the failure to make timely payments. Please be guided accordingly." Tandon followed that with a second email about two hours later:

> Per Section 6(a) of each of the Bareboat Charter Agreements for the Morton S. Bouchard Jr./Barge 220 and the Denise A. Bouchard/Barge 284, this email shall

serve as formal notice of the failure to make timely payments. Please be guided accordingly. Re-sent without the attachments as the last email bounced back.

Two hours later, Unico/Valentini responded by email complaining about the ATB 205 tug and the need to adjust invoicing for the tug, indicating that vetting of ATBs was challenging due to Bouchard's "name and history," noting and providing details of the amounts of money Unico/Valentini spent on the ATBs vessel/tugs and that the ATBs were on a rotation with planned voyages and that:

> . . . even with all the problem [the ATBs] gave us so far . . . we are sure that starting next month we will have all in place to have payments on time, but if you don't care or cannot wait a couple of days more we understand, and we will protect our interest and our money as well.

On the following morning of September 8th, JMB responded stating, in part:

> We look forward to a long partnership. The notice serves to give you three business days to make the required payments, which gives you the requested couple of days. To address several of the other points referenced in your email: JMB does not agree [ATB 205 is] off hire yet and no invoices have been provided to support reducing the charter rate . . . .

Near the end of business hours on September 8th, Unico/Valentini emailed JMB:

> UNICO also looks forward to a long-term partnership with JMB. While UNICO has every intention to fulfill its commitment, there are some key matters we need to address in the coming days, as stated in my [earlier email] that constrains our immediate commitment in meeting the stipulated payment deadline. . . .
> Similar to your reference to the Bareboat Charter Agreement, Section 6(a), in providing UNICO with the Notice of failure to make time payments on September 7 last, we also refer to the complete wording of Section 6(a) that states that if UNICO make payments within the coming three banking days as of September 7, 2021, OWNERS' notice, the payment shall stand as punctual. . . .
> However, UNICO will also refer to Section 20 of the [BC] stating that we will request a curing period of maximum 10 days past the 3-days' Notice to rectify the failure up to September 19, 2021.
> Again, UNICO like to state that we are looking forward to a longstanding relationship.

Within 30 minutes, JMB responded:

> . . . Section 20 . . . says that there is a three banking day cure for payments and ten calendar day cure for Article 15 issues; it does not say that there is an option for three banking days plus ten calendar days for late payments. JMB asks that Unico stays to the three banking days outlined in the agreement.

Within a half hour, Unico/Valentini responded:

Jeff, I am not a lawyer but it should be pretty clear:
"CHARTERER shall fail to perform or comply with any other material provision
of this AGREEMENT, particularly, but not limited to [red in original]
CHARTERER's obligations under Article 15 (upon Notice and ten (10) calendar
days' cure period)" meaning that doesn't cover only art 15 but the entire
agreement hence the [hire] payments.
So the 10 days cure after the 3 days notice is for ANY OTHER MATERIAL
PROVISION OF THIS AGREEMENT. Art 20 is also reciprocal for both
charterer and owner; 10 days cure after the 3 days notice, and this was
negotiate[d] between both parties.

Within an hour that evening, JMB/Tandon responded:

The actual language with the word "or".
20. TERMINATION AND DEFAULT: If CHARTERER shall fail to pay any
charter hire due for more than three (3) banking days after the due date thereof
(subject to notice and cure period), or if CHARTERER shall fail to perform or
comply with any other material provision of this AGREEMENT, particularly, but
not limited to CHARTERER's obligations under Article 15 (upon Notice and ten
(10) calendar days' cure period), then OWNERS may, at their option, withdraw
the VESSEL from the service. The section says any "other" material provision.
Meaning other than payment.

Within about an hour Unico/Valentini responded:

I think we can leave to arbitration to decide but "or" means "either/or". Meaning
payment OR any other cause....why would be excluded the payment without spell
out in the verbiage that payment is not part of the 10 days cure?? Why leave so
ambiguous? And our view is that is not ambiguous because it does refer to
payment OR any other....
But again English is not my first language, so maybe I am wrong, but we can get
on a call with lawyers if you guys prefer or straight with arbitration
Let us know.

Afterward that same evening JMB's Tandon emailed Shenker, M. Ray and a third PPP
colleague: "Get my boats back please."

In response, early the following morning of September 9th, Shenker emailed Tandon (with copies
to PPP colleagues and outside counsel):

Was looking at the contracts again this morning before talking to Riccardo
[Valentini]. The language in P20 regarding event of default is crystal clear to me
with regard to the 3 day cure period for payment and the 10 day cure for
everything else.
With regard to the parent guarantee (attached), P1 guarantees all terms of the

charter agreement, so if this did turn into a legal battle, I think the parent would be
on the hook.
P3 though gives the parent company an additional 5-day window to make
payment (if demanded by Owner) on Marine's behalf.
Assuming today's conversation does not go well (and even if it does), it may
make sense to just serve up the notice to parent company today to start that clock.
This way Friday they are in default and next Thursday parent company is as well.

A few hours later on September 9th, JMB/Shenker emailed Unico/Valentini:

Per Article 3 of the attached parent guarantee, this email shall serve as formal
notice to Unico Commodities LLC Inc. . . . that Unico has failed to make timely
payments under each of the [BCs] for [ATBs 220 and 284]. Please be guided
accordingly.

Shenker then later advised Tandon and others: "I spoke to Riccardo [Valentini]. He says he is
still planning to pay tomorrow. . . ." Late that evening, Tandon responded to Shenker: "He just
emailed saying he won't pay tomorrow. Thinks he has 5 more days. He doesn't. Money tomorrow
or I seize the boats."

On Friday, September 10th, Unico wired and JMB received the September hire for ATBs 220 and
284.

On September 16th, Unico/Valentini and JMB/Shenker exchanged SMS texts concerning ATB
284 and reconfiguring the contractual arrangements:

Valentini: ". . . waiting for the proposal on the lower rate for 284 as per our
conversation. . . ."
Shenker:   ". . . The conversation was around a total redo of all three contracts
bringing them under one contract . . ."
Valentini: ". . . Ok so that we decide what to do when 6 month end [a]t least with
that [284] unit. . ."
Shenker:   ". . . You didn't buy yourself much goodwill with ownership with the
September payment stunt, so I would suggest letting a month go by
without incident prior to bringing up this restructuring of the contracts
again."
Valentini: "We will keep working as agreed but please know that we will return
the 284 if by then we won't get in agreement for a lower payment. . ."

On September 23, 2021, JMB/PPP/Shenker emailed Unico/Valentini invoices for the October
hire for each of the three ATBs "due on October 1, 2021."

After banking hours on Friday, October 1st, JMB/PPP/Shenker emailed Unico/Valentini:

Ricardo,
Per Section 6(a) of each of the Bareboat Charter Agreements for the [three

ABTs], this email shall serve as formal notice of the failure to make timely payments.
\* \* \*
Please be advised accordingly.
Best, Steven
\* \* \*

Late afternoon, October 4th, Unico/O'Toole emailed JMB with copies to Unico and JMB:

> Unico Marine Services LLC will be redelivering ATB 284 tomorrow at the designated Port Of New York. We will be arranging Amspec to conduct a bunker and lube survey, please advise any objections to this.
> We are continuing to inventory the vessel and will provide back up for the final hire settlement in due time.
> . . . Kindly take note that Owners have an absolute duty to mitigate any damages by re-chartering the VESSEL as soon as possible.

In a letter from JMB's lawyer "via email" to Unico's lawyer, R. Gorman, dated October 5th, JMB rejected Unico's declaration that ATB 205 is off-hire, that "charter hire remains past due," that Unico thereby is in default of its obligation to pay hire, that JMB received no response to JMB's "proposed terms to terminate all three charterparties and permit Unico to redeliver all three ATB units", and that JMB "expects either (1) payment of the outstanding charter hire amount or (2) acceptance of [the] proposal to wind down the three charterparties, in either case no later than tomorrow, October 6, 2021."

On October 6th, JMB/PPP/Shenker emailed Unico/Valentini:

> Per paragraph number three (3) of the attached parent guarantee from Unico Commodities, this email shall serve as formal notice to Unico Commodities LLC, Inc., Parent Company guarantor to Unico Marine, that Unico Marine has failed to make timely payments under each of its Bare Boat Charter Agreements for [ATBs 205, 220 and 284]. Please be guided accordingly.

On Friday, October 8th, Unico/Valentini emailed JMB/Shenker that:

> [I]n response to your notice below dated October 6th 2021, we hereby confirm that Unico Commodities was able to secure funds for Unico Marine honoring its parent guarantee (5 business days from such notice) and payment was issue by Unico Marine directly.
> . . . Such payment [of $196,462.50] is to be intended for the hire of [ATB 220].
> As far as the other two units please we would like to remind you that:
> [ATB 284] has been already re-delivered to JMB
> [ATB 205] is Off Hire for latent defects and currently under litigation . . .

JMB and Unico then argued about whether under the wording of the Parent Guarantee and BC terms the $196,462.50 payment under the parent guarantee cured Unico's failure to earlier pay hire for ATB 220 with JMB lawyers stating:

29

> [U]pon being put on notice by JMB Shipping of this failure, [Unico] failed to cure
> the default within three banking days (through close of banks on Wednesday,
> October 6, 2021) in further violation of the terms of the Bareboat Charter
> Agreement. Accordingly, JMB Shipping continues to reserve all its rights against
> Unico Marine under the Bareboat Charter Agreement.

On October 7th, JMB commenced proceedings in federal court in Louisiana and there arrested
ATB 205 based upon alleged failure of Unico to timely pay hire and "fundamental breaches" of
the BC and JMB's "right to re-take possession pursuant to clause 20" of the BC.

On October 8th, JMB commenced proceedings in federal court in Florida and there arrested ATB
220 based upon alleged failure of Unico to timely pay hire and JMB's "right to re-take
possession pursuant to clause 20" of the BC.

Later that day, JMB's lawyers in an email to Unico acknowledged receipt late that day of
$196,462.50 consistent with JMB's October 6 advice advising Unico was "honoring its parent
guarantee" and was intended for ATB 220 hire.

Within a handful of days beginning with Unico's October 5, 2021 redelivery of ATB 284 (about
3 months after having taken delivery) and culminating with JMB's arrest of ATBs 205 and 220,
the ATBs were out of Unico's control/possession.

On October 10, 2021, Unico/Valentini emailed JMB and JMB lawyers with copies to other
involved counsel and Unico/JMB stating, after several paragraphs concerning the Parent
Guarantee payment:

> Lastly, bareboat for [ATBs 220 and 205] are still undergoing contractually and
> please take this email as notice from Unico Marine that we do extend our bareboat
> to the next 6 months option as per contract. . . .

On November 12, 2021, Unico/Valentini emailed JMB with copies to, amongst others, lawyers
acting for JMB, stating:

> . . . [P]ursuant to Clause 5 [of ATB 220 BC], Charterer, Unico Marine, hereby gives
> notice to Owner, JMB Shipping ATB 220, LLC, of its intention to exercise its option to
> extend the charter party for a further six month term commencing December 31, 2021.

An identical email was sent regarding ATB 205, and both emails were mailed to JMB.

### B. Centerline and the ATBs

Based in Seattle, Centerline, a significant operator in the Jones Act tug and barge trade along the
U.S. West Coast, participated in the lead up to the July 19, 2021 auction of Bouchard's tugs and
barges. Centerline had also obtained from Bouchard/PPP unredacted copies of the BCs with
Unico for ATBs 205, 220 and 284, and – in anticipation of the July 19th auction - had

communicated by telephone and/or email and/or in-person communications with Bouchard/PPP/Shenker concerning the Bouchard vessels. After JMB's successful bid at auction for 17 tugs and 12 barges, Centerline purchased one of them from JMB and bareboat chartered an ATB from JMB.

On September 14th Unico/Valentini emailed Centerline's M. Godden (President and CEO) and inquired whether, as an operator of the three ATBs, Unico could do anything for Centerline/Centerline clients. The following day Valentini and Godden spoke. Valentini in an email then proposed to Centerline a "TC" (timecharter) ideally to start October 1st for $90,000/month for the three ATBs representing about $1,000/day over Unico's BC hire rate to JMB plus a sharing of Centerline generated income net of costs and of Centerline's hire to Unico. Valentini advised Godden that he was talking with JMB about reducing the BC hire for ATB 284.

Godden, noting that because the existing BC rates were close to market, advised Valentini that no margin for profit would exist with $1000/day more plus sharing of "profit." Godden suggested alternatives such as taking over the BCs from Unico or subchartering with Unico having some access to the ATBs or managing the ATBs for a fee with profit sharing and possibly chartering them on behalf of Unico with profit sharing or some other arrangement.

Valentini advised Godden he preferred Centerline taking over the BCs but wanted extra dollars on top of the hire Unico was paying to JMB. Three days later on Sunday September 19th, Godden proposed to Valentini that Centerline take over the three BCs for four years at $24,600 (the hire rate Unico was paying JMB) and asked Valentini whether the four year term would allow Valentini "enough leverage" get a "lowered day rate" from JMB so that Unico then could "transfer the bareboat contracts to Centerline" – in other words, Godden wrote, Unico would "earn the day rate differential between Centerline['s] $24,600" and "whatever [Unico/Valentini] could negotiate with JMB" based on a four-year term as opposed to the six 6-month options remaining in the BCs.

Valentini responded later that evening that he did not know if Godden's proposal was possible, "but we can explore it. We cannot sub bareboat but I can time charter them and have a management agreement with you [giving] you [Centerline] the right to run the daily activities including crewing and collecting money from sub [timecharter] and/or spot deals." Valentini went on to say his "problem is not to make money with the units but to manage the people saying to Godden "you guys do it better." Valentini also advised Godden that Unico "can propose a longer term to JMB and lower the rates, but if [JMB] don't do it I will return the 284" at the end of first 6-month BC term.

First thing on the morning of the September 20th, Godden responded to Valentini's email writing:

> "[A] time charter or sub time charter is going to be very difficult, as . . . oil majors are very picky . . . I worry we may impede [Centerline's] commercial opportunities if we're trying to present Unico as technical operator under a sub time charter kind of relationship. If you can make a 4 year deal work for $24,600 with Unico hopefully giving [Unico] enough room to pickup the differential

31

between the $24,600 and whatever you can negotiate [with JMB] then I am sure we [Centerline] can put something together[with you Unico]."

Three hours later Godden emailed JMB/Shenker "FYI" with the above string of emails exchanged by Godden and Valentini between September 14th and September 20th. Shenker responded to Godden: "Thanks – [Valentini] cannot do what he is describing. He is trying to find a loophole in the contract, but it would be blocked. He cannot TC the boats to another operator without JMB consent."

Godden responded to Shenker: "No legitimate customer would buy into it either – all of the major contracts disallow it. . . . I've made my offer to him – let's see if we [Centerline] can put something together with him [Unico] before the beginning of [October]. If not and he [Unico] defaults, we remain interested in the units on the terms discussed."

The following day, September 21st, Unico/Valentini emailed JMB/Shenker that Valentini was "getting feed backs from Vane and Centerline that [Shenker is] telling them to not negotiate with Unico Marine as [Shenker] will oppose any deal that we [Unico] are trying to put together for the benefit of the units . . . on Bareboat? Is this true? . . . I do ask you, if of course is true what I was told, to stop damaging any ongoing negotiation with third party company."

Shenker responded:

> What you accused me of is untrue . . . the [BCs] do not allow for any sub
> bareboating . . . or your appointing of another third party manager without
> consenting of the owners . . . a time charter to another operator with a side
> management agreement is not allowed under the charter agreement Assignment
> and Subcharter Agreement clause. We [JMB] are happy to help facilitate a
> transfer of these [BC] agreements to another operator, but it will require JMB
> consent . . . .

Three days later on September 23rd, Godden emailed Valentini "circling back" regarding his offer made on September 19th and repeated on September 20th to take over the BCs for a 4-year deal at $24,600 with Unico keeping any differential between the $24,600 and any reduction from the $24,600 hire Unico could negotiate with JMB based upon 4 years versus the remaining six 6-month options.

Valentini responded offering a time charter for the term of the BCs and Centerline managing the ATBs both commercially and operationally with any profit by Centerline to be shared. Godden responded (a) advising Centerline needed a longer term, (b) expressing concern, that with a time charter, from a Centerline customer and vetting standpoint more sensible would be for Centerline to be contracting directly with JMB with any rate differential going to Unico (same arrangement as Godden previously proposed) and (c) expressing other concern.

Unico/Valentini responded that Centerline's proposal would breach the BCs and that Unico needed to keep revenues into the Unico entity.

Godden responded that he needed to speak with Centerline's General Counsel to see "how structure would work" and then emailed Valentini asking if Centerline's General Counsel D. Paige could speak with Unico's counsel. After Valentini advised Godden that Unico's counsel was R. Gorman, Gorman and Paige agreed to talk.

On September 23rd, Valentini emailed Godden requesting "a minute" of Godden's time, and on the following morning of September 24th, Valentini referred to their telephone conversation and advised Godden:

> . . . you can decide to either pay 90k for 5 years for the share purchase or give us lump sum now and take over the [Unico] LLC and its contracts. . . . send[ing] . . . outstanding list of payables and receivables . . .

Godden advised paying over time was best for Centerline to which, the next day, Saturday, September 25th, Valentini agreed and said: "we would like to make sure you guys take over as Oct 1st payment for bareboat . . . let me know if you are able to do it by that date." Godden responded: "Understood on the share agreement – I look forward to reviewing."

On September 25th, Godden then emailed Shenker forwarding Godden's above email exchanges with Valentini concerning Centerline purchasing Unico LLC and Valentini's requesting that the deal be concluded by October 1st so that Centerline would pay the October hire for the ATBs to JMB:

> FYI - let's catch up on the below Monday, he [Valentini] believes he can sell his [Unico]LLC interest which holds the charters. Obviously, whatever we do needs to be aligned with JMB but not sure how he's positioning this to others in the market.

Shenker then emailed Tandon with copy to JMB lawyer, Rob Hirsh:

> FYI - Riccardo now trying to sell the [Unico]LLC units in Unico Marine. Riccardo doesn't like me anymore!
> Rob - we need to understand if this is doable under the contract - I think it may be. Worst case we have Centerline operating with same agreements which is fine. They do want a longer term agreement which we can easily negotiate with them. Did you ever secure new maritime counsel for adversary proceedings with Unico?

Over the next several days, Unico, Centerline, their respective lawyers and accounts personnel exchanged many emails including financial documents, Unico corporate documents and contracts, lengthy and extensive drafts of an Equity Purchase Agreement with schedules, LOCs, Notes, etc., pursuant to which Centerline was to immediately purchase Unico by paying, primarily, $90,000/monthly for 57 months. Exchange of documents involving lawyers and others continued through Friday, October 1st.

On Sunday, October 3rd, Valentini emailed to Godden "costs and revenues" for the ATBs to which Godden responded "did the deal change? . . . now I'm seeing pick up payables bills?" and questioned Valentini concerning the financial liabilities of Unico.

On Monday, October 4th, Valentini suggested a telephone call "to discuss" to which Godden responded "very helpful [would be] to have numbers . . . difficult exercise without understanding the liabilities." Valentini then emailed Godden to suggest having a month-to-month management agreement with Centerline with Centerline guaranteeing the earlier agreed amount to purchase Unico and then later finishing Centerline's purchase of Unico. Godden requested a draft of the agreement to which Valentini responded "Ok."

That day, October 4th, Unico emailed JMB notice of Unico's redelivery to JMB of ATB 284.

JMB entered into a BC with Centerline for ATB 284 on October 31, 2021 and on November 15 hire began to run.

JMB entered into a BC with Centerline for ATB 220 on November 22, 2021 and on December 18 hire began to run.

JMB entered into a BC with Centerline for ATB 205 on November 22, 2021 and on January 7, 2022 hire began to run.

### C. Condition of ATBs 220 and 284 at Time of Delivery to Unico

On-hire surveys of the ATBs were conducted of the vessels while alongside a pier in Brooklyn, New York, by surveyors Amtech with Unico attending the surveys.

Amtech surveyors conducted an On-hire survey of the tug of ATB 284 on May 27, 2021 finding, in conclusion, that in all areas inspected the tug was in "GOOD condition, well maintained and capable of full operation." Two days later, Amtech conducted an On-hire survey of the ATB 284 barge. After the body of the report (including mention that "No. 1 generator completing minor repairs" and "No spare cargo hoses were found on board. One hose port manifold required renewal"), the Amtech report concluded that the barge "is considered in Good condition" with all categories and areas inspected and surveyed "well maintained" and with the condition of machinery considered "Fair to Good" considering the barge's age and having been idle. Amtech noted that it took into account the "amount of repairs, inspections and Owner's intent to properly return the [ATB 284] back into operation when determining vessel condition."

Amtech surveyors conducted an On-hire survey of the tug of ATB 220 on June 9, 2021 finding, in conclusion, that in all areas inspected the tug was in "GOOD condition, well maintained and capable of full operation." On the same day, Amtech conducted an On-hire survey of the ATB 220 barge. After the body of the Amtech report (including mention of "No spare cargo hoses were found on board") the Amtech report concludes that the barge "is considered in Good condition" with all categories and areas inspected and surveyed "well maintained" and with the condition of machinery considered "Fair to Good" considering the barge's age and having been

idle. Amtech noted that it took into account the "amount of repairs, inspections and Owner's intent to properly return the [barge 284] back into operation when determining vessel condition."

### D. Condition of ATB 205 at time of delivery

Before delivery of ATB 205 to Unico, ATB 205 was at Caddell's (having been moved there from GMD Shipyard in Brooklyn) for repairs over many weeks from May into August, 2021.

The barge of ATB 205 ("Barge 205"), a "heated barge," could carry petroleum products of high viscosity which need be at high temperatures to be in a sufficiently liquid state to handle/discharge them with cargo pumps. Barge 205 had a closed loop cargo heating system. Two thermal oil boiler heaters ("No. 1" forward of "No. 2") and turbine pumps circulated thermal oil through the system to lines on deck then into tanks and then back onto deck and back to the boiler.

The Barge 205's thermal oil system had a capacity of about 9,000 gallons of thermal oil. Heating the thermal oil causes the thermal oil to expand with the result that the system had an expansion tank which, via a venting mechanism, was open to the atmosphere. The expansion tank accommodates the expansion/increase in volume of the thermal oil as the thermal oil is heated. Intended is that neither impurities nor any water nor air bubbles be in the thermal oil because, when heated above the boiling temperature of water, any water in the thermal oil within the closed loop system will boil and vaporize into steam causing an increase in pressure in the closed system.

In addition to accommodating an expansion in volume of the thermal heating oil when heated, the expansion tank also serves to release into the atmosphere any air entrapped in the closed loop system. The expansion tank had a capacity of several thousand gallons and had to have sufficient thermal oil in it so as to not permit air to enter (or "back into") the closed loop system.

The heating coils through which the thermal oil circulated were at two different distances above the tank bottoms of Barge 205. The tanks were constructed with a "pump well can," essentially a steel tube somewhat greater than shoulder width in diameter, running from the bottom of each tank to about 10 inches above the barge's deck. A positive displacement geared cargo pump sits inside at the bottom of the pump well can. The pump is powered by a drive shaft connected to a motor on deck. Via inlets through the pump can, the cargo pump pulls cargo into the can and pushes the cargo up the pump can to the deck to cargo lines and the discharge manifold on deck. Four U-shaped channels welded to the side of the pump can connected to the thermal oil system, permitting thermal oil to circulate vertically through the four channels, which would heat the steel pump can.

Barge 205 had three diesel generators. The power of one diesel generator was required to operate one (of the two) thermal oil boiler heater ("TOBH") and the turbine pumps coupled to the "TOBHs" to circulate the thermal oil through the closed loop system. Pressure and temperature gauges were incorporated into the system. The level of oil in the expansion tank was visible in a sight glass and would be at 6 to 8 inches and then rise in the glass to about 18 inches when the

thermal oil reached temperatures in the range of 400 degrees Fahrenheit. The "TOBHs" had two basic temperature settings: Low Fire and High Fire.

As of May 2021, Barge 205 had been at GMD Shipyard ("GMD") for more than a year during which time one "TOBH" was overhauled and the other was replaced with a spare, and, as well, thermal oil was drained from the thermal oil cargo system. At GMD, various old valves in the thermal oil lines on deck were replaced with new valves. Neither "TOBH" was in operation at GMD; and electric installation work was to be done at Caddell's shipyard to put the "TOBHs" into operation.

Maritime personnel, for whose services PPP (whether acting for Bouchard or JMB) contracted or arranged, were involved at GMD and, then, at Caddell's, to see that repairs were carried out to get Barge 205 back in operation. The repairs ranged from replacing steel on deck to working on/replacing valves and carrying out electrical and pipe work.

Having entered into the ATB 205 BC in May, JMB wanted the ATB 205 to be delivered to Unico to start generating charter hire. Unico wanted to take delivery because it had customers interested in using the ATB 205 to carry their cargoes which would generate income for Unico. As a result, both JMB and Unico were anxious for the repair work to be completed expeditiously.

On July 7, 2021, Shenker advised Valentini that JMB was working towards JMB's goal for delivery of ATB 205 to Unico on August 1st. On July 19th Valentini advised Shenker that Unico had advised Unico's clients that Unico expected to have the ATB 205 to them for their cargo within the first four days of August. On July 28th, Unico requested an update, noting that it needed to arrange an inspection by Unico and by a third party. During the next days, JMB made minor comments on worklist items to be taken care of, and that follow-up inspection by the U.S. Coast Guard to complete issuance of Certificate of Inspection ("COI") for August 6th was scheduled which, for Barge 205, was successful (COI inspection of the ATB tug had gone well days earlier with issuance of COI contemplated shortly).

JMB suggested Amtech could carry out the on-hire survey on Monday, August 9th "while [JMB was] cleaning up minor hits." Amtech's on-hire survey for the ATB 205 tug concluded "the vessel is in Fair condition and remains under repair." Amtech's on-hire survey report for Barge 205 was twice issued with the first report amended to include fuel for the boiler/thermal oil heaters received on board after Amtech departed the barge, stating:

> The cargo heating boilers and systems were renewed during drydock repairs.
> Barge Captain advised waiting for fuel to complete full testing. Limited initial
> operation commenced during survey.

This report was amended to state:

> The cargo heating boilers and systems were renewed during drydock repairs.
> Barge Captain advised full testing is in progress and burn in underway. Operation
> commenced during survey.

The language "waiting for fuel to complete full testing. Limited initial operation commenced during survey" was dropped.

The Amtech report concluded:

> The Machinery conditions were considered Fair to Good considering the vessel's age and repairs completed. The vessel was under shorepower and no machinery was operating. Based upon information provided and reviewed the vessel is considered in Fair to Good condition. . . . It should be noted that minor repairs continued during the on hire survey and operating spares and consumables were not supplied.

On August 9th, JMB advised Amtech completed its On-hire survey and also advised that JMB had to complete some "cleanup" items on the tug and on Barge 205 on which a vapor pump for a boiler had failed.

On August 10th, Unico advised that, having been on ATB 205 that day, "many more items [are needed by Unico] for safe navigation and operational readiness," and it did not expect ATB 205 to be ready for delivery to Unico until August 13th or 14th "even though we preferred to depart sooner as we have a client waiting for us." JMB responded asking that Unico provide an "issue list . . . [as] need to understand what you will be asking JMB Shipping to cover."

On August 12th, Unico provided an "Ask List" to JMB divided into two categories: (1) "No Go" for completion before ATB 205 could sail from Caddell's and (2) items which could be completed upon arrival at the Mississippi River. The "Ask List" included some 15 items "No Go" and 6 "other."

At this time, Unico personnel were on board Barge 205 in this very latter period of completing repairs and preparations for its operation of ATB 205, as were crew members, before Unico took delivery of ATB 205. Included in the "No Go" list for Barge 205 were the following:

- Heaters/Boilers . . . Terry [of JMB] found a new fuel pump on another barge and our Unico employees are doing the installation (no local labor available). Pending electrician for final install.
- New Thermo oil break in standards not achieved. Once second fuel pump is installed (noted above) this should not take too long to do.

After the end of the lists, Unico wrote: "We believe based on all the activities for the Tug and Barge that Sunday [the 15th]/Monday [the 16th] would be our date for taking possession."

JMB responded the evening of August 12th with notations as to status/intentions/actions-taken/to be taken as to many of the "Ask List" items. Unico responded on August 14th that Unico's Stephens (the author of the email) and JMB's Hickey "are working close to ensure we do this safe and timely."

37

On Monday, August 16th, JMB emailed asking Unico's Stephens whether he had an update as to "anticipated delivery date" and noted that JMB's Hickey that day was on the ATB 205 tug and barge and had advised "they are ready for turnover" with two items on the tug and two on barge 205 including "Caddell's replacing relay on forward boiler today with part arriving today."

On August 18th, Unico emailed JMB's Woolheater and listed 13 items needing repair, parts, or correction prefaced by:

> Per the contract, prior to delivery it is JMB's responsibility to deliver the Bella and UMS 205 in a seaworthy condition:
> SEAWORTHINESS/SURVEY: (a) The OWNERS warrant that at the time of delivery the VESSEL shall be seaworthy and in every respect ready in tanks, hull, machinery and equipment for the service intended under this AGREEMENT and in accordance with the specifications provided in Exhibit A.
> While each item may not be a no sail item, they all affect the seaworthiness of the vessel and its ability to safely conduct cargo operations and will need to be fixed or a mutually agreed plan in place to fix at JMB's expense prior to our taking delivery of the vessel.
> We look forward to your response on these items so we can move forward with taking delivery and sailing.

Within an hour, JMB's Woolheater emailed JMB/Tandon:

> Hi Vikas - FYI below from Unico. Many of these items Terry had been working on with them closely over the past week. They chose at 3:30 pm today to send it to us and formally request responses prior to taking vessel delivery. I am working up formal responses now but it will most likely require me to commit to some additional cost

To which Tandon responded: "I hate these guys. Let me know how much more please and tell them to take the [expletive] boat today."

And then, within an hour, responding to dollar estimates for 9 of the 13 items JMB's Woolheater provided to Tandon, Tandon approved in excess of $50,000 in expenditures for the 9 items, some amount of which concerned earlier approved expenditures.

On August 19th, emails were exchanged between Unico and JMB, with notable excerpts as follows:

- Unico/O'Toole: . . . there are too many items that need to be addressed before we are to take delivery. Per our team on site, it will be more than 2 days to get the vessel in a seaworthy condition
- Shenker to Valentini: Is your intent to take the boat under the proposal that (I was under the impression) was agreed to or is there additional delay anticipated?
- Valentini to Shenker: If we can leave today after making the immediate repairs and do the rest of repairs at a later stage, we will pay you the balance in the upcoming days . . . if

you agree with that we will be able to sail out maybe tonight or tomorrow morning 0600 . . . we cannot agree on 80k as I don't know what will cost us to fix the list we sent you.

• Shenker to Valentini: . . . your team has been onboard for almost two weeks, with Unico Mariners living onboard . . . every day new issues are raised . . . we have been flexible and have responded, fixed and paid for all . . . we do need a clean break on this with you taking delivery so we don't have the issue of who is responsible for what . . . things break on boats. * * * Our final proposal is we share [the pricing to repair/order items on Hickey's spreadsheet of August 18] with you, you take delivery as of yesterday [the 18th], and remit 14 days ofhire ($120,400) less the estimated cost of repairs and you handle the repairs at your leisure. We cannot have an open ended repair list once you take possession as it will be impossible to know what broke once you were underway.

• Valentini to Shenker: . . . I will have my team and the crew off the boat in the next hours and will stop the refueling. When you are ready to deliver the boat with all the item fixed please notify us as per contract.

• Shenker to Valentini: Please call me.

On August 19th, Shanker and Valentini agreed that

1. Unico would wire $80,000 to JMB: 14 days of ATB 205 hire ($120,400) less broker Braemer $3,010 commission and less $37,390 "Repair credit for outstanding items",
2. JMB would provide credit/s up to $40,000 for repair of the 13 already itemized items for repair upon Unico presenting repair invoices, and
3. Unico would accept delivery of ATB 205 as of August 18th by countersigning the Protocol of Delivery dated August 18.

As per text messages between Shenker and Valentini, Unico remitted the $80,000 and provided to JMB the countersigned Protocol accepting delivery of ATB 205 subject to the terms of the ATB 205 BC.

### E. Barge 205's Thermal Oil System and Evidence Regarding the Bake-In

Readying a thermal oil system with new thermal oil for the Barge 205's operation to carry asphalt cargoes includes circulating unheated thermal oil through the system and then, afterwards, heating the thermal oil and circulating it through the system.

The Vapor Power manual for the system explains:

• The first objective . . . is to vent entrapped air from each circuit [of the system by circulating the thermal oil] one circuit at a time to and through the expansion tank so that air may escape out an open expansion tank vent.

• The second objective is to gradually heat the fluid to eliminate moisture and "low boilers." This is accomplished one circuit at a time in the same manner as air was eliminated.

Included in the detailed description of the first objective is that "each system vent valve" should be opened "briefly to purge any trapped air pockets" and while continuing through the process

"continue to check all system vents for trapped air pockets and maintain ¼ level in the expansion tank".

Included in the detailed description of the second objective is to close off the cargo tank circuit loops, set the TOHB temperature at 210°F, start the TOBH and "as the fluid temperature approaches 210°F pump cavitation (indicated by noisy pump operation or fluctuating gauge pressure) may occur . . . usually due to moisture in the system (formation of steam pockets) or plugged inlet strainer." Stop TOBH and after other steps restart and continue until 210°F achieved without cavitation and then repeat the procedure operating the heater to 250°F and, repeating in 50° temperature increases until the "excess temperature setting [i.e., "maximum possible operating temperature"] is reached and system pressure is steady. The [thermal oil in the] main loop is now purged of water vapor and 'low boilers'" – then repeat the steps one circuit-heating loop one at a time until the entire system has been completed. At the last stages of the process heated thermal oil is circulated through the entire system.

Documents and witnesses referred to the "second objective" process using a variety of terminology, for example "break in," "cookout," "bake-in," "cook in," etc. We will, except when quoting, use the term "bake-in."

On June 14th, the cargo tank thermal oil coils were tested to 80psi with shipyard and USCG representatives in attendance with no leaks detected. The usual working pressure for the system is 52psi.

In mid-July 2021, JMB had Vapor Power, the manufacturer of the thermal oil boiler heaters on board for 8 days to put them into operation. After certain repairs over several days, including repairs to the diesel generator/s, the technician was able to "low fire" the thermal oil boiler heaters ("TOBH") to test all safety systems with temperatures set not to exceed 125°F – although Vapor Power carried out no further work after July 14th (having earlier advised JMB that no technicians were available from July 16th when the technician would travel to end August), a Vapor Power invoice states that on July 15th "Trained barge tankerman on how to perform a oil cook out" consistent with a text message JMB received some days earlier that "He'll [the Vapor Power technician] train Richie [Richardson] on the cook out before he leaves so we'll [JMB] be all set."

On August 3rd, both TOBHs were pressure tested with shipyard and USCG representatives in attendance with no leaks detected.

On August 15th, a JMB consultant contacted Vapor Power concerning problems with the fuel pump on one TOBH.

In conjunction with the work at Caddell's to have the two thermal oil boiler heaters operational, thousands of gallons of new thermal oil were introduced into the system.

Heating up the thermal system had to await shipyard workers completing their painting of the barge's main deck.

Various persons testified concerning the bake-in process. No document was presented recording what steps and events took place during the period of time the bake-in process was undertaken. Justin Peaslee was the bargeman primarily carrying out the bake-in "hands-on" but did not testify.

T. Hickey, a licensed marine engineer, was hired by Bouchard/PPP in February 2021 to get the the Bouchard vessels moving again and then worked for JMB to continue that work. In that capacity, Hickey was involved with the repairs being carried out on Barge 205. Hickey advised that at Caddell's before new thermal oil was added to the system the thermal oil lines were purged with nitrogen to push out any old thermal oil and, by using nitrogen, to not introduce any new water or air and that after adding the new thermal oil the plan was to use shore power to circulate the thermal oil through the system to get air out (although he did not observe that being done). Hickey also testified that, one day while on board Barge 205, the bake-in process was underway and that he was told by "I'm not sure who" (and did not recall Peaslee at all) that the thermal oil had reached 300°F (or 325°) but expected a few more days to finish the bake-in – which he expected would be underway 24 hours a day. He believed, but was not sure, that to complete the bake-in the thermal oil had to reach 425° and run for 12 hours. He advised the bake-in was completed before the Barge 205 left Caddell's. He advised that originally JMB had scheduled ten days for the bake-in but that Vapor Power advised bake-in could take 2 to 10 days, depending upon what was in the thermal oil system. He acknowledged that getting adequate fuel on the barge to operate the "TOBHs" and issues with keeping one of the "TOBHs" running existed and that the bake-in started and stopped several times.

B. Chapman, Vice-President of Caddell's, testified concerning the nitrogen purging of the thermal oil lines and that the tightness of the thermal oil lines was tested with air at 80 psi and then again with nitrogen at 80 psi during a USCG inspection with no evidence of leaks. The latter test was carried out for the USCG, at least in part, because of GMD's replacement of valves on thermal oil lines on deck. In the latter part of June, after the testing, Chapman noted that arrangements were made for delivery of thousands of gallons of new thermal oil to Barge 205. Chapman testified that the thermal oil was continuously circulated, without heating, via pumps to get all the air out. He also noted that the bake-in process is to ensure all moisture and air is out of the system and that the bake-in involves "running [the system] as high as you can get it," that it is "not a one man job" as people are needed to open valves and bleeds. Chapman advised that because the bake-in heats the barge deck, Caddell's personnel who were painting the deck had to complete painting work before the bake-in could commence; Chapman believed the painting was completed on August 13th, the last day Caddell's were on board the Barge 205 and therefore "a good guess" would be the bake-in could not start before August 13th.

E. Eastlack, a marine engineer, hired by and reporting to T. Hickey as an independent contractor, initially went to the ATB 205 at GMD shipyard in late March 2021. Early May 2021, ATB 205 was shifted to Caddell's where Eastlack continued on the ATB 205 overseeing the work being carried out until his departure on August 5th.

Eastlack witnessed the mid-June nitrogen pressure test of the thermal oil lines for the cargo tanks with Caddell's and saw that the pressure held for several hours before the USCG arrived. He observed that, as new thermal oil being delivered by trucks was introduced into the thermal oil

system, the oil was circulated slowly through the system to allow air pockets to work their way out and advised that Vapor Power trained tankerman Richardson or Peaslee (or both) on how to conduct a bake-in. Eastlack came to understand that the bake-in involves running both "TOBHs" for an extended period of time at a high temperature rating, Barge 205's "TOBHs" rated at 399°F, to boil out any air or moisture to avoid the risk of a rapid expansion situation when thermal oil gets past 212°F. At Caddell's, he forecast that the bake-in would take a week but did not know from where he got that number and noted that the time for the bake-in varies depending upon the level of contaminants, moisture or air, in the oil. After leaving Caddell's, Eastlack became aware that tankerman Peaslee on (he believed) August 15th, reported that the fuel pump for a "TOBH" kept tripping out. Eastlack noted that the "TOBH" cannot run without the fuel pump operating.

Lead Tankerman R. Richardson was on Barge 205 as an employee of Bouchard/PPP (and later, JMB) at GMD when a pressure test of the thermal oil system was carried out. Richardson continued with Barge 205 at Caddell's until he was relieved by tankerman Justin Peaslee.

Richardson advised that, at Caddell's, he observed nitrogen pressure testing of the thermal oil system and that, because you open everything up, the whole system is pressure tested including the channels running along the pump can wells for the three cargo pumps. They (shipyard personnel and Richardson) opened the cargo hatches on deck to ensure (using a flashlight) no nitrogen was coming out - there was no issue. If the pressure does not hold as shown on a pressure gauge, his understanding is that there is a leak – the "pressure gauge was holding steady, so we didn't have to worry . . . ."

Richardson described the bake-in process as starting at 210/215° F and bringing the temperature up in steps as water separates from the oil which, if it separates too quickly, can shut the TOBH down which you then restart to resume the bake-in until you get the thermal oil to operating temperature. Richardson stated that a bake-in "takes like five to seven days, usually, to bake in properly."

Because Richardson signed off Barge 205, he did not do a bake-in although he recalled that, while on Barge 205 at Caddell's, effort was made to "get cooked in" but that because Caddell's was painting they could only do that " . . . a few hours a day [for two or maybe three days], which really you're not doing anything. You're defeating your purpose. By the time you started warming up, you had to shut down and let the whole thing cool so they could paint."

Richardson said that sometime after he signed off, Peaslee did the bake-in.

When Richardson, as a Unico employee, relieved Peaslee in late August 2021 before ATB 205 proceeded to Mt. Airy Terminal to load its first cargo, Richardson did not discuss the bake-in with Peaslee so that Richardson had no idea how long the bake-in lasted. Richardson testified that Peaslee "just said he got it up to temp" and understood Peaslee's "up to temp" to mean 399°F with pressure in the system.

Richardson testified that after he rejoined ATB 205 in Galveston as Lead Tankerman and after the mid-September aborted cargo loading operations at Mt. Airy Terminal, Peaslee told him that

42

at Caddell's during the bake-in a "burp" occurred which Richardson described as an air pocket - or moisture which heats up creating an air pocket - in the thermal oil which, as thermal oil is circulating it "catches . . . in the corner of a pipe or something" and is pushed up to the expansion tank where it is released into the atmosphere.

### F. ATB 205 Asphalt Loading at Mt. Airy Terminal, Louisiana

From Galveston ATB 205 went to Mt. Airy Terminal upriver from New Orleans to load asphalt. In preparation for loading and with cargo tanks empty, Richardson started up the thermal oil system to preheat the system sometime at/after 2200 hrs. and after an hour or so the temperature was up to 399°F at which point, because the cargo tanks are empty, the temperature can fluctuate between 375/380°F and 399°F, Richardson testified the thermal oil system was operating normally with the fuel pressure thermal oil level good. The preheat normally is carried out for six hours. While preheating was underway, one TOBH started to emit smoke and was shut down which Richardson said meant the preheat would extend out longer to ensure the barge would not be stressed when loading the asphalt, generally then at 275-300°F, into the cargo tanks.

Richardson advised the thermal oil system operated normally to 0200 hrs. on September 14th when, during the on-going preheat, the operating TOBH shut down because the level of thermal oil in the expansion tank dropped below a shutdown point. The shutdown caused an alarm to sound.

At that moment, Richardson was asleep or resting, having left tankerman Calcote on duty and in charge. When Richardson arrived, he and Calcote spoke. Calcote did not tell Richardson any noise was associated with the oil level dropping in the expansion tank (and tug Captain Kvorjak testified that no one told him anything about a noise).

On September 14th, Richardson and tankerman Calcote added thermal oil to the system (some brought on board from shore) and operated the TOBH to continue the preheat while checking thermal oil system valves and lines and the TOBH to determine a possible source of any leak. The TOBH continued to operate and loading commenced – Richardson spoke with Unico about the situation and advised Unico he believed there was a leak in the thermal oil system while the Unico office thought it was just a burp. After loading of the first (and perhaps the second parcel) of asphalt, ATB 205 went to anchor on September 16th where a technician boarded and, after repair of the off-line TOBH, the thermal oil continued to need replenishment as the level in the expansion tank continued to drop.

Richardson concluded the system was leaking so badly somewhere that the system would not be able to keep loaded asphalt at a sufficiently high temperature to carry to the discharge port and pump it off (delivery at 285°F).

Then decided was to return to the terminal on September 17th where Unico offloaded as much of the just loaded cargo as it could. Then, on September 19th, ATB 205 went to a repair yard.

### G. Source of the Thermal Oil Leak

At the repair yard, a crack was found in a pump can. Richardson went into the cargo tank, looked at the crack, and described it as being about 18" long. The crack ran along one side of the 6" wide channel running vertically up the pipe can where the edge of the channel was welded to the pipe can – the crack penetrated into the pump can and permitted thermal oil circulating under pressure in the channel to leak out.

Richardson testified he had no reason to believe that he or tankerman Calcote did anything wrong or to cause the crack. Although he could not say whether the crack occurred before or after he joined at Galveston, he believed that if it occurred while he was on board, he would have heard something and would have known as soon as it happened. Richardson said the crack in the pump can -- "could have. . . I don't know. I'm not the . . . engineer . . . ." -- occurred or initially developed when the burp Peaslee told him about took place at Caddell's. Richardson opined: "I don't think [the thermal oil system] was baked in properly . . . because seeing everything . . . just a guess . . . if it was cooked in properly we should have seen this [thermal oil leak] before [ATB 205] left [Caddell's]."

Repair of the crack required cutting out the section of the pump can and channel where the crack was located. Eastlack, who attended at the repair yard, understood the shipyard would cut out and remove, in one piece, a section 24" long and some 12" wide containing the entire crack. The repair yard, however, cut more than one piece (according to Eastlack, the yard did so to be able to remove the damaged area) and in doing so cut through the crack.

The pieces were, eventually, shipped to Brooklyn for metallurgical inspection where the pieces were further cut and opened by that facility before a joint inspection by the parties/their metallurgists was discussed/arranged.

### H. The Cause of the Crack and Expert Testimony Presented by the Parties

#### 1. Engineering Expert Testimony Regarding the Barge's Heating Operations

Unico presented R. Bouchard as experienced and an expert in the construction, maintenance and repair of barges and, specifically, the operation of heated barges. Based upon Bouchard's review of records concerning Barge 205 repair work at Caddell's and related emails and records, discussions with Richardson, tankermen Peaslee and Ocasio, Caddell's shipyard personnel, records of the repair of the crack, Bouchard opined that the failure to complete the proper bake-in process during commissioning of the thermal oil system at Caddell's resulted in the crack – then existent – not being detected. Bouchard believes a proper bake-in over five to seven full days at Caddell's would have uncovered the leak through the crack because a proper bake-in would then have softened hardened asphalt sealing the crack permitting thermal oil to then leak into the pump can while at Caddell's where the crack then could have been repaired. Instead, the hardened asphalt sealing the crack became soft and permitted the leak when the system was heated to 399°F at Mt. Airy Terminal.