# Exhibit 1 Pt. II

Bouchard further noted that because JMB provided 6,000+ gallons of new thermal oil at Caddell's, the system, which had a capacity of about 9,000 gallons, would have had old thermal oil mixed in with new thermal oil making a proper bake-in important as work had been done on the thermal oil system including new valves.

Although Bouchard could not identify what caused the crack, he believed any one of or some combination of four causes were involved: (1) vibration of the discharge pump in the pump can; (2) over-pressurization of the pump can during testing; (3) internal pressure caused by the atomization of water or impurities in the pump can well when subject to elevated temperatures in a system not correctly prepared for maximum temperature operations; and/or (4) contact damage caused by the removal and/or reinstallation of the cargo pump in the pump can.

JMB presented A. Colletti, a marine engineer and surveyor at Martin Ottaway, with experience in operating and maintaining thermal oil heating systems. Colletti reviewed various documents including the Vapor Power manual for a thermal oil system, participated in telephone interviews of Richardson and Peaslee, and spoke with Chapman of Caddell's, and had experience with thermal oil systems.

Colletti opined that a proper bake-in was carried out at Caddell's by Peaslee. Colletti based his opinion upon three things:
1. Colletti's telephone interview of Peaslee who did the bake-in;
2. Richardson's testimony that Peaslee told Richardson that Peaslee got the system "up to temp" at Caddell's; and
3. Richardson's testimony that at Mt. Airy Terminal which Colletti described as: "he was able to easily raise the temperature (although improperly, too rapidly) and run the system for [2.5] hours with no issues or problems" which Colletti believes Richardson "would not have been able to do . . . if there hadn't been a proper bake-in."

Colletti also opined that a proper bake-in can be completed in one day and that it need not be continuous as one can run the system for a few hours and shut it down and a little later start it up again although running it continuously 24 hours is ideal. Colletti believed that the bake-in at Caddell's "got rid of the air and low boilers and the moisture" in the thermal oil.

Colletti stated that if one heats up the system too quickly during a bake-in "you get . . . bubbles of steam that develop . . . [which] can be very destructive, especially if it's in an enclosed space like a channel heater on a cargo deepwell pump." "If you raise the temperature too quicky and you've got this moisture that vaporizing and it [can move] along and then get . . . into something like the channel heater," and Colletti testified that one of his theories was that a pocket of steam in the channel heater broke open and exploded causing inward deformation of the pipe can.

Colletti opined that Richardson improperly operated the thermal oil system at Mt. Airy. Colletti explained that Richardson at 2300 hrs. having "immediately put – must have put it to high – to the maximum temperature level, which is 399 . . . and then just walked away from it, because it's all programmed . . . to fire it up to 100° on low fire, then . . . to do 100° straight up to the maximum."

JMB presented J. Daly, a marine engineer holding a Chief Engineer's license, as an expert. Daly opined that the channel heating plating was intact until September 14th because no leakage of thermal oil occurred when the thermal oil system was hydrostatically tested with nitrogen at Caddell's, or when Peaslee baked-in the system at Caddell's, or from August 19th until 0200 hrs. on September 14th at Mt. Airy Terminal when the system shut down.

Daly also opined that a proper bake-in took place at Caddell's based upon: (1) Hickey's testimony that someone told him 300° was reached; (2) what Bouchard testified Peaslee told him; and (3) that Richardson testified that Peaslee told him Peaslee "got it up to temp."

Daly disagreed with Bouchard's conclusion that a crack sealed by asphalt pre-existed because the bake-in Daly believed Peaslee carried out would have revealed a leak at a temperature achieved above 250°F.

### 2. The Metallurgists

Unico and JMB presented declarations and reports from their respective metallurgists concerning the issue of spoliation, i.e., whether actions taken by the JMB metallurgists vis-a-vis the pump can pieces cut out by the Louisiana repair yard altered them so as to adversely impact or destroy the ability through inspection and/or testing of the pieces to draw accurate conclusions as to the cause(s) of the pump can crack ("fracture") first observed at the repair yard.

Following the panel's ruling as to spoliation (see pp. 10, 11 of The Proceedings section) and further inspection, etc., of the pieces of the pump can and channel, the metallurgists submitted reports setting out their opinions as to the cause of the fracture and provided testimony.

Unico's metallurgist, J. Quinn, concluded that what he identified as the initial point of fracture (where there was evidence of prior cracking from separate stress events) evidenced "relatively brittle initiation" and "a 'step' between crack propagations" which he opined was "consistent with separate loading events."

From those observations and that opinion, he believed ". . . more likely than not, the subject 'pump can' fracture contained evidence of preexisting damage in the form of cracking from separate loading events." He further opined that because "an extraordinary pressure, not foreseeably possible onboard the barge, would be necessary to cause the plastic deformation observed in a one-time service event . . . pressures necessary to cause [the observed] gross plastic deformation are more likely to occur over multiple overpressure events or from an external pressure source such as hydrostatic testing."

He believed that after the initial cracking the pump can "became progressively more ductile consistent with very low cycle fatigue from multiple separate loading events" and found that the surfaces of the fracture surfaces "are not consistent with a one-time overload failure which would contain macro deformation around the fractures." Several weld discontinuities (as flaws or possibly a defect) were observed in the subject evidence which cause a local weak spot where more ordinary overpressures can grow damage locally over time (e.g. fatigue) versus any other locations.

Unico's metallurgist, amongst criticisms of the conclusions drawn by JMB's metallurgist, stated that JMB's metallurgist "did not consider deformation in the c-channel which would have eliminated [its] extraordinary overpressure theory" that a single event of overpressure caused the observed deformation and fracture.

JMB's metallurgist, R. Vecchio, included several "it is understood" premises in connection with his metallurgical evaluation of the root cause of the fracture, amongst which were:

- The leak occurred while the thermal oil system was in operation to pre-heat the vessel in preparation for a cargo load of asphalt.
- Oil temperature should be raised slowly during system heat-up such that the normal operating temperature is reached in 4 to 6 hours.
- On the day of the leak, the thermal oil was brought to the maximum operating temperature in approximately 1 hour.

To determine "the probable cause of the cracks" the metallurgist conducted a root cause analysis of the pump can pieces/fracture area which included:

- Metallurgical examination: visual observation including microscopically/electron microscopically; examination of the microstructure of the fracture, mechanical testing and analysis of the composition of the steel of the pump can and of the channel.
- Finite element analysis using software: "to assess the stress and strain distributions within the cargo pump can when subjected to various operations conditions" the goal of which was to "identify the driving force for the observed cracking and pump can deformation."

From this metallurgical examination, JMB's metallurgist concluded that the longitudinal fractures on low carbon steel pump can resulted from a "single-event, rapid, overstress fracture" and that no evidence "of progressive fracture, such as fatigue or corrosion assisted cracking" existed. The pipe can channel (also low carbon steel) and the welds of the channel to the pipe did not exhibit "any pre-existing material defects which, if present, could have been a causative or contributory factor in cracking of the pump can" and exhibited neither significant corrosion nor mechanical damage/pre-existing deterioration.

The finite analysis, using a computer model/replica of the pipe can with the channel welded to it, involved two "tests," thermal loading and pressure loading. The thermal loading indicated that neither the observed deformation of the pump can nor the cracks through the pump can steel could be attributed to the temperatures to which they could be subjected by the thermal oil system. The pressure loading revealed that at a pressure of 1,000 psi significant inward deformation of the pump can occurs with the deformation stressing the fillet welds putting severe stresses on the weld roots where the fracture of the pump can initiated and from where the fracture propagated into the pump can with these results being consistent with the cracking observed on the pump can.

From the metallurgical examination and finite element analysis JMB's metallurgist concluded that:

- Thermal loading was not consistent with the deformation or through wall cracking observed on the pump can.
- "Elevated pressure loading produces deformations that are consistent in appearance and magnitude with the Inward radial bulging observed in the cracked pump can" with approximately 1,000 psi required to produce deformation similar to that observed which in turn produces stresses of sufficient magnitude to initiate and propagate the observed cracking.
- The root cause of pump can cracking was an "overpressure event in the oil channel" with the "rate at which the heating of temperature was raised . . . likely a contributing factor in producing the conditions necessary to cause an overpressure event."
- No cracks were present in the pump can prior to the leak event on September 14, 2021.

In explaining how an overpressure event might occur, the JMB metallurgist referred to the Vapor Power manual:

> A new system will probably contain undesirable pockets of entrapped air, moisture, mill scale, or other material which the solvent action of some fluids will tend to loosen, and the "low boilers" (fractions of the fluid with low boiling points), which will vaporize, producing the same results as the presence of moisture. New fluid being replaced in an existing system must also be treated as if the system were new.

In the report and in testimony, the JMB metallurgist noted that dissolved air and moisture are impurities with new thermal oil and that "[h]eating the thermal fluid tends to release air and water vapor, which will collect in pockets that should be vented and removed from the system." He identified the top of the heating channel on the pump can as "one potential pocket" into which air or water vapor might collect "until sufficient thermal fluid flow swept the pocket out of the channel." He stated that during operation of the system such a pocket could collapse "leading to a pressure shock" within the heating channel. He noted that if the pocket was filled with water vapor then the pocket "could collapse entirely (from water vapor back to liquid water) and produce a water hammer pressure shock." He advised that previous experience "indicates that the pressure could reach several times the operating pressure of the system as a brief shock load."

JMB's metallurgist, responding to Unico's expert's criticism that the basis for the overpressure opinion "did not consider deformation in the c-channel," stated that deformation and "deflection" and "yielding" are all within the model which in fact showed deformation of the channel but of a very slight magnitude.

### I. Alleged Damages, the ATB Market, and Mitigation Issues

#### 1. Unico's Alleged Damages

Unico presented two witnesses who testified concerning the market for ATBs in the Jones Act trade such as the 205 and the 220, and what Unico may have realized had Unico continued to operate ATBs 205 and 220 through the term of the BCs including the option periods.

Broker Braemer/Jurewicz (who testified concerning the May 2021 JMB-Unico negotiation of the BCs in which Braemer/he was involved) testified as a fact witness with knowledge of ATBs trading in the US coastwise Jones Act trade carrying petroleum products, including asphalt market areas on which he concentrated, and concerning which Braemer maintained/had access to a database said to contain fixtures for Jones Act vessels such as the ATBs 205 and 220. Noting that the market rates are dictated by supply and demand, Jurewicz advised that in May 2023 (which is when Jurewicz testified) the market for ATBs was tight with strong rates. He generally observed that the market had continually improved, citing specific ranges of rates within which he believed the ATBs would have been chartered with strong rates in 2022 and 2023. Jurewicz noted that, as a 105,000 bbl. capacity heated barge able to transport asphalt, ATB 205 was "a unicorn . . . in the market . . . being a high-heat barge …" which Jurewicz believed was confirmed by reason of ATB 205 having had continuous employment since it re-entered the market in 2021. He further believed the ATB 205 would have a high utilization rate on hire to an oil major (and that mid-2023 utilization rates for Jones Act vessels was 100%, with customers paying a premium to get vessels).

Unico presented Captain R. Johnsen as an expert based upon extensive experience including participating on the owner and customer side in the Jones Act trade, contract operational auditing and involvement with Bouchard Transportation, and negotiation of charters in the Jones Act trades. Based upon Johnsen's review and analysis of the ATB Jones Act market and using a 5% discount factor based on LIBOR and a 20% discount in calculating time charter equivalent rates for ATBs 205 and ATB 220 on projected future employment, Johnsen concluded that from continued employment of the ATBs, including BC option periods, Unico would have earned $5,009,007 for the ATB 205 and $7,208,834 for the ATB 220 with damages for both ATB's equal to $12,217,841.

Johnsen, as part of his review of the market, had discussions with chartering brokers and marketing people and those in the Jones Act trade from which he concluded that significant demand existed for vessels such as ATBs 205 and 220 and that the market was such that Unico would have had no difficulty attaining full employment and, as well, opportunity to put the ATBs on four year time charters (". . . the dialogue with Centerline confirmed that a four-year deal was doable. And they would have done a four-year deal with somebody, because the customers were certainly there. And the success in Centerline, in putting the equipment to work after [Centerline] did the four-year deal, basically confirms that.")

Johnsen critiqued the bases, methodology and conclusions of the JMB expert concerning the Jones Act market-trade and the prospects for Unico had it continued to operate ATBs 205 and 220 in that market.

### 2. JMB's Alleged Damages

JMB presented D. St. Amand to testify concerning damages related to the three ATBs, including concerning mitigation. As a consultant, St. Amand provides analytical and managerial support to clients in domestic and international waterborne transportation markets, carries out chartering and voyage calculations, vessel valuations, technical, operational, and economic aspects, and assesses Jones Act oil tanker and ATB markets, rates, costs, and competitive issues.

With regard to ATB 284 and, after redelivery, JMB's charter with Centerline, St. Amand noted that the charter rate was at a lower rate (initially $7,833.33 per day rather than the $9,500 per day rate with Unico). In addition to the reduced charter rate in considering damages, St. Amand also considered the impact of the Centerline BC, including a bargain purchase option allowing Centerline to purchase the ATB 284 at the end of the charter for fair market value less $1.35 million.

St. Amand determined that the bargain purchase option is the equivalent of a $765.92 per day discount off the charter hire which JMB otherwise would have realized. Adding the $765.92 to the difference between the rate to Unico and the rate to Centerline puts the per day loss to JMB at $2,195.09 which, when added to the loss of hire from Unico's redelivery to Centerline's paying hire to term for the Unico BC ending December 29, 2021 results in market damages to JMB of $482,665.

St. Amand also presented concerning out-of-pocket costs which JMB claims for crew, berthage, insurance, management fees, repairs/off-hire survey which, less fuel and lubes on board at redelivery, yields a JMB claimed loss of $124,537.

Unico's argument challenging the necessity/recoverability of various of these items were discussed, and St. Amand opined that they were necessarily and/or reasonably incurred. In result, St. Amand concluded that JMB's total loss/damages as a result of the early redelivery were $607,202.

With regard to ATB 220, St. Amand considered Unico's claim that it suffered market/future loss by reason of JMB's termination of the BC/repossession of ATB 220 to be unfounded. St. Amand found, when calculating a time charter equivalent ("TCE") rate for the two spot voyages Unico's ATB 220 performed (for some 20 voyage days within an about 100 day period), that the TCE for one voyage was less than Unico's BC hire for the voyage and that the TCE on the second voyage yielded minimal funds over the BC rate which, when then taking into account daily operating costs, resulted in the two spot charters having negative cash flow for Unico. Also, St. Amand did not see an upside for Unico continuing with ATB 220 in the market.

St. Amand generally criticized the methodology and assumptions, including as to operating costs, utilization percentage, and other components of Johnsen's analysis of Unico's losses vis-a-vis ATB 220, and believed that had correct assumptions been used then the analysis instead would demonstrate Unico had no/minimal prospect to profit from any future operation / chartering out of ATB 220. St. Amand, in fact, believed that despite JMB mitigating its losses by entering into a BC with Centerline, JMB nevertheless had damages of about $1,200,000.

With regard to ATB 205, St. Amand considered only the base term of the BC with Unico ending on December 31, 2021. St. Amand opined that JMB lost BC hire due to Unico's non-payment from October 1, 2021 for 98 days times daily hire of $8,600 (less 2.5% brokerage) for total charter hire of $821,730 lost to JMB. In addition, St. Amand noted that JMB had as damages costs incurred to preserve/protect ATB 205 after the arrest of the ATB 205. Those included costs for/expense of berthage and crew ($246,972), insurance ($58,990), legal and management fees

50

($120,419), repairs and off-hire survey ($363,651), and liens to pay off ($558,884), which costs, less credit of $81,341for fuel and lubes on board, results in St. Amand's calculation of total damages of $2,132,115.00.

St. Amand, after considering the opinions and conclusions of Unico's damages expert Johnsen, concluded that Johnsen's report was misleading and incorrect in several respects. St. Amand took issue with comments concerning port charges and Johnsen's suggestion that St. Amand over-estimated those charges as well as need for pilotage and/or tugs. St. Amand also argues that Johnsen's optimistic outlook for Unico overcoming the very negative reputation in the marketplace and Unico's lack of history in operating Jones Act vessels was unrealistic.

St. Amand argues that Johnsen's criticism of St. Amand's analysis of the two ABT 220 spot voyages is misplaced and notes that Johnsen does not provide a voyage analysis of either. St. Amand further criticizes Johnsen's suggestions as to fuel and port charges for the ATB 220's two spot voyages.

St. Amand takes issue with the discount rate of 5% utilized by Johnsen, especially given, St. Amand suggests, that Unico was in St. Amand's view a small and inexperienced company and suggests 10% would be conservative. And St. Amand suggests reliance on the hire rate/s paid by Centerline for calculation would be misplaced.

## III. ARGUMENTS AND CONTENTIONS OF THE PARTIES

### A. Arguments and Contentions of Unico

Pointing to on-hire surveys and documents and communications exchanged before, at the time of, and shortly after delivery of the ATBs to Unico, Unico argues that at the time of delivery no one of the three ATB's was seaworthy when delivered to Unico. ATB 205 is a particular focus of Unico's argument given the repair period at Caddell's leading up to delivery and given the lists of "outstanding items" which were exchanged during the days surrounding the August 18, 2021 delivery which Unico suggests evidences a material breach of the ATB 205 BC. Unico further argues that with discovery of a latent defect at Mt. Airy (pump can fracture), Article 7(a) and Article 10 together suggest a breach of seaworthiness at the time of delivery of ATB 205 to Unico.

Unico argues that by arresting ATB 220 and 205 to repossess them (a) without having accrued the right to do so (Unico Commodities having paid hire for ATB 220 and ATB 205 having been off-hire due to the pump can fracture/leakage) and (b) without having provided to Unico the required written notices of withdrawal and of termination before repossessing ATB 220 and ATB 205, JMB materially breached the ATB 220 and 205 BCs.

And Unico argues that because under the Parent Guarantee Unico Commodities had five business days to make payment of hire and cure any default, the $196,462.50 remitted to JMB October 8, 2021 (in response to JMB's demand that Unico Commodities honor its guarantee) was within the cure period provided by the parent guarantee curing any default for untimely

payment of ATB 220 hire. Unico further notes that JMB retained / does still retain the $196,462.50 without conceding curing of the default.

Unico urges that JMB's dealings with Centerline simultaneous with Unico's negotiations with Centerline to employ the three ATBs with Centerline breached the implied covenant of good faith and fair dealing which JMB owed to Unico. Unico suggests that JMB's dealings with Centerline was a plan to deprive Unico Marine of the benefit of the BCs and to convert the Centerline opportunity to JMB's benefit. Unico further urges that JMB's actions constituted tortious interference with Unico's commercial use of the ATBs.

Unico contends that because the evidence amply demonstrates that the fracture of the ATB 205 pump can was due to a latent defect (pre-existing crack in the pump can) (a) ATB 205 then was deemed/was off hire and (b) BC Article 6 permitted Unico to suspend hire payments when the barge was "out of service due to OWNERS' breach of seaworthiness warranty provided in Article 7(a)."

Unico also argues that because of defects in the barge, especially the crack (in the weld joining the heating channel to the pump can wall) hidden in the heating channel which resulted from multiple over-pressure events over time, latent defects - within the meaning of Article 7(a) of the Charter - resulted in ATB 205 being "deemed offhire" under BC Article 7(a) and required that JMB "at their sole cost and expense . . . resolve the issue and make the VESSEL in every respect ready in tanks, hull, machinery and equipment for the service intended."

Unico points to the testimony concerning the bake-in (and the absence of testimony of J. Peaslee and non-production of Barge 205 log pages covering the bake-in period), including the expert testimony, and urges that the evidence supports the conclusion that because of an inadequate bake-in, air, water and other impurities remained in the thermal oil system upon delivery to Unico and remained status quo until the preheat at Mt. Airy (and Unico suggests that JMB offered no evidence that Unico introduced or caused water vapor or other moisture to enter or remain in the heating fluid from delivery to Unico until the preheat at Mt. Airy Terminal).

With regard to ATB 284 and JMB's claims for items and repairs and related expenses JMB incurred when Unico redelivered ATB 284 to JMB, Unico argues that virtually all of the damage JMB claims concerns equipment issues and/or conditions which existed at the time JMB delivered ATB 284 to Unico Marine, ordinary wear and tear excepted.

Unico requests that Unico be awarded $12,217,841 as damages consistent with Johnsen's report, opinion and testimony.

### B. Arguments and Contentions of JMB

Contending that ATB 220 and ATB 284 were seaworthy on June 28, 2021, JMB points to the Protocol of Delivery and Acceptance ("PoDA") Unico signed by which, JMB argues, Unico accepted the ATBs - "subject to any reasonably undiscoverable latent defect" - as in all respects seaworthy." JMB emphasizes that, having attended the on-hire surveys and with full knowledge

of the surveys, Unico accepted the ATBs without reservation and notes that Unico's Valentini testified that Unico is not claiming for latent defects on ATB 220 and ATB 284.

JMB contends that ATB 220 and ATB 284 were seaworthy as further evidenced by their: (a) having valid U.S. Coast Guard Certificates of Inspection, (b) being classed with Bureau Veritas International Classification Society, (c) protection and indemnity insurance having been agreed by the American Club and having hull and machinery insurance coverage from Lloyd's of London.

JMB dismisses as unsupported Unico's suggestion that cargo hoses were missing from ATB 284 and points to photographs and the off-hire survey as undermining that suggestion.
With regard to ATB 220, JMB notes that the only suggestion as to an unseaworthy condition concerns a leaking header valve which Unico, per its testimony, believed was repaired shortly after and in line with a proposal by JMB.

JMB contends that Unico's early redelivery of ATB 284 was a wrongful cancellation of the BC and that by its email saying that JMB had "an absolute duty to mitigate any damages by re-chartering the VESSEL as soon as possible" Unico so admitted.

JMB adds that Unico's failure to provide the 45, 30, 15 and 3 days notice prior to redelivery required by the ATB 284 BC constituted a breach of the BC independent of the early redelivery breach.

JMB states that by failing to pay the October 2021 ATB 220 charter hire on the due date, Unico was in breach of the BC and that Unico acknowledged JMB was entitled, then, on October 1st, to provide notice of 3 days for Unico to cure the default which JMB did do on October 1 by email. JMB contends notice by email rather than by mail was consistent with a course of dealing of emailing notices which JMB and Unico had established (rather than using the post).

JMB urges that, Unico having failed to remit hire within the 3 days, JMB acted in accord with the BC when it then terminated the ATB 220 BC pursuant to Clause 20, repossessed ATB 220 and withdrew ATB 220 from the BC as of October 6, 2021 .

Pursuant to the Parent Guarantee, on October 6th JMB notified Unico Commodities that monies were owing, and although $196,462.50 was remitted to JMB on October 8th, JMB contends that its receipt of the $196,462.50 did not cure the default as the payment was after the contractually agreed cure period. JMB points out, as well, that the BC and Parent Guarantee are separate agreements, and the Parent Guarantee provides that notwithstanding payment under the guarantee "[t]he rights and remedies of [JMB] under this Guarantee shall be cumulative and not exclusive of any rights or remedies which it would otherwise have in law, in admiralty, in equity and/or under the terms of the [BC]… ."

JMB urges that notices to Unico by a letter dated October 5th, email correspondence of October 8, 2021, and the arrest of the ATB 220 on October 8th constituted proper notice of JMB's intention to terminate the charter party and withdraw the ATB 220 under Clause 20 of the BC at which point JMB was legally entitled to take possession of ATB 220.

Given that in the run-up to the bankruptcy auction Unico agreed JMB could provide copies of the BCs to Centerline and given that Unico itself provided to Centerline information as to hire rates, suggestion that JMB and Centerline engaged in illicit communication is incorrect.
And because Unico failed to reach any time charter agreement with Centerline and the Centerline-Unico exchanges shift amongst different "ideas" as to what could be a basis for a deal, clear is that no agreement was made.

Indeed, JMB argues, Centerline never provided a concrete offer and the nature of some proposals Unico suggested to Centerline amounted to sub-bareboat charters which the BCs prohibited. JMB also points out that irrespective of Unico believing the idea of a time charter did or could have attraction for Centerline, Centerline was clear that any such arrangement was not workable because the oil majors would not want to contract for such vessels with an entity operating them as a time charterer. In sum, JMB suggests that Unico's argument that, by engaging with Centerline, JMB failed to act in good faith and engage in fair dealing is without substance.

With regard to delivery of ATB 205 to Unico, JMB points out that (a) the USCG had inspected the vessel and issued a COI, (b) the management settlement to which Unico and JMB agreed August 18-19, 2021 resolved issues raised by Unico concerning items of repair and supplies, and (c) the PoDA was signed by Unico effective August 18th for delivery and acceptance of ATB 205 under the terms of the BC. In result, JMB contends, ATB 205 was delivered by JMB and accepted by Unico as in the condition delivered, of which Unico was fully cognizant.

With particular regard to the thermal oil system, JMB argues that, before Barge 205 departed Caddell's, the bake-in process of the system had been completed and that no pre-existing leaks or defects were discovered. In support, JMB points to the USCG pressure test of the system, Vapor Power's commissioning of the TOBHs, the testimony of Richardson concerning his bake-in steps and concerning what Peaslee told him, the testimony of Hickey concerning his conversation with someone on barge 205 and his expectations as to the bake-in, and Hickey's testimony that his use of "level heating throughout the system" in his August 19, 2021 email to Unico ("Small seeps may occur [in the system] until level heating throughout the system") meant "[t]hat the system was in an operating stance, normal operating condition, not being stressed in different directions at different times. Steady state."

With regard to what might have been in any log record kept concerning the bake-in, JMB urges that the testimony indicates any log record would not have contained details of the process and that at Caddell's any entries would only concern which tankermen signed on/off the barge.

After observing that no steps were taken by Richardson or others to operate the thermal oil system after Caddell's / in anticipation of cargo operations at Mt. Airy, JMB notes that that the system could not have been operating at 399°F after an hour into the preheat without, per Daly's opinion, impurities in the system, including low boilers and other impurities having already been removed from the system.

JMB criticizes Unico's decision to load asphalt at Mt. Airy after the 0200 hrs. boiler shutdown and thermal oil leak at Mt. Airy given that Richardson believed there was a leak in the system.

JMB criticizes Unico's expert Bouchard's conclusions concerning the pump can crack pre-existing the Barge 205's delivery to Unico and argues that the opinions of Daly and Colletti as to the cause of the crack are well supported as were the opinions of JMB's metallurgist.

Noting that no dispute exists that Unico failed to remit ATB 205 charter hire for October 2021, JMB argues that Unico's failure to do so when due or within the three-day cure period (i.e., by October 6, 2021) breached the charter party entitling JMB under BC Clause 20 to terminate the ATB 205 BC and to withdraw ATB 205 as of October 6, 2021.

JMB further argues that the language of Clause 20 requiring "written notice" does not mean notice need be advance notice "but rather may be simultaneous with re-taking of possession of the vessel, at Owners' option" and that Clause 20 "expressly contemplates arrest proceedings as a means to withdraw the vessel and re-take possession, by reference to 'court appointed custodians or substitute custodians.'" JMB refers to its lawyer's October 5, 2021 emailed letter as fulfilling that obligation, noting that on October 6th without payment by Unico or alternatively an agreement reached per the October 5th letter, JMB took rightful steps to terminate the ATB 205 BC, and withdraw ATB 205 via arrest papers filed on October 8th.

JMB claims liens Unico permitted to accrue against ATB 205 constituted a breach of BC Clause 19(a) pursuant to which Unico agreed not to allow maritime liens against ATB 205 and argues Unico's breach of Clause 19(a) provided a separate and distinct ground for JMB to arrest and repossess ATB 205.

### C. Arguments and Contentions of both Unico and JMB

Article 23 of the BCs states that "All Notices and other communications under this AG shall be by mail (certified-return receipt requested) addressed [postal addresses and an email address follow for each party]." Both parties point to the other party's failure to "mail" notice/s and argue that, therefore, those emailed/un-mailed were of no effect.

## IV. FINDINGS

The Panel met multiple times to deliberate, exchanged memoranda and emails concerning, quoting and citing exhibits, testimony, legal and case authorities and the parties' arguments. The deliberative process was extensive owing in part to the advocacy of counsel to the parties who raised and well argued many issues. The Panel segregated out some 24 liability issues for discussion and parsed the many elements of claimed damages.

Although the Panel's findings and conclusions do not discuss every issue counsel raised and advanced and which the Panel identified and deliberated, issues and arguments counsel advanced but not here discussed were carefully and respectfully considered but dismissed *sub silentio.*

Before discussing issues particular to one ATB, we consider issues common to the three ATBs.

*A. Seaworthiness - JMB's Delivery of the ABTs to Unico and Unico's Acceptance of the ATBs*

The circumstances surrounding the delivery of the ATBs and Unico's acceptance of them are well documented and covered via the testimony (primarily of JMB/Shenker, Unico/Valentini and on-hire surveyor Amtech/Kunkel) and emails JMB/Unico exchanged simultaneous with the arrangements for delivery-acceptance of ATB 205.

When delivered to Unico, each of the ATBs had USCG inspection COI and BV class certification. Unico attended the on-hire surveys and had an opportunity either to inspect whatever area of the ATBs it wished or to refuse delivery pending inspection of areas not available for inspection.

The delivery of ATBs 220 and 284 included Unico acknowledging, without exception taken, delivery as per the BCs which as to delivery-acceptance provide that JMB's delivery and Unico's acceptance ("subject to any reasonably undiscoverable latent defect as described in Article 7(a)")

> establish conclusively that [Unico] has inspected or has caused to be inspected (or
> has elected to waive inspection) the VESSEL and has found the VESSEL to be
> clean, tight, staunch, strong, and in all respects seaworthy, and in all respects fit
> for the work and service intended by [Unico].

Latent defect is not an issue vis-a-vis ATBs 220 and 284. The few issues Unico raised concerning the "seaworthiness" of ATBs 220 and 284, for example as to cargo hoses, were known, open and obvious, and Unico need not have accepted delivery pending their resolution. Unico did not do so and its acceptance, therefore, established Unico's having found ATBs 220 and 284 "in all respects seaworthy, and in all respects fit for the work and service intended by [Unico]."

With regard to ATB 205, because the need for certain repairs and supplies were identified as existing as of August 18, 2021, the situation surrounding delivery-acceptance is more complex than that surrounding ATBs 220 and 284. Whatever the outstanding issues as of August 18th, Unico was free to not accept delivery and would have been within its rights to do so.

As Unico's testimony (and that of the broker Braemer) and Unico's emails make abundantly clear, Unico was anxious to have the ATB 205 to provide transport to its customer which had been waiting on Unico to present ATB 205 for cargo loading. JMB, as well, was anxious to get ATB 205 underway and out of Caddell's.

The result was an acceptance-delivery arrangement deemed to have taken place on August 18th. Taking into account dollar figures estimated for items Unico identified as requiring repair/supplies before Unico would accept delivery, the agreed arrangement had JMB credit Unico with several tens of thousands of dollars (against hire Unico was to pay for the remaining days in August) and agree to pay several additional thousands towards the items upon Unico presenting repair and supply invoices. For its part, Unico reduced its August hire obligation and had a credit for future repairs/supplies it chose to do. The underlying quid pro quo is that JMB

56

and Unico accomplished what they wanted: delivery and acceptance of ATB 205 with an exchange of money/credits having "greased the wheels" to achieve that.

With both parties making a deal so as to accomplish the acceptance-delivery of ATB 205 with each knowing exactly what they were doing vis-a-vis conditions determinable by inspection etc., and putting aside the issue of latent defect (discussed below), we find that Unico's claim that JMB is liable for delivering ATB 205 to Unico in an unseaworthy condition is unfounded.

### B. Good Faith and Fair Dealing – Unico, JMB and Centerline

To consider Unico's claim that JMB breached its obligation of good faith and fair dealing, the commercial setting in which Unico, JMB and Centerline found themselves is of significance.

JMB personnel (then with PPP for Bouchard, but for ease of discussion, we here will use "JMB") began its commercial relationship with Unico in May 2021 with broker Braemar also then involved. After negotiation, JMB and Unico entered into the three BCs. JMB's commercial relationship with Centerline began at least as early as July 2021 when JMB was contacting operators of Jones Act tugs and barges to foment interest in Bouchard's 47 vessels being auctioned on July 19, 2021. Centerline was a significant presence in that market – on the West Coast – and in result JMB/Shenker communicated by telephone and/or email and/or in-person with Centerline's CEO Godden, Centerline's Paige and Centerline's "Rachel" who were, as were other operators, performing due diligence inquiries to consider bidding on any of the 47 Bouchard vessels to be auctioned including Unico's ATBs. In dealing with JMB, Centerline requested and received the Unico BCs for the three ATBs being auctioned.[1]

After the auction, and JMB's successful bid for 17 tugs and 12 barges including Unico's ATBs, JMB had tugs and barges available for operators in the Jones Act market, and JMB's Shenker continued to be in communication with Centerline which then purchased one of them from JMB and chartered another ATB from JMB.

The JMB and Centerline relationship well pre-dated September 20, 2021. On that day, Godden, unsolicited, emailed JMB/Shenker an "FYI" string of emails that Godden had recently exchanged with Unico, including Godden's effective rejection earlier that morning of Unico/Valentini's time charter with management agreement proposal to which Godden commented saying "a time charter or sub time charter is going to be very difficult, as . . . oil majors are very picky." Godden also then reiterated to Unico Centerline's proposal first made on September 14th that Centerline take over the BCs, pay Unico the BC total "rate" of $24,600 leaving to Unico to pick-up any differential by negotiating a reduction from JMB of the $24,600. From Unico/Valentini's perspective, that "reduction" would be based on the ATB 284 for which Valentini had already advised JMB/Shenker he wanted a lower rate, the extension option for which Unico/Valentini obtained but never planned to exercise and concerning which, on September 16th, Unico/Valentini texted JMB/Shenker that ". . . we will return the 284 if by [a month from September 16th] we don't get an agreement for a lower payment . . ." for ATB 284 hire.

---

[1] Centerline bids at the auction for the Bouchard vessels were unsuccessful.

For Centerline, a time charter with Unico was off the table and had been since at least September 19th, if not earlier. From the subsequent emails exchanged between Centerline and Unico, clear is that Centerline stuck with its basic position that any deal would need to involve Centerline taking over the BCs including variants such as buying Unico.

Unico's argument concerning bad faith/unfair dealing focuses on text in certain emails including Shenker's later morning September 20th response to Godden: "He [Valentini] cannot TC the boats to another operator without JMB consent."

The record concerning the reference to that text and "TC" does little to clarify what Shenker meant by "TC." For example (tr. 188), when asked about "cannot TC" Shenker said "[Unico] were proposing a time-charter with a sub-bareboat, or a sub-management agreement, which in my view was not allowed under the current charter agreements." When asked (tr.192), after a reference "TC" having been made, Shenker testified that he did not have a basis to disagree with Valentini's September 15th email to Godden:

> We are asking for 90K a month above bareboat amount in the form of a TC (total of the monthly bareboat cost plus 90k per month) for the entire duration of contracts (the 90k is basically 1k per unit per day above the bareboat rate – the 284 should go down to a lower rate and we are already in talks with JMB), and a 70-30% of the net margin generated by TCs or spot voyages fixed done by you guys during each month (Net of cost of hire and operation). 70 Centerline and 30 Unico; Centerline to pay the TC to Unico (bareboat plus the 1k per day per unit) first of the month while the split on can be paid the 15th of the following month. Centerline to manage and operate the units on Unico's behalf including maintenance and crewing. If there are availabilities during the month we will help you to get the units moving even if we have to take them in TC for spot voyages as we can move product to Mexico and other places.

And (tr. 201) after being referred to his "cannot TC the boats" statement, Shenker testified: "[t]ypically speaking, in this industry a time charter is between an operator and an oil customer, not between an operator and another operator."

Furthermore, Shenker's understanding of and his meaning when referring to TC/time charter is not what, perhaps, others might understand it to mean (tr. 631-33):

> Q. But you do recall . . . telling Mr Godden that Unico Marine could not time charter the ATBs to Centerline, correct?
> A. Correct.
> Q. You also told me, and we looked at the language in the bareboat charterparties, expressly saying that Unico Marine could time charter the units, correct?
> A. *Using the proper definition of 'time charter,' yes.*
> Q. Are you saying there is a proper definition of 'time charter' in the bareboat charter parties, or are you just adding that on to what is stated in the charter party?
> A. I am saying *there is an __industry__-accepted notion of what a time charter is.*

Q. And what is that definition, if you would share it with us?
A. *It's a charter contract between an operator and an oil customer who owns the product to move said product on the operator's vessel.* Generally speaking, it's a defined period of time, and there's a hire amount that is exchanged for that defined period of time.
Q. Let me make sure that I understand what you just told me. A time charter can only be between an operator and a party who is moving cargo; is that your understanding or your definition of a time charter?
A. . . . that is my understanding of the industry-accepted use of that term, yes.
Q. So in your understanding of the industry-accepted terminology, Unico Marine could not time charter the vessel to Centerline, who would than take on cargo on spot voyages for third parties who owned oil products; is that right?
A. Correct.

"Correct" is consistent with Shenker's viewpoint that a time charter by Unico to Centerline is contrary to Unico's BC permitting time charters because Centerline is an operator and not an "oil customer." And the "industry" to which Shenker refers is not merchant vessels in international trade but the the Jones Act coastwise trade of barges and tugs.

From Shenker's testimony, clear is that when Shenker used the term "TC" in his "He [Valentini] cannot TC the boats to another operator without JMB consent" Shenker was stating fact based upon his definition and understanding that a "TC" is between an operator and an oil company and a Unico time charter to Centerline, not being that, was not within what the BC permitted.

We know what Shenker meant by TC but we do not know what Godden, the recipient of Shenker's "cannot TC" email, understood Shenker's TC to mean.

Whether Godden understood TC to mean a "proper industry-accepted use of time charter" or some other TC arrangement we do not know. We do know Godden had copies of the unredacted Unico BCs, had bareboat chartered a vessel from JMB in late August/early September, and would know of the time charter wording. Whether Godden paid any attention to Shenker's "TC" is unknown.

Godden's response to Shenker that "No legitimate customer would buy into *it* either – all of the major contracts disallow *it*. . ." leaves unclear what Godden understood Shenker's use of "TC" to mean.

For sure, we do know one thing. Before writing to Shenker on the morning of September 20th and before receiving Shenker's "TC" email, Godden had written Valentini that a time charter or sub-time charter would not work as "we may impede [Centerline's] commercial opportunities if we're trying to present Unico as the technical operator under a sub-charter kind of relationship."

Shenker's testimony as to what a TC is -- in the absence of testimony from Godden as to what Godden understood Shenker to mean -- and the sequence of emails evidencing that before Shenker's "TC email" Godden had already emailed to Valentini Godden's rejection of a time charter or sub-time charter proposal and had repeated to Valentini Godden's earlier offer to

Valentini to take over the Unico charters at $24,600/day, leaving to Valentini to negotiate a lower rate with JMB, taken together, suggest Shenker's "TC email" was of no significance and had no import vis-a-vis Godden's dealings with Unico.

Centerline/Godden was never compelled to appear and testify in these proceedings pursuant to the previously issued subpoena. The Panel made clear to the parties that we were prepared to support an effort to obtain from the court in Oregon, where Centerline was based, an order compelling Centerline testimony (Unico, in communicating with Centerline's lawyer, reserved the right to obtain an order compelling compliance). However, no such order was ever requested from the Panel, and the record before us does not include any testimony from Godden or anyone from Centerline.

With regard to Unico/Valentini's email of September 21st to JMB/Shenker that Valentini had heard that Shenker told Centerline to not negotiate with Unico as Shenker would oppose any deal, Shenker accurately responded that "What you accused me of is untrue . . . ." Shenker did not do so and later emails indicate JMB was open to an arrangement along the lines of Centerline's proposals to take over the BCs or buy Unico. Indeed, Shenker's email to Valentini continued "We are happy to help facilitate a transfer of these [BC] agreements to another operator, but it will require JMB consent . . . ."

On September 25th when Godden emailed Shenker concerning the potential sale of Unico to Centerline, Shenker commented in an internal email that he thought such a sale may be doable under the BCs. It was understandable, in contemplating a major investment in buying Unico whose BCs were with JMB with whom Centerline had a commercial relationship, that Centerline/Godden wanted JMB to be aware and okay with Centerline's potential purchase.

Pointing to two JMB internal emails written by Tandon (September 8th and August 10th) in which Tandon writes "Get my boats back please" and "I hate these guys," Unico argues that these messages evidence JMB's bad faith and unfair dealing viewpoint. Our review of the entire string of emails preceding and following these emails exchanged between JMB and Unico does not support Unico's contentions. Rather, the contemporaneous correspondence evidences circumstances where each party was frustrated with the other. While the language in the parties' exchanges demonstrated frustration, these communications did not constitute or amount to bad faith.

Having considered the entire record surrounding the evidence cited by Unico, we find that the record does not support a finding that JMB sought to interfere with or did prevent Unico from realizing the benefits and fruits of the BC Unico had with JMB for ATBs 205, 284 and 220. Accordingly, the Panel rules that JMB is not liable to Unico based upon a theory of alleged bad faith or unfair dealing.

### C. Redelivery of ATB 284 by Unico, Loss of Hire and Claimed costs and Expenses (and Credits)

Clause 5 of the BC provides that the "base term" of the BC is from "the date of delivery (*estimated* to be on or about June 1, 2021) for a period of *approximately* six (6) months, *ending*

60

*on November 30*, 2021". (Italics added for emphasis). The BC provides that "[t]he first option period shall be from December 1, 2021 . . . ."

Unico redelivered ATB 284 to JMB on October 7, 2021, well short of the base term's November 30, 2021 end date and, in doing so, Unico thereby breached the BC.

JMB promptly sought to mitigate losses it would suffer by the early return of ATB 284 and chartered ATB 284 to Centerline with ATB 284's hire commencing on November 15th. In result, JMB received no hire between October 1st through November 14th, some 45 days. The hire for that period was 45 days at $9,262.50 ($9,500/day less brokerage) per day, or $416,813.

JMB's damages expert, St. Amand, calculated the difference between the Centerline hire and the Unico hire, taking into account brokerage, to be $1,429.17/day.

November 15, 2021 to end of the base term of November 30, 2021 is 16 days.

Therefore, JMB is entitled to lost hire of $1,429.17 per day for 16 days which is $22,867.

St. Amand noted that the Centerline charter contained a bargain purchase option permitting Centerline to purchase the ATB at the end of the charter term at "fair market value" less $1.35 million. St. Amand referred to a four-year annuity at 10% interest to come up with a daily value of $765.92 per day for the "bargain discount" allowed to Centerline.

For its part, Unico argues that the valuation is speculative, that unknown is what/whether the Bargain Discount came into play, and suggests that at term of the charter the date would be beyond the term of the Unico ATB 284 BC.

Nothing in the record provides background as to how, if at all, the Discount provision played a part in the mitigation efforts/re-chartering the ATB 284.

On balance, we believe the daily "value" St. Amand calculated is not recoverable by JMB.

With regard to miscellaneous items of claimed damages including various costs and expenses, we have considered the arguments presented and find:

(1) JMB claims Extra Costs incurred by reason of Unico early redelivery:
$60,637 Crew Costs – Granted
$16,315 Berthage October – Granted
$8,484 Berthage 6-31 August PAoNYNJ (includes 50% reduction negotiated) - Granted
$38,817 Insurance $- Granted
-----------------------------------------
$124,253 Total Granted extra costs

(2) Management fees - $~~56,427.66~~ - Denied

(3) Maintenance & Repair (not fair wear and tear)
$12,634.92 hoses: - Granted
$20,813 broken valves – Granted
$4,780 for re-Class Surveys ABS $3,140/testing of tanks $1,640 – Granted
$1,560 certificates for GMDSS, SASS, Navtex, radio: - Granted
$3,310.37 repair alarm panel: - Granted
$1,135 first aid kit: - Granted
$44,234 Total Granted as claimed

(4) Martin Ottaway Off-hire survey: $5,811 - Granted

(5) Credits to Be Applied by JMB to Unico:
$94,490 credit for Fluids/Inventory
$7,376 credit for inventory in Captain's Assets
-------------------------------------
$101,866 - Total credits in favor of Unico

Total ATB 284 Costs and Expenses Granted to JMB:
$124,253
  44,234
   5,811
$174,298 Total Costs and Expenses Granted to JMB *less* $101,866 Total Credits to Unico =
$72,432 balance of Granted Costs and Expenses to JMB


### D. ATB 220 – Issues as to Payment of Hire, Claimed Costs and Expenses (and Credits)

In the latter part of September, invoices for the October hire for each of the three ATBs, including ATB 220, were emailed to Unico/Valentini although no requirement existed that JMB do so.

Clause 6 of the ATB 220 BC states that hire is "payable monthly in advance on the first day of each month, or if the 1st falls on a non-banking day, the last banking day of the previous month. . . ." With October 1st being a Friday, the October hire was payable on October 1st.

Unico did not pay hire on October 1st, and after banking hours that day, JMB emailed Unico that "[p]er Section 6(a) of each of the Bareboat Charter Agreements for the [three ATBs], this email shall serve as formal notice of the failure to make timely payments."

The section to which JMB referred provides, in part, that "[i]f the CHARTERER fails to make punctual payment of hire due, the OWNERS shall give the CHARTERERS three (3) banking days written notice to rectify the failure, and when so rectified within those three (3) banking days following the OWNERS' notice, the payment shall stand as punctual."

On October 5th, JMB's lawyer "via email" wrote to Unico's lawyer R. Gorman stating:

> Unico is in default of its obligation to pay charter hire for both [ATB 205 and
> 220] . . . JMB has proposed terms to terminate all three [BCs] and permit Unico to
> redeliver all three ATB units but has received no response. . . . JMB Shipping's
> offer of those terms remains outstanding until 5:00 pm EST on October 6, 2021. .
> . . JMB . . . expects either (1) payment of the outstanding charter hire amount or
> (2) acceptance of [the] proposal to wind down the three charterparties, in either
> case no later than close of business tomorrow, October 6, 2021.

In circumstances of Unico failing "to pay any charter hire due for more than three (3) banking
days after the due date thereof (subject to notice and cure period)" then

> OWNERS may, at their option, withdraw the VESSEL from the service of the
> CHARTERER and terminate this AGREEMENT by giving written notice to
> CHARTERER, without prejudice to any claim for damages suffered or to be
> suffered by reason of the CHARTERER's default . . . which OWNERS might
> otherwise have had against CHARTERER in the absence of such withdrawal; and
> upon giving such notice or at any time thereafter, OWNERS may retake
> possession of the VESSEL, wherever found, without prior demand and without
> legal process, and for that purpose OWNERS and/or their authorized
> representatives, including any court appointed custodians or substitute custodians,
> may enter upon any dock, pier, fleet or other premises where the VESSEL may be
> or may take possession thereof.

On October 8th, JMB commenced proceedings and arrested the ATB 220 in Florida based upon
Unico's alleged failure to timely pay hire for October and upon JMB's "right to re-take
possession pursuant to Clause 20" of the BC.

The issue presented is whether JMB complied with the notice requirements of Clause 20.
JMB believes the October 5th letter was sufficient in that it refers to permitting Unico early
redelivery and winding down the three BCs with a deadline of October 6th.

Late payment of charter hire, although not common, is not infrequent. Reasons vary widely from
something as simple as using an incorrect account number for a wire transfer to awaiting receipt
of "late" hire from a subcharterer. The reasons are myriad and varied. That late payments do
happen has over time put into focus charter party clauses and requirements to deal with late
payments. The clauses often provide leeway, having in mind that if some forgivable hiccup has
occurred delaying payment then some days of grace will permit the parties to continue.
Given that payment of hire is a fundamental element in the charter "equation," owners expect
close adherence to the charter requirements concerning payment of hire, as did JMB here.
By the same token, the other fundamental element in the charter equation is "the vessel" – just as
important to the charterer as the hire is to the owner. As the owner expects strict adherence to
requirements for payment, so does the charterer expect strict adherence to requirements which
may result in its loss of use of the vessel, especially if the loss will be permanent.

Because withdrawal of a vessel/termination of a charter is a dramatic event ending an agreed
venture, charter party provisions and requirements concerning it are typically strictly enforced.

Here, the language of Clause 20 is unambiguous and clear. JMB had the right, at its option, to withdraw ATB 220 from Unico and terminate the BC "by giving written notice" and then "upon giving such [written] notice" had the right to repossess ATB 220.

We do not read the letter of October 5th to be such notice and entertain doubt that the letter was intended to give such notice – the letter sets a deadline for a response but neither expresses nor implies failing to do so will trigger termination of the BC/repossession. This is buttressed by the testimony of JMB's Shenker: "I do not know of any notice [expressing JMB's intent to withdraw ATB 205 and 220 from Unico's service] being sent" and "I do not believe that any notice [of intent to terminate, i.e., repossess] was sent prior to the arrest."

Given that JMB did not provide the required notice under the BC by withdrawing ATB 220, terminating the BC, and repossessing ATB 220, JMB breached the BC. In other words, JMB's termination of the BC was improper and wrongful, and constitutes a material breach by JMB entitling Unico to damages that flow from that breach.[2]

Both parties, depending upon which was the recipient of a notice received by email, have as to those/that particular email argued that such notice was ineffective because clause 23 of the BC states "All Notices . . . under this AGREEMENT shall be in writing and shall be by mail (certified-return receipt requested)" – although, interestingly, an email address appears after each parties postal address. Given that repetitively the parties used email for notices, we find that the parties established a course of dealing for notices required under the BCs to be accepted as proper notice when received by email.

Given our finding that JMB did not provide proper notice of withdrawal or termination, the ATB 220 BC was not terminated. We find that Unico/Valentini's October 10, 2021 email to JMB and JMB lawyers stating that "bareboat for [ATBs 220 and 205] are still undergoing contractually and please take this email as notice from Unico Marine that we do extend our bareboat to the next 6 months option as per contract. . . ." was an effective exercise of the option to extend the ATB 220 BC term for 6 months (the BC required such notice to be provided 45 days before expiry of the base term November 30, 2021).

With regard to damages, although we defer for later discussion issues surrounding the parties' claims concerning loss of earnings, we here address individual items of expense claimed by JMB.

With respect to claimed expenses associated with the ATB 220, we have considered JMB's invoices and the parties' arguments and we find:

---

[2] In passing, although not necessary to determine given our finding of liability, the October 6th payment to JMB of $196,462.50 did not cure Unico's failure to timely pay October hire. The Parent Guarantee provides that JMB's rights and remedies under the Guarantee are cumulative, i.e., in addition to any other rights, and not to the exclusion of "any rights or remedies which it would otherwise have" under the ATB 220 BC.

JMB claims:
Maintenance & Repair items after re-possession $~~205,312~~ (Exh 117-139) – Denied
(improper withdrawal and termination – conditions beyond "wear and tear" inapplicable).
Custodia Legis expenses, Insurance, Management fees – Denied

$69,354 John W Stone (JMB Exh 104-105) - Granted
$24,261 Norton Lily (JMB Exh 106-109) - Granted
$41,002E. N. Bisso (JMB Exh 110-115) - Granted
$134,617 Total Granted to JMB for its payment of Necessaries / third-party liens

Credits to be applied by JMB to Unico:
$70,549 for fluids (JMB Exh 282)
$196,462.50 remitted to JMB per Parent Guarantee and retained by JMB
$267,011.50

$134,617    - Total ATB 220 Payments of Necessaries / third-party liens Granted to JMB
$267,011.50 - Total Credits in favor of Unico
$132,394.50  balance of Credits in favor of Unico

### E. ATB 205 – Issues as to Latent Defect, Payment of Hire, Loss of Hire and Claimed Costs and Expenses (and Credits)

The September 14, 2021 loss of thermal oil via a crack along the weld joining a channel carrying thermal oil to the pump can during preheat at Mt. Airy terminal had impact on the parties and, in turn, in this arbitration. Many witnesses, fact and expert, weighed-in on causes and effects of the crack and what had occurred.

The primary issue the parties present is whether a latent defect existed on August 18th when Unico accepted delivery of Barge 205. In other words, did the crack already exist on August 18th and then later reveal itself at Mt. Airy covered by and sealed with hardened asphalt? Or did a singular overpressure event occur at Mt. Airy caused by Richardson too rapidly raising the thermal oil temperature during the preheat process to ready Barge 205 to load asphalt?

If, in the days before delivery, a crack sealed with hardened asphalt existed then JMB's belief is the crack would have revealed itself during the bake-in which tankermen Richardson and Peaslee carried out during the last days Barge 205 was at Caddell's, in effect suggesting that if the preheat, per Unico's latent defect argument, revealed the crack at Mt. Airy then the same would have occurred during the bake-in at Caddell's had the crack existed prior to or at delivery to Unico on August 18th.

In response to Unico's contentions, JMB and its experts believe Richardson's too rapidly raising of the thermal oil temperature caused a water hammer-like event: heating the thermal fluid tends to release air and water vapor which can collect in pockets which should be vented and removed

from the system with the heating channel on the pump can a potential pocket from which the flow of the pressurized thermal oil can sweep the pocket out of the channel with the pressurized high temperature thermal oil causing the pocket to collapse leading to a pressure shock within the heating channel.

The parties' respective metallurgists drew differing conclusions from their analysis of the pump can steel and had dueling views as to whether or not the finite analysis computer modeling correctly and completely reflected the actual parameters of the pump can so as to provide reliable results.

Whether Richardson's pre-heat at Mt. Airy was too rapid or was usual and in line with normal practice was hotly debated. That apparently those involved in the preheat sensed nothing out of the ordinary during the preheat up to the moment the boiler shut down due to loss of thermal oil is argued to cut against an overpressure water-hammerlike event.

Whether the bake-in carried out at Caddell's was properly carried out so as to accomplish its objective, removal of air, water, impurities/low-boilers, accounted for many hours of testimony, fact and expert. The panel wrestled with the evidence relating to exactly how many hours or days the process should have and did entail – and, as well, what temperature was achieved and for how long the system was run at that temperature.

With so much time and energy expended concerning the bake-in, a paradox is that the "bake-in" opinion of each parties' expert/s heavily relied upon what Peaslee - the tankerman who directly carried out the bake-in – told them during telephone discussions while Peaslee himself never testified.[3] In result, snippets of hearsay such as "got it up to temp" became key to their conclusions as to whether the bake-in was properly carried out. Likewise, various witnesses extrapolated from their bits of direct involvement how many hours or days may have been used for the bake-in at Cadell's, whether Peaslee stopped the bake-in to sleep, etc. Additionally, the ATB 205's logbook pages may have contained information about the bake-in, but, unfortunately, these logbook entries for the period in question at Cadell's were never located or produced by JMB, and this non-production undermines JMB's contention that the bake-in was properly performed prior to delivery to Unico.

The Panel reviewed and considered the documentary, expert (reports and testimony) and witness testimony concerning the bake-in, and similarly reviewed and considered that concerning whether a latent defect existed at delivery and the alternatives presented concerning existence and cause of the crack and resultant thermal oil loss.

Although not unanimous as to the particular defect existing at time of delivery of ATB 205 to Unico, the Panel is unanimous in finding (a) that a latent defect existed on August 18th when Barge 205 was accepted by Unico with the thermal oil system harboring that defect and an improper and/or incomplete bake-in implicated, and (b) that such latent defect "could not be reasonably [be] discovered" on August 18th or during the on-hire survey.

---

[3] A subpoena was issued for Peaslee's testimony, but the Panel was never requested to take steps to enforce it.

Although not unanimous as to the precise mechanism or event which resulted in the crack / thermal oil leaking through the crack, the Panel is unanimous in finding that a latent defect existed when ATB 205 was accepted by Unico and that the latent defect was causally connected to the boiler shut down/thermal oil loss through the crack, rendering ATB 205 unseaworthy/not fit for the intended service.

As per Clause 7(a) of the ATB 205 BC, when the latent defect rendered ATB 205 unseaworthy/not fit for the intended service, ATB 205 was agreed to be "deemed offhire until [JMB] at [its] sole cost and expense, resolve[s] the issue and make[s] the [ATB 205] in every respect ready in tanks, hull, machinery and equipment for the service intended . . . ."

The offhire of ATB 205 went from September 14th to September 30th, a period for which Unico had paid hire. The offhire period would have continued well into October during repairs, but was "interrupted" when, on October 7th, JMB caused the federal court in Louisiana to arrest ATB 205 based upon Unico's failure to timely pay hire to JMB.

We refer to our finding concerning ATB 220 that JMB did not provide proper or adequate notice of withdrawal or termination. Because the evidence and arguments of the parties as to "notice" and withdrawal/termination/repossession concerning ATB 220 are the same for ATB 205 (and the shortcomings of the October 5th emailed letter equally applicable as to ATB 205), we will not repeat here that discussion which supports our finding that as to ATB 205, JMB did not provide proper or adequate notice of withdrawal or termination.

Given our finding that JMB did not provide a proper notice of withdrawal or termination, the ATB 205 BC was improperly terminated and the ATB 205 would have remained "offhire" into October and until JMB completed repairs to make ATB 205 in every respect ready in tanks, hull, machinery and equipment for the service intended. The arrest and repossession interrupted the offhire period by removing ATB 205 from Unico's service.

Unico/Valentini's October 10, 2021 email to JMB and JMB lawyers that "bareboat for [ATBs 220 and 205] are still undergoing contractually and please take this email as notice from Unico Marine that we do extend our bareboat to the next 6 months option as per contract. . . ." and Unico/Valentini's November 12, 2021 emailed/posted letter to JMB and its lawyers giving notice of Unico's "intention [pursuant to Clause 5 of ATB 205 BC] to exercise its option to extend the charter party for a further six-month term commencing December 31, 2021" effectively exercised the option to extend the ATB 205 BC term for 6 months (the notice/s were timely because the BC required such notice to be provided 45 days before the December 31, 2021 expiry of the base term).

With regard to damages, we defer for later discussion issues surrounding the parties' claims concerning loss of earnings.  But having considered JMB's invoices and the parties arguments concerning individual items of expense claimed by JMB, we here address them and find:

JMB claims:
Substitute custodian-Insurance costs, legal/management fees (1/3 re: arrest) – Denied
Buck Kriehs Sept/Oct repairs, wharfage, materials, etc. $350,345 – Denied

Repairs - JMB (JMB Ex. 283; 182 parag 11) $~~363,419~~ – Denied
Port Engineer - JMB (JMB Exhs 283, 133-139) $~~14,000~~ – Denied

$227,865 Bunkers/Glander (JMB Exh. 274-75) - Granted
$3,662.70 Ian-Conrad Bergan (JMB Exh. 278) Necessaries (safety gear) - Granted
$231,527.70 Total Granted JMB costs/expenses

*To be CREDITED to Unico:*
$81,341 for fluids (JMB Exh 282)

Summary:
$231,527.70  - Total ATB 205 Payments of Necessaries / third-party liens Granted to JMB
 $81,341.00  - Total Credits in favor of Unico
$150,186.70  balance of Payments of Necessaries / third-party liens in favor of JMB


## *F. BC OPTIONS – ATB 205 AND ATB 220*

Unico's Valentini testified that both ATB 205 and ATB 220 were a very attractive arrangement
for Unico. ATB 205 was a valuable asset because it was a heated barge capable of carrying
asphalt and was unique in the marketplace so that demand for that unit would always be there.
Similarly, ATB 220 was valuable because the hire rate which JMB placed on the ATB 220 was
below market, an "incredible rate," for Barge 220 at 110,000 Bbls. Further, regarding ATB 220,
Valentini testified that because no other 110,000 Bbl. barges at $6,500/day were in the market
(Centerline took ATB 220 at $7,800) Unico had no way to mitigate its losses on the ATB 220.
Given the attractiveness of those two units Valentini planned on keeping both ATBs for a long
time. This was expressed to Broker Braemar.

Broker Braemar's Jurewicz more than echoed Valentini's testimony about ATB 205 referring to
Barge 205 as a "unicorn," the demand for which would be sustainable and high. Expert
Johnsen's testimony likewise indicated a strong market for both ATBs and pointed to demand at
the time he testified in May 2023.

St. Amand did not see the market in a similar way and emphasized his opinion that Unico,
without a track record in the Jones Act marketplace as an operator, and with ATBs tainted by
their association with Bouchard and its bankruptcy, would not enjoy a profitable future with the
ATBs. St. Amand also pointed out what he characterized as the spotty under-utilization of ATB
220 during the period Unico had it under charter.

We have carefully considered the testimony and exhibits bearing on the market and the options
as well as the parties' Briefs on Options to Extend and Damages and cited authorities.

Testimony and exhibits amply evidences that ATB 220 was desirable and would be readily
employable in the rising market (the existence of which was not disputed). After having
improperly terminated the ATB 220 BC and having removed ATB 220 from Unico's service

October 8, 2021 (JMB's arrest and repossession), JMB's own actions confirm that Unico, with BC hire at $6,500/day, would have no difficulty employing ATB 220 in the market: November 22, 2022 JMB bareboat chartered ATB 220 to Centerline at $7,800/day for four years.

Similarly the testimony and and exhibits evidence that ATB 205 was a uniquely sized heated barge, a "unicorn," with continuous employment in a rising market to be expected – indeed in May 2023 Jurewicz testified that having worked out kinks upon completion of repair of the cracked pump can the 205 had been continuously employed in a rising market with rates a multiple of Unico's daily bareboat rate. On November 22, 2022, JMB bareboat chartered ATB 205 to Centerline at $7,833/day for four years (increasing in steps to $8,833/day the fourth year).

JMB having improperly terminated the ATB 205 and ATB 220 BCs and having on October 7/8, 2021 arrested and repossessed ATB 205 and ATB 220, the ATBs were effectively in a state of limbo. Lawyers and JMB and Unico were in communication.

On October 10th, Valentini emailed JMB, JMB's lawyers and others with regard to ATB 205 and ATB 220: "please take this email as notice from Unico Marine that we do extend our bareboat to the next 6 months option as per contract. . . ;" November 12th Valentini emailed JMB and others concerning ATB 205 and 220: pursuant to Clause 5 [of BCs] Unico Marine, hereby gives notice to Owner . . . of its intention to exercise its option to extend the charter party for a further six month term commencing December 31, 2021 - both notices were provided more than 45 days before expiry of the initial existing BC period as per the BC option clause.

JMB proposes that because Unico's notices were provided after JMB had terminated and arrested ATBs 205 and 220 Unico should be limited to damages (if any) only for the balance of the base BC period. In effect, JMB's argument is that its termination of the BCs/repossession of the ATBs prevented Unico from exercising its options in the period from October 7/8 to mid-November, 45 days before expiry of the initial existing BC period before which the BC option clause provides an option is to be exercised.

When Unico provided the October 10 and November 12 notices to exercise the option to extend, JMB had control and possession of ATB 205 and 220.

Given JMB's termination of the ATB 205 and 220 BCs was improper and therefore ineffective, we find that Unico's notices to exercise the first option were effective.

On November 22nd, circumstances changed. JMB bareboat chartered ATB 205 and 220 to Centerline with ATB 220 on hire to Centerline December 18, 2021 and ATB 205 on hire to Centerline January 7, 2022.

Having received Unico's notices to exercise the first option to extend ATB 205 and 220 BCs while JMB had them in its possession – and having incorrectly assumed the notices to be ineffective - JMB in December 2021 and January 2022 gave up possession and control of ATB 205 and 220 to Centerline under new BCs. By doing so JMB eliminated any possibility that JMB could rectify JMB's improper termination of the BCs or fulfill JMB's BC contractual obligations owed to Unico, for example, fulfilling JMB's obligation to provide the ATBs in response to an

exercise of options by Unico to extend the BC period/s. That circumstance (of JMB's doing) belies JMB's argument that because Unico did not notify JMB that Unico was exercising its options 2 through 6 to extend in 2022, 2023 and 2024 Unico's recovery of damages/losses is limited to the base period.

A majority of the Panel disagrees with JMB's arguments concerning the exercise of the options and finds them to be fundamentally flawed:

- JMB improperly terminated the BCs and relies upon that improper termination to deny Unico damages/losses for the first option period because Unico provided notice to extend after JMB's improper and ineffective termination.
- JMB, having improperly terminated the BCs, took possession, bareboat chartered and delivered ATB 205 and ATB 220 to Centerline, suggests that - despite having done so - Unico's failure to provide notices to exercise options 2 through 6 means Unico cannot recover damages/losses for the option periods because JMB's own actions eliminated any possibility of JMB providing the ATBs to Unico for the option periods.

Three weeks after Unico's November 12, 2021 notice to exercise its first options to extend, on December 2nd the Panel in this arbitration was deemed accepted and the arbitration was underway. The majority of the Panel, especially in the light of the above discussion, finds it unrealistic to expect, much less require, Unico to provide notices to exercise options 2 through 6 to recover damages/losses for the option periods.[4]

That during the time Centerline had and was operating ATB 205 and 220 Unico in 2022-2024 did not notify JMB that Unico was exercising options 2 through 6 on the ATBs JMB had bareboat chartered to Centerline does not foreclose Unico from recovering lost earnings for those periods of time.

A majority of the Panel believes and finds that had JMB not wrongfully terminated the ATB 205 and 220 BCs and had JMB not then repossessed ATBs 205 and 220 so that the ATBs thereby would remain under charter to Unico, Unico (having effectively exercised the first option) would have exercised the remaining five six-month options available to Unico under paragraph 5(c) of the BCs.

Unico proved its recoverable damages of $4,992,980 with respect to the ATB 250, and $7,139,460 with respect to the ATB 220, with reasonable certainty. (see *Wathne Imports, Ltd. v. PRL USA, Inc.*,101 A.D.3d 83 (1st Dep't 2012); *Schonfeld v Hilliard*, 218 F.3d 164 (2d Circ. 2000); *Time Charters*, section 4.86 *et seq* Terence Coughlin, *et al* (6th ed. 2008)).

The BCs of the ATB 205 and ATB 220 provided as follows :

ATB 205:
      5. TERM:
      (a) Base: The base term of this AGREEMENT shall be from the date of delivery

---

[4] Arbitrator Tsimis disagrees with the Panel majority on this point and his reasons are set forth in his Partial Dissent attached to this Final Award.

70

(estimated to be on or about June 30, 2021) for a period of approximately six (6) months, ending on December 31, 2021. The first option period shall be from January 1, 2022 ending on June 30, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the *then-existing base period*.

* * *

(c) Additional Option Periods: CHARTERER shall have an option to exercise five (5) additional six (6) month option terms, ending respectively on or about, December 31 2022, June 30, 2023, December 31, 2023, June 30, 2024 and December 31, 2024, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the *then-existing period*. In all cases, the term is subject to earlier termination in accordance with the terms of this AGREEMENT. [italics added for emphasis]

ATB 220:

5. TERM:

(a) Base: The base term of this AGREEMENT shall be from the date of delivery (estimated to be on or about June 1, 2021) for a period of approximately six (6) months, ending on November 30, 2021. The first option period shall be from December 31[**sic**], 2021 ending on May 31, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the *then-existing base period*.

* * *

(c) Additional Option Periods: CHARTERER shall have an option to exercise five (5) additional six (6) month option terms, ending respectively on or about, November 30 2022, May 31, 2023, November 30, 2023, May 31, 2024 and November 30, 2024, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the *then-existing period*. In all cases, the term is subject to earlier termination in accordance with the terms of this AGREEMENT. [italics added for emphasis]

The majority of the Panel finds no merit in the position that the bulk of Unico's claimed damages for the ATB 205 and ATB 220 should be denied on the ground that Unico did not give written notice of exercising the last five option terms within the last forty-five days of five "*then-existing base period[s]*" when said periods could not and did not then exist, and they did not *then exist* because of JMB's breaches of contract, wrongful repossessions of the ATB 205 and ATB 220 (followed by bareboat chartering of ATB 205 and 220 to Centerline).

## V. Damages – The Parties' Claims Concerning Loss of Earnings

The views of experts St. Amand and Johnsen, as set out above in "*Damages and the ATB Market and mitigation,*" and as discussed above in the context of "options," and as expressed and explained in their initial reports, were very much at odds with each other. Their testimony in support of their views emphasized and explained the bases and methodology and factors (for example, costs of fuel, port charges, tugs, pilotage, crew, etc. and factors such as ballast voyage/s, off-hire and repair periods, etc.) upon which they relied in forming their opinions and

estimates as to earnings with both providing details as to ATB 220 earnings/lost earnings vis a vis Unico. Also, as to ATB 205, St. Amand opined that, based upon the "failed" ATB 205 BC, JMB suffered damages while Unico had no damages; in result St. Amand provided no calculations for the Panel to consider as to potential for Unico ATB 205 earnings.

Their testimony also covered, as did cross examination, various points raised in their reports responding to the other's main report. Each expert sought to defend the bases upon which they relied and their own methodology and calculations.

Because neither expert accepted modification or criticism of their conclusions, the Panel weighed their testimony and reports as presented. With one proviso, the Panel was persuaded, on balance, to accept the lost earnings damages presented by Johnsen as reasonably representing the lost earnings to Unico by reason of JMB's withdrawal – termination and repossession of ATBs 205 and 220.

The proviso to which we refer concerns the base term of the ATB 220 BC:

> (a) Base: The base term of this AGREEMENT shall be from the date of delivery (estimated to be on or about June 1, 2021) for a period of approximately six (6) months, ending on November 30, 2021. The first option period shall be from December 31[**sic**], 2021 ending on May 31, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing base period.

Within the quote we have "from December 31[**sic**], 2021."

The December 31 date is, we find, clerical/typographical error.

The BC base term was six months from estimated delivery June 1 which would be to November 30th. The first option to extend is stated to end "May 31, 2022" which is six months from December 1, 2021. The ATB 284 BC, tracking the same estimated delivery date, has the base term ending "November 30, 2021."We find that the base term of the ATB 220 BC was to be November 30, 2021, and we adopt that date to modify the damages calculated by Johnsen for ATB 220.

*Lost earnings – damages ATBs 205 and 220*

Given the Panel's findings above, we hereby rule that Unico is entitled to damages caused by JMB's breaches when it wrongfully terminated the ATB 205 BC and the ATB 220 BC. In this regard, the majority of the Panel[5] finds that the following damages will be awarded:

---

[5] As mentioned above, Arbitrator Tsimis dissents on this point insofar as he believes that damages should only be awarded to Unico for the remainder of the base term of the BCs for ATB 220 and ATB 205, and for the first option periods thereunder, which were exercised by Unico in writing. A more detailed discussion is set forth in his Partial Dissent which is attached at the end of this Award.

ATB 205

Periods at issue and recoverable damages:
September 14 – 30 offhire: Unico had paid in advance 16 days x ($8,600 less 2.5% brokerage = $8,385) = $134,160.

October 1 - 6 offhire – Unico paid no hire.

October 7 (arrest of ATB 205) to January 2, 2025 = $5,009,007
(base term plus six 6-month Option/s).

ATB 220

Periods at issue and recoverable damages:
October 9, 2021 > Dec 28, 2021 (80 days) $514,040 less 5% discount to be applied over time.
Six option periods leading up to last option period of July 4 > January 2, 2025 (182.6 days) $1,458,535 less 5% discount to be applied over time.

For the first period ending December 28 the daily figure is $6,425.50.
For the last period ending January 2 the daily figure is $7,987.
The average daily figure for those two periods is $7,206, which times 28 days is $201,768, which we subtract from the Johnsen total damages of $7,208,834 to eliminate the 28 days which were included by Johnsen based on the "as presented" BC containing the clerical/typographical error.

$7,208,834 less $201,768 = Recoverable damages of $7,007,066.

## VI. Conclusions

*Unico Marine Services LLC is liable for damages to JMB Shipping ATB 284, LLC for breach of the ATB 284 BC:*

$124,253 Extra costs
$44,234 Maintenance & Repair (not fair wear and tear)
$5,811 MartinOttaway Off-hire survey

$416,813 - Hire for 45 days (less brokerage)
$22,867 - Hire for 16 days (less brokerage) (difference between Centerline hire and Unico hire)
$613,978
less
$101,866 - Total credits
**$512,112**


*JMB Shipping ATB 205, LLC is liable for damages to Unico Marine Services LLC for breach of the ATB 205 BC:*

$5,009,007 – Lost earnings
$134,160 – Hire paid for 16 days (September 14 – 30, 2021)
$5,143,167 plus
$81,341 - Fluids on board at time of arrest
$5,224,508
less
$231,528 Total Allowed JMB (JMB Shipping ATB 205, LLC) Necessaries / Third-Party Liens
**$4,992,980**


*JMB Shipping ATB 220, LLC is liable for damages to Unico Marie Services LLC for breach of the ATB 220 BC*:

$7,007,066 - Lost earnings
$70,549      - for fluids
$196,462    - remitted to JMB per Parent Guarantee and retained by JMB
$7,274,077
less
$134,617      Total allowed **to JMB** for its payment of Necessaries / third-party liens
**$7,139,460**

## VII. Attorneys' Fees and Costs of the Parties

Section 30 of the SMA Rules provides the Panel with discretion "to award reasonable attorneys' fees, expenses or costs incurred by a party or parties in the prosecution or defense of the case." This section also provides the Panel with the discretion to grant any remedy or relief which it deems just and equitable…." In this matter, the Panel has considered the supporting declarations submitted by the parties' appointed counsel in connection with each proceeding involving the disputes presented and decided. In this regard, the Panel, bearing in mind Section 30 above and the facts of these matters and the evidentiary record, awards the following attorneys' fees and costs as follows for each proceeding:

1. ATB 205 – Unico is awarded $641,899.55;
2. ATB 220 – Unico is awarded $124,921.09; and
3. ATB 284 – JMB is awarded $380,000.[6]

## VIII. SEALED OFFER

February 7, 2023, Unico Marine Services LLC notified the Panel that Unico served JMB Shipping ATB 205 and JMB Shipping ATB 220 with Sealed Settlement Offers dated February 7, 2023 and that JMB Shipping ATB 205 and JMB Shipping ATB 220 declined to accept the offers. Unico Marine advised it would send the offers to the Panel Chairman in sealed envelopes "which should not be opened until such time as the Panel has arrived at its final decisions on the 205 and 220 disputes respectively" – almost verbatim the language found in Rule 31 of the SMA Rules (hereinafter "the Sealed Offer").[7]
Section 31 provides in relevant part:

> (b) At any time after presentation of initial submissions to the Panel, but in no event later than the date the proceeding is declared "closed" per Section 25, either party may present the other with a Settlement Offer binding itself to either pay or accept a fixed sum (including accrued interest) or in the case of a claim for injunctive relief or specific performance, to perform, not perform or discontinue

---

[6] The Panel appreciates that JMB's attorneys' fees and costs for the ATB 284 proceeding totaled $647,619.96, but after careful consideration of the principal amounts involved, the amount of time spent with respect to each proceeding, the degree of complexity of the issues and evidence adduced, the Panel considers its exercise of discretion to award $380,000 to be an appropriate reflection of these aforementioned factors.

[7] Effective June 1, 2022, the SMA revised Section 31 to include the Sealed Offer mechanism language cited above. *See https://smany.org/pdf/arbitrator/Vol52_No2_May2022.pdf*, page 2, Lucienne Carasso Bulow, *Amendments to SMA Rules and Shortened Arbitration Procedure*. This consolidated arbitration is governed by the prior edition of Rules of the SMA for contracts entered into from March 2018 to June 1, 2022. Because Rule 31 effectively is a codification of a practice concerning "Sealed offers" used from time to time in SMA arbitrations without a rule addressing their use, the Panel relied upon the current Section 31 for guidance concerning Unico's utilizing a Sealed Offer. For context, we quote from the current Section 31.

performing a specified activity or contract obligation and stating a date by which such offer must be accepted.

(c) If the Settlement Offer is timely accepted and the arbitration is discontinued in accordance with the terms of the Settlement Offer, the terms of the settlement may provide for an Award upon Settlement in accordance with Section (a). If the Settlement Offer is timely accepted but the parties do not agree on the amount and allocation of legal and arbitrator fees and expenses, the parties shall submit the dispute to the Arbitrators who shall determine the amount and allocation of such fees and expenses in accordance with Section 30, also taking into account the terms and timing of the Settlement Offer, and issue an Award with respect to the amount and allocation of such fees and expenses.

(d) If the Settlement Offer is refused, the Offeror may notify the Panel that a binding Settlement Offer was made but declined by the Offeree. The details of the last Settlement Offer shall then be delivered in a sealed envelope to the Chair or Sole Arbitrator who shall not open the envelope until such time as the Panel or Sole Arbitrator has arrived at a final decision. Should the rejected Settlement Offer be equal to or more favorable to the Offeree than the Panel's Award, the Panel shall, subject always to the provisions of Section 30 and taking into account the terms and timing of the Settlement Offer, award the reasonable legal fees and expenses as well as such arbitrator fees and expenses that would have been saved had the offer been accepted at the date by which acceptance was required.

The Panel Chair received two sealed envelopes containing the offers. Neither party has since notified the Panel that JMB had accepted either Sealed Offer.

Guided by Rule 31, the Panel deliberated and made its decisions on the merits of the disputes regarding the ATB 205 and the ATB 220 as discussed in this Award. Thereafter, Mr. Corwin opened the envelopes and circulated the Sealed Offers contained in the envelopes to Arbitrators Tsimis and Sheinbaum. The terms of the Sealed Offers were more favorable to JMB than the damages awarded by the Panel against JMB in connection with the ATB 205 BC and the ATB 220 BC.

Because the terms of the Sealed Offer made by Unico were more favorable than the results reached by the Panel in the ATB 205 and the ATB 220 proceedings, the consequences for an award of fees and costs provided are triggered, and the Panel has included these considerations as part of its decision to award Unico the full amount of its attorneys' fees and costs in connection with these two proceedings.

## IX. Arbitrators' Fees and Expenses

The Panel's total fees for this consolidated proceeding are $647,835. The arbitrators' fees and expenses are the joint and several responsibility of Unico and JMB, and the Panel, again exercising its discretion under Section 30 quoted above, assesses the arbitrator fees and expenses

17.75%[8] against Unico and 82.25% against JMB.  These result in the following amounts when calculated against the Panel's total fees of $647,835:

- 17.75% - $114,990.71
- 82.25% - $532,844.29

The arbitrators' fees and expenses and their manner of settlement are set forth in Appendix A which is incorporated herein and is an integral part of this Award.  Because the parties, in the first instance, are each paying 50% of the Panel's fees, and because the Panel has ruled that Unico is to be responsible for 17.75% of the Panel's fees and JMB is to be responsible for 82.25% of the Panel's fees, we further rule that Unico shall have a right of claim over and against JMB for those fees advanced in the first instance by Unico.

---

[8]  The figure of 17.75% was the midpoint between the apportionment of time  that each party represented it had spent on the ATB 284 dispute.  JMB had represented in its supporting attorney declaration that it allocated 23% of its attorneys' fees to the ATB 284 matter, while Unico represented that it had allocated 12.5% of its attorneys' fees and costs to that matter.

**Award** in the Arbitration between
UNICO MARINE SERVICES LLC
-and-
JMB SHIPPING ATB 205, LLC

As explained and set forth in the Conclusion in Section VIII above, the Panel awards as follows:

1. The Panel finds JMB Shipping ATB 205, LLC liable to Unico Marine Services LLC for damages in the amount of $4,992,980.00.
2. The Panel also awards Unico interest in the amount of $1,429,018.21 which has been calculated at the weighted prime lending rate as determined using the calculator on the SMA website beginning to run from October 7, 2021 until the date of this Final Award.
3. Additionally, Unico is awarded recovery of its reasonable attorney's fees and expenses in the amount of $641,899.55.
4. The Panel also allocates responsibility for the Panel's fees as set forth in Section X above, as well as in Appendix A which forms an integral part of this Award.

If any of the Final Awards is not satisfied within 30 days from the date hereof, interest at the prime lending rate published by the Federal Reserve Bank will resume accruing until that/those Final Award/s shall be fully satisfied or reduced to judgment, whichever first occurs.

Judgment may be entered upon any of the Final Awards, in accordance with the terms of the charter party between the parties, in any Court having jurisdiction in the premises.

Louis P. Sheinbaum

George J. Tsimis

Dick Corwin, Chair

November 13, 2025
New York, NY

**Award** in the Arbitration between
UNICO MARINE SERVICES LLC
- and -
JMB SHIPPING ATB 220, LLC

As explained and set forth in the Conclusion in Section VIII above, the Panel awards as follows:

1. The Panel finds JMB Shipping ATB 220, LLC liable to Unico Marine Services LLC for damages in the amount of $7,139,460.00.
2. The Panel also awards Unico interest in the amount of $2,042,716.84 which has been calculated at the weighted prime lending rate as determined using the calculator on the SMA website beginning to run from October 8, 2021 until the date of this Final Award.
3. Additionally, Unico is awarded recovery of its reasonable attorney's fees and expenses in the amount of $124,921.09.
4. The Panel also allocates responsibility for the Panel's fees as set forth in Section X above, as well as in Appendix A which forms an integral part of this Award.

If any of the Final Awards is not satisfied within 30 days from the date hereof, interest at the prime lending rate published by the Federal Reserve Bank will resume accruing until that/those Final Award/s shall be fully satisfied or reduced to judgment, whichever first occurs.

Judgment may be entered upon any of the Final Awards, in accordance with the terms of the charter party between the parties, in any Court having jurisdiction in the premises.

Louis P. Sheinbaum

George J. Tsimis

Dick Corwin, Chair

November 13, 2025
New York, NY

79

**Award** in the Arbitration between
UNICO MARINE SERVICES LLC
- and -
JMB SHIPPING ATB 284, LLC

As explained and set forth in the Conclusion in Section VIII above, the Panel awards as follows:

1. The Panel finds Unico Marine Services LLC liable to JMB Shipping ATB 284 LLC for damages in the amount of $512,112.00.
2. The Panel also awards Unico interest in the amount of $146,660.46 which has been calculated at the weighted prime lending rate as determined using the calculator on the SMA website beginning to run from October 5, 2021 until the date of this Final Award.
3. Additionally, Unico is awarded recovery of its reasonable attorney's fees and expenses in the amount of $380,000.
4. The Panel also allocates responsibility for the Panel's fees as set forth in Section X above, as well as in Appendix A which forms an integral part of this Award.

If any of the Final Awards is not satisfied within 30 days from the date hereof, interest at the prime lending rate published by the Federal Reserve Bank will resume accruing until that/those Final Award/s shall be fully satisfied or reduced to judgment, whichever first occurs.

Judgment may be entered upon any of the Final Awards, in accordance with the terms of the charter party between the parties, in any Court having jurisdiction in the premises.


Louis P. Sheinbaum


George J. Tsimis


Dick Corwin, Chair

November 13, 2025
New York, NY

## PARTIAL DISSENT (G. Tsimis)

I fully concur with my fellow Panel members with respect to all liability issues addressed, considered, and ruled upon in the Final Award. However, I disagree with the scope of damages awarded by my fellow panel members to Unico Marine with respect to its lost profits claims for JMB Shipping's breaches of the bareboat charters for the ATB 205 and the ATB 220. It is my position that Unico Marine is not entitled to damages for the option periods that were never exercised as required by the express terms of the governing bareboat charter parties.

The bareboat charters for the ATB 205 and ATB 220 (hereinafter "the ATB 205 BC" and "the ATB 220 BC" separately and "the two BCs" collectively) each had a base term of 6 months. The base period for the ATB 205 BC was to end on December 31, 2021, and the first option period was to be "from January 1, 2022 ending on June 30, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five days before the end of the then-existing base period."

Clause 5(c) provided for five additional six-month option terms ending respectively on December 31, 2022, June 30, 2023, December 31, 2023, June 30, 2024 and December 31, 2024. Clause 5(c) further expressly provided that these five six-month option periods are "**subject to CHARTERER giving notice to OWNERS** of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing period." (Emphasis added). The terms for the ATB 220 were nearly identical to those for the ATB 205.

On October 10, 2021, Unico Marine advised JMB Shipping via email that with respect to these two BCs to "please take this email as notice from Unico Marine that we do extend our bareboat to the next 6 months option as per contract . . . ." See JMB Ex. 11. Additionally, on November 12, 2021, Unico Marine sent an email and letter via certified mail to JMB Shipping and stated the following:

> Under the Bareboat Charter Party Agreement dated May 12, 2021, and pursuant to Clause 5(c) thereof, Charterer, Unico Marine, hereby gives notice to Owner, JMB Shipping ATB 220, LLC, of its intention to exercise its option to extend the charter party for a further six month term commencing December 31, 2021.

An identical message and letter were sent by Unico Marine to JMB with respect to the ATB 205.[9] Moreover, when Unico Marine sent its November 12, 2021 messages/letters, the BCs had already been terminated by JMB and these consolidated arbitration proceedings had

---

[9] These two emails/letters from Unico Marine to JMB exercising the first option periods for the ATB 205 and ATB 220 were included as Appendices 1 and 2 to Unico Marine's Reply Memorandum dated June 20, 2024.

already been commenced. Yet, Unico Marine nevertheless saw fit to do so to protect its option rights for the January 1, 2022 to June 30, 2022 period under the two BCs, and in accordance with the plain language of Clause 5(a) and (c) and the requirement to provide 45 days' advance notice before the end of the existing base charter period.

Significantly, no other writings were ever sent or communicated by Unico Marine to JMB regarding any of the other option periods identified in Clauses 5(c) of the two BCs.

Consistent with black letter law, the language of the two BCs is to be given its ordinary meaning[10] and the express language of Clause 5(c) makes these subsequent option periods for Unico Marine to use and operate the vessel subject to its giving notice to JMB Shipping. Aside from the first option periods for the two BCs, Unico Marine did not satisfy this requirement of giving 45 days' advance notice of its intention to exercise the other option periods. Without such notice, there is no valid contractual predicate under the express language of the BCs for Unico Marine to request an award for damages for any subsequent option periods.[11]

As argued by JMB in its papers, a valid enforceable contract is a prerequisite to the consideration of any claim for lost profits, *see* JMB Supp. Brief, at 4 – 5, much less for an option period that has never been exercised as required by the underlying contract.[12] Without this valid predicate, I do not believe that Unico Marine is entitled to recover its alleged lost profits for these unexercised option periods, despite JMB Shipping's wrongful termination of these two bareboat charters.

The lack of any case law or arbitration awards that are directly on point with respect to Unico Marine's premise that it is entitled to lost profits for the unexercised option periods is also significant. Despite the Panel's request for separate briefing on this issue alone, neither party cited any authorities that squarely addressed this issue, and the maritime decisions discussed in their supplemental briefing were not persuasive. For example, the SMA arbitration award in *The OAK PEARL*, S.M.A. No. 2427 is inapplicable to these proceedings insofar as that contract involved a voyage charter party -- not a bareboat charter -- and an option that the charterer could have exercised during the base term of the voyage charter. It did not involve extending the base term of a bareboat charter six times

---

[10] *See Interocean Shipping Co. and Nipon Yusen Kaisha* (*The T.V. GIOVANNA LOLLI-GHETTI*), SMA No. 881 (Sept. 6, 1974) Healy, Bond-Smith, Nixon, Chair), at 5 (citing Restatement of Contracts §230).

[11] JMB Shipping argued as much on pages 4 – 5 of its Supplemental Brief on Options to Extend dated December 6, 2024 ("JMB Supp. Brief.").

[12] *See also* cases cited on page 5 – 6 of JMB Supp. Brief. These decisions consisted mostly of non-maritime cases which cited general principles regarding disputes involving contractual options, and while they were helpful, they were not completely on point with the circumstances before us in this consolidated arbitration.

over, and it did not involve any unexercised options of future performance such as that contemplated by Clause 5(c) of the BCs.

*Classic Maritime Inc. v. XCoal Energy and Resources*, S.M.A. No. 4450 (Aug. 16, 2022), which I saw as being the most intriguing decision cited by the parties, is also distinguishable because it addressed damages stemming from charterer's breach of a contract of affreightment (COA) to ship coal in the amount of "725,000 mts 10 pct moloo – loading Newport News, in 3-4 bottoms jan/dec 2020" and owner's lost profits incurred as a result of charterer's breach of this COA by only providing about 266,000 metric tons of coal, i.e., far less than the amounts contemplated by the express terms of the COA.  While the Panel there conducted a detailed analysis of the lost profit calculations presented by the parties, that analysis did not include a forecasting of future earnings regarding any periods of performance outside the base term of the COA.

Unico Marine's own papers underscore the lack of precedent or authority to support its position.  Unico Marine cites *Time Charters* §4.86 *et seq.* (6th ed. 2008) for the proposition that "where withdrawal leads to termination of the charter, the charterers are entitled to compensation for the loss of the ship's services during the remainder of the charter period".  Unico Supplemental Brief, at 8.  However, this language says nothing about an unexercised option period and, clearly, if Unico Marine had entered into a four-year bareboat charter without any option periods, I would wholeheartedly agree with Unico Marine's argument here.  Unfortunately, it made the business decision to agree to a six-month base term and a series of six-month option periods, of which only the first one was exercised in accordance with the clear requirements of Clauses 5(a) and (c).  This specifically negotiated base term is a commercial reality that cannot be disregarded in the assessment and analysis of this dispute.

Unico's reliance on *Voyage Charters* (3rd ed. 2007), as discussed on pages 1 through 3 of its supplemental memorandum dated December 6, 2024 ("Unico Supp. Memo"), is also misplaced.  Specifically, Unico argues that "the Panel should presume that Unico Marine's damages, as the non-breaching party, are based upon the exercise of options that would have been in its economic interest."  Unico Supp. Memo, at 2 (citing *Voyage Charters*, § 21.18 (3rd ed. 2007)).  The scenario discussed and envisioned by *Voyage Charters* involves options that would have been exercised during the base period of the underlying contract, to wit, a voyage charter.  There is no discussion therein of contractual options that might be exercised one, two or three years down the road after the base period of the charter party

has expired.[13]  Doing so is far more speculative, remote, and simply "a bridge too far" in the context of the two BCs in question.

As mentioned above, it is noteworthy that Unico specifically negotiated a charter term that was only six months long with several additional six-month option periods.  Unico did so because it was a new operator in the Jones Act trade and did not have the cash flow, market presence or established reputation that a Vane Bros. or Centerline had to warrant a long-term bareboat charter.  Rather, Unico wanted to keep its "options" open to not be burdened or obligated with the bareboat charter in case business did not go the way it had hoped it would go.  This is precisely what happened with Unico and the ATB 284.  It knowingly and deliberately made a business decision to return that ATB early and materially breached that bareboat charter, inviting claim for the remaining charter term under that BC.  Unico would likely not have redelivered the ATB 284 so early if the base term had been a four-year or five-year period.  JMB mitigated its losses by chartering the ATB 284 to Centerline at a slightly lower daily charter rate than that under the Unico ATB 284 BC and, for this reason, this Panel has awarded damages against Unico Marine for charter hire differential with the Centerline charter during the base term only (e.g., $1,429.17 per day for 16 days or $22,867) and not any hire differential during the option periods.

That Unico was keeping its commercial options open is further demonstrated by its negotiations with Centerline in October 2021 when Valentini and Godden were discussing potential arrangements to allow Centerline to take over the charters for the three ATBs, 205, 220 and 284.  During those discussions, Godden proposed a four-year time charter with Unico because Centerline, as an established Jones Act carrier with existing business relationships and presumably consistent cash flow, knew what trades it could use these units for and how it could make considerable profits by fixing cargoes and trading them.  Centerline would not have suggested a six-month period charter because it would not be worth its while to do so.  If the two BCs had been four-year or five-year terms, this issue regarding the option periods would not be before us – the Panel would clearly award damages for the full four-year or five-year terms that Unico Marine would have operated the ATBs had JMB not wrongfully terminated those charters.  However, Unico Marine chose to use much shorter terms for its bareboat charter obligations and it should be accountable for the consequences for making such a business decision, for better or for worse, which here would mean that it would be entitled to damages only for the base period and for the option periods that were validly exercised.

---

[13] There is no such discussion because voyage charters by their nature do not and would not contain such future options of performance, save for an option to might add another discharge port or voyage at a party's option.  But they would not entail options to be exercised and performed years down the road.

Awarding the undeclared option period to Unico would, in my view, create a windfall for them and prompt the Panel to speculate as to future events outside the agreed charter period and declared option periods. For example, Unico admittedly had every intention of ceding its operation of the ATB 205 and ATB 220 and selling its contractual interests in them when Centerline proposed a four-year deal to purchase Unico marine's operation. Valentini himself said to Centerline that "you guys do it better" when he proposed to offer a longer term for the two BCs to JMB to make a deal with Centerline work. He even went so far as to ask Centerline, on September 25, 2021, "we would like to make sure you guys take over as Oct. 1st payment for the bareboat . . . let me know if you are able to do it by that date." If Unico was ready to hand off these two BCs only a few months into a six-month base charter period, it would be inappropriate in my opinion for the Panel to be asked to speculate and award damages during the undeclared option periods when Unico had already communicated its intention to no longer continue to operate these two ATBs itself because another third-party operator could "do it better". And who can say that Unico may not have sold its operation to someone else in October, November or December 2021 had it continued operating the ATB 205 and/or ATB 220 and had the vessels not been wrongfully repossessed by JMB? To try and answer that question would be speculation.

As such, there is a heavy commercial dimension here that pervades the negotiation and execution of the BCs for these former Bouchard vessels -- which had reputational issues in the marketplace and and operational / seaworthiness concerns due to extended periods of lay-up during the bankruptcy proceedings -- which culminated with the drafting of the three subject bareboat charters, and the negotiation of a six-month base term and the inclusion of Clause 5, which conditioned each six-month option on the charterer's notification to owners that the option period was being exercised 45 days before the expiration of the existing charter term. Everyone involved knew that the vessels had significant challenges to become operational again -- much less profitable -- and everyone involved was aware of the business risks associated with investing considerable capital into these units to do so. These business decisions spilled over and influenced how the BCs were negotiated and agreed, how the parties each performed their respective obligations thereunder, and how both parties breached those obligations respectively, Unico with respect to the ATB 284 and JMB with respect to the ATB 205 and the ATB 220.

Our Final Award above has made several rulings on the numerous, complex liability issues before us in this detailed and extensive evidentiary record, and the Panel has resolved those issues, , resulting in the award of damages to each party under each BC for those damages that directly flowed from those contractual breaches. However, I do not believe that these numerous business decisions associated with the three ATBs and the parties' respective efforts to get them up and running to earn freight / hire and make them

profitable again can be separated from the context of the contracts before us and their express terms found in Clause 5, which were negotiated and agreed under these circumstances, and which bound the parties involved with these contracts. In our capacity as arbitrators, we are similarly tasked with interpreting and assessing those contractual provisions bearing in mind the factual record before us and, in my opinion, we should not speculate or award damages claims that are too remote.

Accordingly, with respect to the issue of whether an unexercised future option period under a bareboat charter can be the subject of an award of lost profits / compensatory damages for a counterparty's material breach, I respectfully disagree with the majority on this specific point. I respectfully submit that it is not the Panel's mandate to read in or imply such rights into a contract that has clear and unambiguous terms regarding its base term and the manner in which such subsequent option periods must be exercised -- terms which were heavily negotiated and expressly agreed by the parties with eyes wide open considering the history of the assets involved. Moreover, I feel uncomfortable doing so when there is no clear precedent to support such a finding, and in the context of the evidentiary record for these proceedings. I would have limited any lost profits to be awarded to Unico Marine to the remainder of the base period following JMB's wrongful termination of the ATB 205 BC and the ATB 220 BC, as well as the first exercised option period for those two fixtures through June 30, 2022. Those lost profits calculations, taken from Unico's damages expert's calculations, would have entailed the following amounts:

*ATB 205 Base Period: $350,386; 1st Option Period: $726,300 = $1,076,686*

*ATB 220 Base Period: $514,040; 1st Option Period: $1,325,310 = $1,839,350*

*---------------------------------------------*

*TOTAL LOST PROFITS: $2,916,036*

| | |
|---|---|
| IN THE MATTER OF THE CONSOLIDATED ARBITRATION<br><br>-between-<br><br>UNICO MARINE SERVICES LLC,<br>Claimant,<br><br> -and-<br><br>JMB SHIPPING ATB 205, LLC<br>(under a Bareboat Charter Party dated May 5, 2021<br>Tug BELLA and Barge B - 205 -<br>formerly Tug LINDA LEE BOUCHARD and UMS 205),<br><br>JMB SHIPPING ATB 220, LLC<br>(under a Bareboat Charter Party dated May 12, 2021<br>Tug MORENA and Barge B-220 -<br>formerly Tug MORTON S. BOUCHARD JR. and UMS 220),<br><br>JMB SHIPPING ATB 284, LLC<br>(under a Bareboat Charter Party dated May 12, 2021<br>Tug RUBIA and Barge B-284 -<br>formerly Tug DENISE A. BOUCHARD and UMS 284),<br>Respondents. | Before:<br>Dick Corwin, Chair<br>Louis P. Sheinbaum<br>George J. Tsimis<br><br>**Appendix A**<br><br>November 13, 2025 |

For Unico Marine Services LLC:
      By Lennon, Murphy & Phillips, LLC
      Patrick F. Lennon, Esq.
      Kevin J. Lennon, Esq.
      Steven R. Winters, Esq.
      Keith W. Heard, Esq.

For JMB Shipping ATB 205, LLC, JMB Shipping ATB 220, LLC
 and JMB Shipping ATB 284, LLC:

      By Holland & Knight LLP
      Vincent J. Foley, Esq.
      Marie Larsen, Esq.
      Francesca Morris, Esq.

The Panel's fees and expenses for its services in connection with this consolidated arbitration proceeding total $647,835 and are the joint and several obligation of the parties, Unico Marine Services LLC ("Unico") and JMB (collectively "JMB Shipping ATB 205 LLC," "JMB Shipping ATB 220 LLC" and "JMB Shipping ATB 284 LLC").

On February 26, 2023, the Panel advised the parties, and they subsequently agreed, that the $107,565 would be distributed out of funds held in escrow with the Society of Maritime Arbitrators, Inc. ("SMA") and that the following payments would be made to each Panel member for their first interim invoices for fees issued in connection with these consolidated proceedings:

1. R. Corwin: $44,115;
2. L. Sheinbaum: $30,650; and
3. G. Tsimis: $32,800.

On September 30, 2023, the Panel issued its second interim invoices for these proceedings and was thereafter paid $196,310.00. JMB remitted its 50% share directly to each Panel member, while Unico deposited its 50% share into the SMA escrow account from which the Panel was paid. The amounts paid to each arbitrator under their second interim invoices can be broken down as follows:

1. R. Corwin: $76,530;
2. L. Sheinbaum: $58,100; and
3. G. Tsimis: $61,680.

On November 6, 2025, the Panel directed that Unico and JMB each deposit $115,000 with the SMA which $115,000 would, together with $63,717.50 from each of Unico and JMB already on deposit with the SMA, result in Unico and JMB each then having on deposit with the SMA $178,717.50 as security for the Panel's fees in this proceeding. Soon thereafter, Unico and JMB made their respective deposits of $115,000 with the SMA bringing the total of security in this proceeding for the Panel's fees to $357,435.

Although, as set forth in the Panel's Final Award, Unico is to pay 17.75% of the Panel's total fees of $647,835 and JMB is to pay 82.25% of the Panel's fees of $647,835, in the first instance Unico will pay 50% of the Panel's fees of $343,960 and JMB will pay 50% of the Panel's remaining outstanding fees of $343,960. These remaining outstanding fees of the Panel will be paid out of the $357,435 on deposit in escrow with the SMA as security for the Panel's fees and expenses.

The foregoing fees and expenses are to be paid from the escrow account in the first instance as follows:

|  | Panel's Fees and Expenses | SMA to Disburse from Unico Funds in Escrow | SMA to Disburse from JMB Funds in Escrow |
| --- | --- | --- | --- |
| Louis Sheinbaum | $ 90,800 | $45,400 | $45,400 |
| George Tsimis | $ 88,000 | $44,000 | $44,000 |
| Dick Corwin | $165,160 | $82,580 | $82,580 |

|        |              |              |              |
|--------|--------------|--------------|--------------|
| Total  | $343,960     | $171,980     | $171,980     |

The SMA is directed promptly to pay the Panel the amounts indicated above from the escrow fund with any balance remaining on deposit from Unico to be returned to Unico and with any balance remaining on deposit from JMB to be returned to JMB.

Dated: New York, New York
      November 13, 2025