# EXHIBIT 2

## BAREBOAT CHARTER AGREEMENT

In consideration of the rate of charter hire agreed to herein, the B. No. 220 Corp., the registered OWNER of the Barge B-220 and the Tug Morton S. Bouchard Jr. Corp., the registered OWNER of the tug MORTON S. BOUCHARD JR., both with its principal place of business at 58 South Service Road, Suite 150, Melville, New York 11747 (hereinafter referred to as "OWNERS") hereby agree to bareboat charter the aforementioned Tug and Barge (collectively, as a unit, referred to hereinafter as "VESSEL") and Unico Marine with its principal place of business located 3773 Richmond Avenue, Suite 565, Houston, Texas, 77046 (hereinafter referred to as "CHARTERER") hereby agrees to charter and hire on a bareboat basis (hereinafter referred to as "AGREEMENT"), the aforementioned VESSEL, pursuant to the following terms and conditions:

1.  **VESSEL** (Tug and Barge as a unit): Tug *Morton S. Bouchard Jr.*, 130'x38'x22', ON 1265315, 6,000HP, built in 2016.
    Barge *B. No. 220*, 400'x78'x34', ON 1087420, 110,000 bbl. capacity, Clean Oil capable, built in 1999.

    Both the Tug and Barge are registered and flagged as United States vessels. CHARTERER shall not during the term of the AGREEMENT change or otherwise modify the VESSEL registration or Flag. VESSEL specifications attached hereto as Exhibit A.

2.  **VALUATION:**     Tug:   $20.0 million USD.
    Barge: $25.0 million USD.

3.  **PORT OF DELIVERY:** The OWNERS shall deliver the VESSEL at New York Harbor, New York, New York, USA on or about the dates set forth herein at such readily accessible safe berth or mooring as mutually agreed by the parties hereto.

4.  **PORT OF REDELIVERY:** The CHARTERER shall re-deliver the VESSEL at New York Harbor, New York, New York, USA on or about the dates set forth herein at such readily accessible safe berth or mooring as mutually agreed by the parties hereto.

    The CHARTERER shall keep the OWNERS informed of the VESSEL'S itinerary for the voyage leading up to redelivery and shall serve the OWNERS with written approximate/definite notices of the VESSELS re-delivery at 45, 30, 15 and 3 days prior to such re-delivery.

    The CHARTERER warrants that it will not permit the VESSEL to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the VESSEL within the AGREEMENT re-delivery Period and in accordance with the notices given. Notwithstanding the above, should the CHARTERER fail to redeliver the VESSEL within the Charter Period, the CHARTERER shall pay the daily equivalent to the rate of hire stated herein plus ten (10) per cent or the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. Such payment of the enhanced hire rate shall be without prejudice to any claims the OWNERS may have against the CHARTERER in this respect. All other terms, conditions and provisions of this AGREEMENT shall continue to apply.

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

P-02915E-00008032

JMB_00015651

2

5.    **TERM:**

(a)    Base: The base term of this AGREEMENT shall be from the date of delivery (estimated to be on or about June 1, 2021) for a period of approximately six (6) months, ending on November 30, 2021. The first option period shall be from December 31, 2021 ending on May 31, 2022, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing base period.

(b)    [not used]

(c)    Additional Option Periods: CHARTERER shall have an option to exercise five (5) additional six (6) month option terms, ending respectively on or about, November 30, 2022, May 31, 2023, November 30, 2023, May 31, 2024 and November 30, 2024, subject to CHARTERER giving notice to OWNERS of its intention to exercise such option not later than forty-five (45) days before the end of the then-existing period. In all cases, the term is subject to earlier termination in accordance with the terms of this AGREEMENT.

(d)    Further Option Periods: If the VESSEL remains under hire to CHARTERER through the last option term provided in Article 5(c) above, and OWNERS intend to offer the VESSEL for hire thereafter, OWNERS will offer the VESSEL to CHARTERER for additional three (3) six (6) month option terms, ending respectively on or about May 31, 2025, November 30, 2025 and May 31, 2026, at a market rate of hire for the VESSEL under the then pending circumstances, and no higher than the rate at which OWNERS have offered the VESSEL to any third-party (in any case, the parties will negotiate in good faith regarding rate of hire for such additional options). The OWNERS will advise the CHARTERER in writing of such availability and the rate of hire to be charged as soon as possible, and no later than forty-five (45) days prior to the expiration of the last option term provided in Article 5(c,) and the CHARTERER will confirm in writing within seven (7) days of receipt of the OWNERS' notice whether to accept the further option terms, and, thereafter, the CHARTERER will give OWNERS notice of the intention to exercise further additional option terms not later than forty-five (45) days before the end of the then-existing period.

(e)    OWNERS shall use commercially reasonable efforts to deliver the VESSEL on or about June 1, 2021; however, in the event that the OWNERS cannot deliver the VESSEL on or before July 31, 2021, CHARTERER shall have the right, but not the obligation, to terminate this AGREEMENT.

6.    **CHARTER HIRE:** For the base term and first option period, if exercised by CHARTERER, of this AGREEMENT, Charter Hire shall be **$6,500.00 USD** per calendar day or part thereof, payable monthly in advance on the first day of each month, or if the 1st falls on a non-banking day, the last banking day of the previous month, by CHARTERER to OWNERS, commencing on the date of delivery of the VESSEL to CHARTERER. For the remaining Additional Option Periods in Article 5(c), if exercised by CHARTERER, Charter Hire shall increase by **$100.00 USD** per day for each successive six (6) month option period. Charter Hire shall continue until the date the VESSEL is redelivered by CHARTERER to OWNERS in compliance with the requirements of this AGREEMENT. Except for any period when the VESSEL is out of service due to OWNERS' breach of seaworthiness warranty provided in Article 7(a), CHARTERER shall owe and pay Charter Hire from the time of delivery until the time of redelivery, without any deductions whatsoever, regardless of whether the VESSEL is working as a unit or is taken out of service for necessary repairs and maintenance or is delayed or is otherwise idle, regardless of cause; and the occurrence of force majeure or any other circumstance affecting the working of the VESSEL shall not excuse or limit CHARTERER's obligation hereunder for payment of charter hire.

(a)    The CHARTERER shall pay hire due to OWNERS punctually in accordance with the terms of this

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

3

AGREEMENT. If the CHARTERER fails to make punctual payment of hire due, the OWNERS shall give the CHARTERERS three (3) banking days written notice to rectify the failure, and when so rectified within those three (3) banking days following the OWNERS' notice, the payment shall stand as punctual.

(b)    Payment of hire shall be made to the OWNERS' designated bank account:

Signature Bank
5655 Fifth Avenue, 8th Floor
New York, NY 10017
Bank ABA Number: 026013576
SWIFT BIC: SIGNUS33
Beneficiary Name: Bouchard Transportation Co., Inc.
Beneficiary Account Number: 1503825275

7.    **SEAWORTHINESS/SURVEY:**

(a)    The OWNERS warrant that at the time of delivery the VESSEL shall be seaworthy and in every respect ready in tanks, hull, machinery and equipment for the service intended under this AGREEMENT and in accordance with the specifications provided in Exhibit A. Should any latent defect, that could not be reasonably discovered during the joint survey set forth in Article 7(c) below, pre-existing delivery render the VESSEL unseaworthy within one (1) year of delivery of the vessel, the VESSEL shall be deemed offhire until OWNERS, at their sole cost and expense, resolve the issue and make the VESSEL in every respect ready in tanks, hull, machinery and equipment for the service intended under this AGREEMENT and the VESSEL returned to the location where the VESSEL was put offhire, unless otherwise agreed.

(b)    Prior to and following execution of this AGREEMENT, CHARTERER shall have reasonable opportunity to inspect the VESSEL to confirm the OWNERS' work to make the VESSEL seaworthy and, in every respect, ready in tanks, hull, machinery and equipment for the intended service.

(c)    Prior to delivery, CHARTERER and OWNERS shall appoint a mutually acceptable qualified marine surveyor to determine and provide written reports on the condition of the VESSEL (including exterior hull and internal inspection of the void tanks to establish the existence, or lack thereof, of any significant indentations; and, tank compartments to establish the condition of the tank-bottom of the VESSEL) together with its equipment, appliances, machinery, spares and all consumable stores on board at the times of delivery and redelivery hereunder. It is agreed between the parties hereto that the survey reports shall be taken as conclusive evidence of the condition of the VESSEL and its equipment on delivery and redelivery.

(d)    The CHARTERER and the OWNERS respectively shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the VESSEL at the then current market prices at the points of delivery and redelivery, respectively. The CHARTERER shall ensure that all spare parts listed in the inventory and used during the Term are replaced at its expense prior to redelivery of the VESSEL. OWNERS shall have the right at any time after giving reasonable notice to CHARTERER and without unduly interfering with the VESSEL's commercial operations, to inspect or survey the VESSEL or to instruct a duly authorized surveyor to carry out such survey on its behalf.

(e)    In the event that the survey conducted in preparation for delivery under Article 7(c), and/or the

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

4

inspections of OWNERS' and/or CHARTERER's employees and agents conducted simultaneously thereto, discover a condition that is unacceptable to CHARTERER, then the OWNER of that particular vessel shall repair or correct such condition at its expense. However, if the cost to repair or correct such condition is so onerous as to materially affect the OWNERS' anticipated financial return, then such OWNERS shall, at their sole option, have the right, but not the obligation to terminate this AGREEMENT without further liability. In like manner, if the repair or correction as proposed or as executed by OWNERS is not in accordance with generally accepted marine standards or is not approved by the applicable regulatory body or OWNERS' classification society, then CHARTERER shall have the right, but not the obligation, to terminate this AGREEMENT without further liability.

(f)     Notwithstanding anything to the contrary in this AGREEMENT, if OWNERS chose to install a ballast water treatment system to comply with the then applicable rules and regulations for VESSEL's intended service, OWNERS will do so, at their sole time, cost and risk. OWNERS will provide CHARTERER at least forty five (45) days' advance notice of the schedule for such installation, and the parties will work together in good faith to minimize the disruption of CHARTERER's cargo schedule. During the time the VESSEL is taken out of service to the CHARTERER, the VESSEL will be offhire.

8.     **DELIVERY AND ACCEPTANCE:** Subject to termination under Articles 5(c) and 7(a), the VESSEL shall be delivered by OWNERS and accepted by CHARTERER at the place indicated in Article 3. The delivery of the VESSEL by OWNERS to the CHARTERER and the acceptance of the VESSEL by CHARTERER, subject to any reasonably undiscoverable latent defect as described in Article 7(a), shall establish conclusively that CHARTERER has inspected or has caused to be inspected (or has elected to waive inspection) the VESSEL and has found the VESSEL to be clean, tight, staunch, strong, and in all respects seaworthy, and in all respects fit for the work and service intended by CHARTERER.

CHARTERER shall make no structural or substantial changes to the VESSEL without the OWNERS' prior written approval. If the OWNERS agree to such changes, the CHARTERER shall, if the OWNERS so require, restore the VESSEL, prior to redelivery of the VESSEL, to its former condition provided that such structural changes are subject to Class approval, if applicable, before same are made. All requested and approved structural or substantial changes, and restorations to original condition shall be at the sole cost and expense of CHARTERER.

9.     **OPERATION, MANAGEMENT AND CONTROL:** OWNERS, upon delivery, shall relinquish complete possession, direction and control of the VESSEL over to CHARTERER; and throughout the term of this AGREEMENT, CHARTERER shall have the full use and exclusive possession, direction and control of the VESSEL. This AGREEMENT shall not constitute a transfer of OWNERS' ownership of the VESSEL and CHARTERER shall be regarded as the owner *pro hac vice* solely with respect to liability to any third party.

10.     **MAINTENANCE:** During the term of this AGREEMENT, CHARTERER, at its sole cost and expense, shall maintain, service, repair and preserve the VESSEL and its equipment in accordance with good commercial maintenance practices, in compliance with any currently existing and currently required Class, Flag or U.S. Coast Guard or other U.S. governmental authorities, or other Port State Control requirements, and in substantially the same condition as when received from the OWNER, ordinary wear and tear excepted. In the event that, during the term of this AGREEMENT, the VESSEL requires either an engine overhaul or a routine shipyard period due to class rules, then in those cases, the costs of such overhaul and/or shipyard expenses shall be for the account of the OWNERS and be considered to be part of ordinary wear and tear as to the CHARTERER.

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

5

In the event of partial loss (or loss short of actual or constructive total loss) of either the Tug or the Barge, CHARTERER shall arrange for the repair of such damage to the VESSEL, and CHARTERER shall pay the cost thereof and all other expenses incidental thereto. Further, CHARTERER shall continue to make or cause to be made all payments due and provided for in this AGREEMENT during the period of such repair, including the payment of Charter Hire, without any deduction whatsoever. Any omission or delay of insurers in making loss payments shall not relieve CHARTERER of its obligations to pay Charter Hire due or to make necessary repairs and restore the VESSEL to the same condition as Delivery.

11.    **NAVIGATION LIMITS:** Under the VESSEL's current classification, the VESSEL shall be employed only in lawful trades and for lawful purposes and only in the carrying of lawful merchandise upon the waters of the East Coast, Gulf Coast, and West Coast of the United States. For voyages to Canada or the Caribbean, CHARTERER must obtain DOCs and any other required documents to operate the VESSEL for such voyages, at CHARTERER's sole cost and expense.

12.    **TOTAL LOSS OF VESSEL:** In the event that either the Tug or the Barge shall become an actual total loss or shall be declared to be a constructive total loss under the terms of any applicable insurance policy thereon, CHARTERER shall pay OWNERS the amount stated in Article 2 above, allowing reasonable time, not to exceed forty-five (45) days from the date the Tug and/or Barge is declared a Total Loss or Constructive Total Loss, for hull underwriters to make such payment. Charter hire due hereunder shall continue without setoff until such payment is made by the hull underwriters. In the event that either the Tug or Barge becomes a wreck and requires compulsory removal, CHARTERER shall, in addition to providing the insurance coverages set forth in Article 14 of this AGREEMENT, including wreck removal and liability coverage, indemnify OWNERS against all sums whatsoever which the OWNERS shall become liable to pay and shall pay in consequence of the VESSEL becoming a wreck. OWNERS shall not, under any circumstance, contribute to general average. In the event of a total loss of the either the Tug and/or the Barge, OWNERS shall have the option, at its sole discretion, to substitute another Tug or Barge of similar characteristics to finish out the term of this AGREEMENT. The substitute VESSEL will be subject to the approval of the CHARTERER, but such approval shall not be unreasonably withheld. If OWNERS choose not to replace the wrecked Tug and/or Barge, this AGREEMENT shall be terminated as of the date of the loss.

13.    **CONFIDENTIALITY:** Any and all pricing terms contained in this AGREEMENT, and any related correspondence between the OWNERS and the CHARTERER, shall be considered confidential information. OWNERS and CHARTERER agree to hold such information in strict confidence and not to disclose it to any third parties, except to the extent that may be required by any court order. Notwithstanding the foregoing, CHARTERER may disclose such information only to the extent necessary to fulfill the obligations set forth herein. OWNERS agree to take all reasonable measures to protect the confidentiality of and avoid disclosure, or use of such confidential information, which measures shall include the highest degree of care that it utilizes to protect its own confidential information of similar nature.

14.    **INSURANCE:**  Without prejudice to or otherwise diminishing CHARTERER's obligations under the INDEMNITY Clause hereto (Article 15), CHARTERER, at its sole cost and expense, shall procure and maintain throughout the term of this AGREEMENT the following insurances on forms and with underwriters approved by OWNERS:

(a) Hull Insurance on the VESSEL, including collision liability, in the American Institute Hull Clauses form or equivalent, equal to or in excess of the full stated value of the VESSEL (as reflected in Article 3 above), with geographical and navigation extensions of coverage to the areas and waters

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

6

in which the VESSEL may operate or work under this AGREEMENT, and with the deductible not to exceed $100,000.00 per accident or occurrence; If Collision Liability is excluded as primary coverage from the P&I Insurance, it shall be included by specific Endorsement or Clauses under the Hull Insurance which shall also include a Running Down Clause, Strikes, Riots, (SRCC) Terrorism (TRIA) and War Risks.

(b) Protection and Indemnity (P&I) Insurance on the VESSEL, from a recognized International Group of P&I Club Member, with a minimum limit of $500,000,000.00 applicable to any one accident or occurrence, and with the deductible not to exceed $100,000.00 per accident or occurrence which insurance shall include compulsory wreck removal liability and sue and labor coverages.

(c) Pollution Liability Insurance, either by endorsement to the appropriate insurances named above, or by separate insurance, in the P&I Club form and amount of not less than $1,000,000,000.00, including full limits for Defense Fines & Penalties, State Acts Other Substances and Firefighting/Salvage with the deductible not to exceed $100,000.00 per accident or occurrence, and providing insurance coverage for and against liability for pollution damages and pollution clean-up expenses as provided for under the Oil Pollution Act of 1990 (OPA), the Federal Water Pollution Control Act (Clean Water Act), the Act for Prevention of Pollution From Ships (APPS), the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), and under any other applicable federal regulations, and as provided for under appropriate state law or municipal law where applicable.

The insurance policies required in subparagraphs (a), (b) and (c) shall each name OWNERS and Bouchard Transportation Co., Inc. as additional named assureds, as their interests may appear for subparagraph (a), and as joint named assureds in accordance and in compliance with the P&I Club rules and requirements for joint assureds in respect to P&I coverage for the VESSEL, for subparagraphs (b) and (c).

Any Lender/Mortgagee of the VESSEL shall be named as loss payee under the insurance policy required under sub-paragraph (a), as its interests may appear, and be named as an additional assured and provided with Misdirected Arrow coverage for the policies under subparagraphs (b) and (c), above. The aforementioned policies of insurance shall each contain a waiver of all underwriters' rights of subrogation against the named Lender/Mortgagee.

The CHARTERER shall be responsible for the payment of all deductibles provided for in each of the above policies of insurance.

Excepting circumstances under which the P&I Club may invoke immediate termination (i.e., circumstances of breach of sanctions or illegal trading), the insurance policies required above shall each provide for ten (10) days prior written notice of material change or advance notice of cancellation to OWNERS and the additional named assureds.

Certificates of insurance evidencing compliance with the foregoing insurance requirements shall be provided to OWNERS prior to the delivery of the VESSEL to the CHARTERER.

15. **INDEMNITY:** OWNERS shall have no responsibility or liability for the consequences of CHARTERER's use, employment, possession, control, charter, operation, navigation, manning, maintenance, management and work of the VESSEL; and notwithstanding the insurance requirements in Article 14, CHARTERER assumes all risk of liability in connection with its use, employment, possession, control, charter, operation, navigation, manning, maintenance, management and work of the VESSEL.

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

OWNERS shall have no responsibility or liability for any personal injury, illness, death or occupational disease suffered by any person, including crewmembers assigned to the vessel, employees of the CHARTERER, third party contractors, invitees and the like, on account of any involvement with the VESSEL, and OWNERS shall have no responsibility or liability for any property damage or loss (including pollution damages and pollution clean-up expenses) caused in whole or in part by or on account of the VESSEL; CHARTERER assumes all risk of liability for personal injury, illness, death or occupational disease suffered or sustained by any person on account of the VESSEL, and CHARTERER assumes all risk of liability for property damage or loss (including pollution damages and clean-up expenses) caused in whole or in part by or on account of the VESSEL.

CHARTERER shall fully protect OWNERS against the consequences of the CHARTERER's use, employment, possession, control, charter, operation, navigation, manning, maintenance, management and work of the VESSEL. Accordingly, CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNERS and the VESSEL from and against any and all claims, demands, causes of action (including challenges to CHARTERER's coastwise privileges), liabilities, judgments, liens, losses, damages, expenses, taxes, fines and penalties, of every kind and character, arising out of or in any way connected with or in consequence to CHARTERER's use, employment, operation, navigation, manning, maintenance, management or work of the VESSEL, for and on account of (a) personal injury, illness, death and occupational disease suffered by any person, regardless of whether such injury or death is caused in whole or in part by OWNERS' negligence, (b) property damage or loss to the VESSEL or its equipment, (c) property damage or loss to third parties, regardless of whether such property damage is caused in whole or in part by OWNERS' negligence or is caused in whole or in part by the unseaworthiness of the VESSEL, (d) damage or loss or contamination or expense to cargo carried aboard the VESSEL, (e) salvage and/or wreck removal of the VESSEL, and (f) pollution damages and pollution clean-up expenses, pollution penalties and fines, and damage to the environment resulting from pollution, caused in whole or in part by or on account of the VESSEL.

OWNERS agree to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) CHARTERER and the VESSEL from and against any and all claims, demands, causes of action, liabilities, judgments, liens, losses, damages, expenses, taxes, fines and penalties, of every kind and character, arising out of or in any way connected with or in consequence of any third party challenge, of any type or nature, to CHARTERER's possession, control, or charter of the VESSEL. This clause shall not be applicable and shall be of no force or effect if the challenge to the CHARTERER's possession, use or control of the VESSELS is as a result of CHARTERER's actions, omissions, negligence, violations or failure to abide by any governmental regulations or Class requirements or any other breach of this AGREEMENT.

Notwithstanding anything to the contrary herein, CHARTERER's indemnity obligations will not apply to any claim, loss, damage, fine or penalty independently determined to have been caused solely by any reasonably undiscoverable latent defect as described in Article 7(a) during the twelve-month period mentioned therein.

16. **REDELIVERY:** Upon expiration or termination or cancellation of this AGREEMENT, or upon default of CHARTERER resulting in termination of this AGREEMENT, CHARTERER shall, at its sole cost and expense, redeliver the VESSEL to OWNERS at OWNERS' designated place of redelivery, and said VESSEL shall be redelivered to the OWNERS in the same good order and condition as that in which the VESSEL was delivered, ordinary wear and tear excepted. Necessary cleaning of the VESSEL, and the removal and disposal of all debris and pumpable cargo from the VESSEL, shall be the responsibility of CHARTERER at CHARTERER's sole cost and expense. For the avoidance of any doubt, notwithstanding

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

CONFIDENTIAL

JMB_00015657

any terms herein to the contrary, on redelivery, the VESSEL tanks to be returned in substantially the same condition as they were on delivery, ordinary wear and tear excepted.

17. **COMPLIANCE WITH LAWS, TAXES, FINES, ETC.:**  During the term of this AGREEMENT, CHARTERER, at its sole cost and expense, shall cause the VESSEL to at all times comply with all applicable federal, state, regional, county and municipal statutes, ordinances, rules and regulations pertaining to the use, employment, possession, operation, navigation, maintenance, management or the work of the VESSEL, and CHARTERER shall have on board the VESSEL, when required thereby, valid certificates showing such compliance.  CHARTERER shall pay and discharge all taxes, assessments, excises, levies, duties, port charges, wharfage charges, waterway tolls, pilotage and harbor fees, fines, penalties and any other governmental charges (whether federal, state, regional, county or municipal) lawfully imposed upon CHARTERER or upon the VESSEL; and CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNERS and the VESSEL against any and all claims, demands, causes of action, judgments, liens, and liabilities for such taxes, assessments, excises, levies, duties, port charges, wharfage charges, waterway tolls, pilotage and harbor fees, fines, penalties or other governmental charges in any way connected with the VESSEL or its use, employment, possession, operation, navigation, maintenance, management or work by CHARTERER.  CHARTERER warrants that it is a citizen of the United States within the meaning of the U.S. Code as it relates to vessel ownership and coastwise endorsement and that it is qualified to enter into this AGREEMENT and to take demise ownership of the VESSEL in accordance with all laws imposing restrictions upon transfer to persons not citizens of the United States.  CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNERS and the VESSEL against any and all claims, demands, causes of action, or judgments relating to CHARTERER's citizenship.

18. **ASSIGNMENT AND SUBCHARTER:**    CHARTERER shall neither assign nor novate this AGREEMENT nor sub-bareboat the VESSEL.  CHARTERER may time, voyage or spot charter the VESSEL, and issue contracts of affreightment, provided the CHARTERER remains fully responsible for the obligations of this AGREEMENT.

19. **LIENS AND MORTGAGES:**
(a)    Neither CHARTERER nor any other person shall have the right, power or authority to create, incur or permit to be placed or imposed upon the VESSEL any lien or encumbrance whatsoever.  CHARTERER shall not cause or permit any lien or encumbrance against the VESSEL or any arrest or seizure or detainment of the VESSEL, and CHARTERER, at its sole cost and expense, shall immediately remove or cause to be removed any such lien, arrest, seizure or detainment, unless such claim of lien is reasonably challenged and substitute security posted to permit the release of the VESSEL from such arrest, seizure or detainment.  Any substitute security required shall be posted by CHARTERER at its sole cost and expense. During the period of any arrest, seizure or detainment as a result of CHARTERER's breach of this Article 19 (a), the VESSEL shall remain fully on hire.

(b)    The VESSEL is financed and subject to a first preferred ship mortgage loan. CHARTERER undertakes to comply and provide such information and documents to enable OWNERS to comply with all instructions, operation, repairs and maintenance of the VESSEL as set forth in the mortgage. OWNERS and/or its secured creditors shall have a lien upon any cargoes carried in the VESSEL during the term for any claims under this AGREEMENT exercisable upon Default of the CHARTERER.

(c)    So long as CHARTERER continues to perform its obligations under this AGREEMENT, CHARTERERS shall not be disturbed or interfered with in their quiet and peaceful use and enjoyment of

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

the VESSEL, and OWNERS shall obtain a letter of quiet enjoyment from such secured creditor substantially in the form attached hereto as exhibit B.

20. **TERMINATION AND DEFAULT:**  If CHARTERER shall fail to pay any charter hire due for more than three (3) banking days after the due date thereof (subject to notice and cure period), or if CHARTERER shall fail to perform or comply with any other material provision of this AGREEMENT, particularly, but not limited to CHARTERER's obligations under Article 15 (upon Notice and ten (10) calendar days' cure period), then OWNERS may, at their option, withdraw the VESSEL from the service of the CHARTERER and terminate this AGREEMENT by giving written notice to CHARTERER, without prejudice to any claim for damages suffered or to be suffered by reason of the CHARTERER's default (including reimbursement of attorneys' fees and costs) which OWNERS might otherwise have had against CHARTERER in the absence of such withdrawal; and upon giving such notice or at any time thereafter, OWNERS may retake possession of the VESSEL, wherever found, without prior demand and without legal process, and for that purpose OWNERS and/or their authorized representatives, including any court appointed custodians or substitute custodians, may enter upon any dock, pier, fleet or other premises where the VESSEL may be or may take possession thereof.

If OWNERS shall fail to perform or comply with any provision of this AGREEMENT, particularly, but not limited to OWNERS' obligations under Article 15 herein, then CHARTERER may, at its option, after written notice to OWNERS and an opportunity for OWNERS to cure the default within ten (10) days of such notice, redeliver or abandon the VESSEL and terminate this AGREEMENT by giving written notice to OWNERS, without prejudice to any claim for damages suffered or to be suffered (including reimbursement of attorneys' fees and costs) by reason of the OWNERS' default which CHARTERER might otherwise have had against OWNERS in the absence of such redelivery or abandonment.

21. **BENEFIT OF LIMITATIONS:**  This AGREEMENT is not a personal contract, and OWNERS shall have the benefit of all limitations of and exemptions from all liabilities accruing to the owners of vessels by any statute, regulation or rule of law for the time being enforced, and CHARTERER shall have the benefit of all limitations of and exemptions from liability accruing to demise chartered owners or demise charterers of vessel by any statute, regulation or rule of law for the time being enforced; provided, however, that such limitations of and exemptions from liability shall not in any way effect the obligations of the CHARTERER to the OWNERS under this bareboat charter.

22. **CARGO:**  CHARTERER shall employ the VESSEL to carry lawful cargoes, as listed by the carriage authority of the Barge's Certificate of Inspection, always within the design and structural capabilities of the VESSEL. CHARTERER releases OWNERS and OWNERS' agents and their affiliated companies, from and against any and all liability for loss of or damage to or expense to cargo which may be aboard the VESSEL; and CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNERS and OWNERS' agents, affiliated companies and the VESSEL from and against any and all claims, demands, causes of action, judgments, liens, liabilities, loss, damage, expense, taxes, excises, duties, or fines and penalties of every kind and character arising out of or connected with or in consequence to the loss or damage or expense to cargo carried aboard the VESSELS.  CHARTERER warrants that all documents issued during the Term evidencing the terms and conditions agreed in respect of carriage of goods shall contain a clause paramount incorporating the Carriage of Goods By Sea Act as well as the New Jason Clause and Both-to-Blame Clause.

23. **NOTICES:**  All Notices and other communications under this AGREEMENT shall be in writing and shall be by mail (certified-return receipt requested) addressed as follows:

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

If notice is to CHARTERER:

> Unico Marine
> 3773 Richmond Avenue
> Suite 565
> Houston, Tx, 77046
> Attn. Riccardo Valentini
> Email: rvalentini@unico-commodities.com

If notice is to OWNERS:

> B. No. 220 Corp.
> Tug Morton S. Bouchard Jr. Corp.
> c/o Bouchard Transportation Co., Inc.
> 58 South Service Road
> Suite 150
> Melville, New York 11747
> Attn: Matthew Ray
> Email: mray@pppllc.com

CHARTERER shall report to OWNERS as soon as practical, but in no event to exceed two (2) calendar days following the occurrence, any marine casualty or accident or loss involving the VESSEL, including but not limited to, damage to the VESSEL, damage to the property of third persons caused by or involving the VESSEL, and personal injuries or death sustained on or otherwise involving the VESSEL; and such report shall include the date, time and place of the occurrence giving rise to the casualty, a brief description of the facts of the casualty, and the nature and extent of any damage, loss or injury.

24.   **APPLICABLE LAW/FORUM SELECTION/INTEGRATION:** The terms and conditions of this AGREEMENT, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the general maritime law of the United States; and any controversy, claim, dispute, or demand arising out of this AGREEMENT shall be brought in arbitration in accordance with the rules of the Society of Maritime Arbitrators, Inc. in New York, NY before a panel of three arbitrators.  A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send a notice of appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days after receipt of the notice.  The two arbitrators so chosen shall choose a third arbitrator.  The award of two of the three arbitrators so chosen shall be binding on both parties.  No prior written or oral understanding shall control and this AGREEMENT contains the entire understanding between the parties hereto regarding the charter memorialized herein.

25.   **DUE DILIGENCE:** OWNERS shall have the right to conduct a financial and safety management system due diligence examination of CHARTERER to ensure that CHARTERER has the financial wherewithal to meet its financial and safety management obligations under this AGREEMENT prior to entering into this AGREEMENT. CHARTERER agrees to cooperate in such examination and produce and provide all reasonable, non-propriety documentation or other information requested.

26.   **EMPLOYMENT OF BOUCHARD CREW MEMBERS:** CHARTERER agrees to offer employment to Bouchard crewmembers to man and operate the VESSEL on the following basis. CHARTERER will solicit and accept applications for employment from Bouchard crewmembers, particularly those with experience on the VESSEL.  CHARTERER will review and process all such applications received by it

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

in accordance with its standard hiring practices and protocols. Applicants who are deemed to be qualified and acceptable to CHARTERER will be offered employment. For all such hired former-Bouchard employees, CHARTERER shall be responsible to pay the wages, benefits and health, disability and unemployment insurances of such crewmembers at the same levels and under the same terms as CHARTERER provides to its current similarly situated employees.

27. **ADDITIONAL CLAUSES:**

    (a) On or before delivery of the VESSEL to CHARTERER, OWNER will furnish to CHARTERER a United States Coast Guard Certificate of Inspection ("COI"), a Certificate of Class (with a remaining duration that is acceptable to CHARTERER) and a Load Line Certificate; and,

    (b) CHARTERER shall be allowed a minimum of thirty (30) calendar days between the date indicated on the signature page of this AGREEMENT and the date of delivery to obtain the proper insurance coverage for the VESSEL, however, in all cases, such insurance will be secured and in place prior to delivery; and,

    (c) CHARTERER shall be allowed a minimum of thirty (30) calendar days between the date indicated on the signature page of this AGREEMENT and the date of delivery to incorporate the VESSEL into its safety management system, however, in all cases, the VESSEL shall be incorporated into CHARTERER's safety management system prior to delivery; and,

    CHARTERER, at its sole cost and expense, shall be allowed a minimum of thirty (30) calendar days between the date indicated on the signature page of this AGREEMENT and the date of delivery to obtain vetting approvals from a major oil company, including, but not limited to, SIRE and TMSA.; and,

    (d) CHARTERER shall have a right to re-name the VESSEL and to re-paint the VESSEL to match the colors of the CHARTERER's other vessels. CHARTERER, at its sole cost and expenses shall repaint the VESSEL to their original colors upon re-delivery under this AGREEMENT; and,

    (e) OWNERS hereby acknowledge that they are listed debtors in the Federal Bankruptcy Court located in the Southern District of Texas pursuant to Case Number 20-34682 (hereinafter referred to as the "Bankruptcy Court"), styled Bouchard Transportation Co., Inc. OWNERS affirm this AGREEMENT is being entered into in the ordinary course of business for OWNERS and therefore this AGREEMENT does not require Bankruptcy Court approval and would not be unwound by the Bankruptcy Court. On this basis, CHARTERER accepts copies of a letter of consent for this AGREEMENT, authored and issued by the OWNERS' secured Lender/Mortgagee, in lieu of an order from the Bankruptcy Court. OWNERS will tender copies the letter of consent from the Lender/Mortgagee to CHARTERER at least ten (10) days before the Delivery of the VESSEL; and,

    (f) Brokerage commission of 2.5% commission payable to Braemar ACM Shipbroking Inc., Houston TX on all bare boat hire paid is to be paid by CHARTERER and deducted from Charter Hire.

    (g) Financial Security. CHARTERER shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

12

or municipal or other division or authority thereof, including, but not limited, to Certificates of Financial Responsibility (COFRS) to enable the VESSEL, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this AGREEMENT without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The CHARTERER shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the CHARTERER's sole expense and the CHARTERER shall indemnify the OWNERS against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(h) Anti-Corruption

(i)    The parties agree that in connection with the performance of this AGREEMENT they shall each:

1. Comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organization and/or by any person providing services for it or on its behalf; and

2. Make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this AGREEMENT.

(ii)    If either party fails to comply with any applicable ant-corruption legislation, it shall defend and indemnify the other party against any fine, penalty, liability loss, or damage and any related costs (including, without limitation, court costs and legal fees) arising from such breach.

(iii)    Without prejudice to any of its other rights under this AGREEMENT, either party may terminate this AGREEMENT without incurring any liability to the other party if:

1. At any time, the other party or any member of its organization has committed a breach of any applicable anti-corruption legislation in connection with this AGREEMENT; and

2. Such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

Any such right to terminate must be exercised without undue delay.

Each party represents and warrants that in connection with the negotiation of this AGREEMENT neither it nor any member of its organization has committed any breach of applicable anti-corruption legislation. Breach of this subclause (d) shall entitle the other party to terminate this AGREEMENT without incurring any liability to the other.

(i) Sanctions and Designated Entities

(i)    The provisions of this clause shall apply in relation to any sanction, prohibition or restriction imposed on any specified persons, entities or bodies including the designation

Doc ID: a8fdd6eef915cc2319d2535e54900e6e296e4ad8

CONFIDENTIAL

JMB_00015662

of specified vessels or fleets under United Nations Resolutions or trade or economic sanctions, laws or regulations of the United States of America.

(ii) The OWNERS and CHARTERER respectively warrant for themselves, shippers, receivers, or cargo interests that at the date of this AGREEMENT and throughout the duration thereof they are not subject to any of the sanctions, prohibitions, restrictions or designation referred to in subclause (a) which prohibit or render unlawful any performance under this AGREEMENT. The OWNERS further warrant that the VESSEL is not a designated vessel.

If at any time during the performance of this AGREEMENT either party becomes aware that the other party is in breach of warranty in this Clause, the party not in breach shall comply with the laws and regulations of any Government to which that party or the VESSEL is subject and follow any orders or directions which may be given by any body acting with powers to compel compliance, including where applicable the OWNERS' Flag State. In the absence of any such orders, directions, laws or regulations, the party not in breach may, at its option, terminate this AGREEMENT forthwith.

(i) If, in compliance with the provisions of this Clause, anything is done or is not done, such shall not be deemed a deviation but shall be considered due fulfilment of this AGREEMENT.

(ii) Notwithstanding anything in this Clause to the contrary, the OWNERS or the CHARTERER shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

(iii) The OWNERS or the CHARTERER shall be liable to indemnify the other party against any and all claims, losses, damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty in this Clause.

*(Signature page to follow)*



Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

CONFIDENTIAL

JMB_00015663

14

*(Signature page to Charter Agreement)*

Agreed and accepted, this __12__ day of May, 2021.


OWNERS:                                    CHARTERER:

B. No. 220 Corp.                           Unico Marine

By: _____             By: _____

Its: _____CRO_____             Its: Manager _____


Tug Morton S. Bouchard Jr. Corp.

By: _____

Its: _____CRO_____

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

CONFIDENTIAL

P-02915E-00008032

JMB_00015664

15

EXHIBT A
VESSEL SPECIFICATIONS

[To be completed and attached]

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

CONFIDENTIAL

JMB_00015665

16

EXHIBT B
LETTER OF QUIET ENJOYMENT

May 12th, 2021

Dear Sirs:
Re:  Quiet Enjoyment by Unico Marine (“**Charterer**”)
Vessel:Tug *Morton S. Bouchard* Jr. ON 1265315 and Barge *B. No. 220*, ON 1087420 (“**Vessel**”)
Bareboat Charter Party between Charterer and B. No. 220 Corp. and Tug Morton S. Bouchard Jr. Corp.
(“**Owners**”) dated [•] (“**Charter**”)
Loan Agreement between Owners. [•] and [•] lender entity] (“**Lender**” “**us**” or “**we**”) dated [•] (“**Loan
Agreement**”) for the finance of the purchase of the Vessel

We, confirm that we have received a copy of the Charter and are familiar with its terms.

We will notify Charterer in a timely manner of any act or omission by Owners under the Loan Agreement that
entitles us to take action that may interfere with the quiet enjoyment by Charterers of the Vessel under the
Charter.  Charterer will in turn notify us in a timely manner of any act or omission by Owners which may entitle
Charterer to terminate the Charter.

In consideration of the sum of One (1) US dollar and for other good and valuable consideration, the receipt and
sufficiency of which are acknowledged, effective from the date of this Letter of Quiet Enjoyment, we,
undertake that, provided that Charterer are, at the relevant time, Charterer of the Vessel under the Charter and
not in default of any of the terms of Charter, or the Charter has been unlawfully terminated by Owners, Lender
will not (i) interfere with or otherwise disturb in any way Charterers’ quiet, peaceful, and continuing use,
possession and employment of the Vessel under the Charter, (ii) do or cause to be done any act which might
deprive Charterer of the full, quiet and unfettered use, possession, and employment of the Vessel under the
Charter, or (iii) do or cause to be done any act which might otherwise adversely affect Charterer’s rights under
the Charter, including but not limited to the following:

    issue any arrest, detention or similar proceeding against the Vessel;

    exercise any power of sale or other disposal of the Vessel or of foreclosure to which Lender may be
    entitled or make any application for the sale of the Vessel;

    take possession of the Vessel; or

    exercise against the Vessel any right or remedy which would diminish, prejudice, or interfere with
    Charterer’s rights, options, benefits, or privileges under the Charter or otherwise interfere with the quiet
    use and enjoyment of the Vessel by Charterer under the Charter,

unless Charterer give written consent to any of the above actions, such consent not to be unreasonably withheld
or delayed.

For the avoidance of doubt, the undertakings in this Letter of Quiet Enjoyment shall apply from the date that the
Charterer have taken delivery of the Vessel under the Charter; and

All notices and other communications made between Charterer and Lender in connection hereto shall be in
writing and either faxed or couriered:

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

CONFIDENTIAL

P-02915E-00008032

JMB_00015666

If to Charterers at: [...]
If to Lender at: [...]
If to Owners at: [...]

or at such other address as shall be designated by such party in a written notice to the other party. All such notices and communications shall be effective when received. A notice or other communication received on a non-business day or after business hours in the place of receipt shall be deemed to be served on the next following business day in the place of receipt.

This Letter of Quiet Enjoyment shall be governed by, and construed in accordance with, the laws of New York. The state or federal courts of New York, NY shall have exclusive jurisdiction in relation to all matters which may arise out of or in connection hereto.

Please acknowledge your receipt of, and agreement to, the terms of this Letter of Quiet Enjoyment by signing the attached copy where indicated and returning same to us.

Your Truly,

_____

Name: Riccardo Valentini
Title: Manager

We, [Lender entity], [on behalf of ourselves and the syndicate of lenders for whom we act as agent] hereby confirm our agreement to the provisions of this Letter of Quiet Enjoyment.
Per: _____
Name:
Title:

We, [OWNERS] hereby confirm our agreement to the provisions of this Letter of Quiet Enjoyment.
Per: _____
Name: MATTHEW RAY
Title: CRO

Doc ID: a8fdd6eef915cc2319d2535e5d900e6e296e4ad8

CONFIDENTIAL