# EXHIBIT 3

## BAREBOAT CHARTER AGREEMENT

In consideration of the rate of charter hire agreed to herein, JMB Shipping ATB 284, LLC, the registered OWNER of the *Barge UMS 284* and the tug *Rubia*, with its principal place of business at 205 South Martel Avenue, Los Angeles, CA 90036 (hereinafter referred to as "OWNER") hereby agree to bareboat charter the aforementioned Tug and Barge (collectively, as a unit, referred to hereinafter as "VESSEL") and BUNKER BARGE 2020 LLC with its principal place of business located 910 SW Spokane St., Seattle, WA 98134 (hereinafter referred to as "CHARTERER") hereby agrees to charter and hire on a bareboat basis (hereinafter referred to as "AGREEMENT"), the aforementioned VESSEL, pursuant to the following terms and conditions:

1. **VESSEL** (Tug and Barge as a unit): Tug *Rubia*, ON 1251312.
   Barge *UMS 284*, ON 1216341.

   Both the Tug and Barge are registered and flagged as United States vessels. CHARTERER shall not during the term of the AGREEMENT change or otherwise modify the VESSEL registration or Flag. VESSEL specifications attached hereto as Exhibit A.

2. **VALUATION:**           Tug:   $20.0 million USD.
                            Barge: $28.0 million USD.

3. **PORT OF DELIVERY:** The OWNER shall deliver the VESSEL at New York Harbor, New York, New York, USA or at such berth mutually agreed by the parties hereto on or about the dates set forth herein at such readily accessible safe berth or mooring as mutually agreed by the parties hereto ("DELIVERY").

4. **PORT OF REDELIVERY:** The CHARTERER shall redeliver the VESSEL at the port of delivery or at such location mutually agreed by the parties hereto on or about the dates set forth herein at such readily accessible safe berth or mooring as mutually agreed by the parties hereto ("REDELIVERY"). The CHARTERER shall keep the OWNER informed of the VESSEL's itinerary for the voyage leading up to REDELIVERY and shall serve the OWNER with written approximate/definite notices of the VESSEL's REDELIVERY at 45, 30, 15 and 3 days prior to such REDELIVERY.

   The CHARTERER warrants that it will not permit the VESSEL to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow REDELIVERY of the VESSEL within the AGREEMENT redelivery period and in accordance with the notices given without the written consent of OWNER. Notwithstanding the above, should the CHARTERER fail to redeliver the VESSEL within the Charter term, the CHARTERER shall pay the daily equivalent to the rate of hire stated herein plus ten (10) per cent or the market rate, whichever is the higher, for the number of days by which the Charter term is exceeded. Such payment of the enhanced hire rate shall be without prejudice to any claims the OWNER may have against the CHARTERER in this respect. All other terms, conditions and provisions of this AGREEMENT shall continue to apply.

5. **TERM:**
   (a)    The term of this AGREEMENT ("TERM") shall be from the first date of on hire, being the date of November 15, 2021, for a period of four (4) years, ending on or about November 14, 2025. CHARTERER will accept DELIVERY of the VESSEL on November 1, 2021 and charter hire will commence on November 15, 2021.

   (b)    OWNER shall use commercially reasonable efforts to deliver the VESSEL on November 1, 2021; however, in the event that the OWNER cannot deliver the VESSEL on or before December 31, 2021,

CHARTERER shall have the right, but not the obligation, to terminate this AGREEMENT.

6. **CHARTER HIRE:** For the TERM of this AGREEMENT, the charter hire ("CHARTER HIRE") shall be **$7,833.33 USD**; per calendar day or part thereof, with a $333.33 USD increase to the daily hire rate on each annual anniversary of the TERM of this AGREEMENT, payable monthly in advance on the first day of each month, or if the 1st falls on a non-banking day, the last banking day of the previous month, by CHARTERER to OWNER, commencing on the date of DELIVERY of the VESSEL to CHARTERER. CHARTER HIRE shall continue until the date the VESSEL is redelivered by CHARTERER to OWNER in compliance with the requirements of this AGREEMENT. Except for any period when the VESSEL is out of service due to OWNER's breach of seaworthiness warranty provided in Article 7(a), CHARTERER shall owe and pay CHARTER HIRE from the time of DELIVERY until the time of REDELIVERY, without any deductions whatsoever, regardless of whether the VESSEL is working as a unit or is taken out of service for necessary repairs and maintenance or is delayed or is otherwise idle, regardless of cause; and the occurrence of any other circumstance affecting the working of the VESSEL shall not excuse or limit CHARTERER's obligation hereunder for payment of CHARTER HIRE. For the avoidance of doubt, CHARTER HIRE begins on November 15, 2021.

(a) The CHARTERER shall pay CHARTER HIRE due to OWNER punctually in accordance with the terms of this AGREEMENT. If the CHARTERER fails to make punctual payment of CHARTER HIRE when due, the OWNER shall give the CHARTERER three (3) banking days written notice to rectify the failure, and when so rectified within those three (3) banking days following the OWNER's notice, the payment shall stand as punctual. For purposes of this AGREEMENT, the term "banking days" shall mean days on which banks are open in the United States.

(b) Payment of CHARTER HIRE shall be made to the OWNER's designated bank account:

First Republic Bank
111 Pine Street
San Francisco, CA 94111
Bank ABA Number: 321 081 669
SWIFT BIC: FRBBUS6S
Beneficiary Name: JMB Shipping ATB 284, LLC
Beneficiary Account Number: 80009940596

7. **SEAWORTHINESS/SURVEY:**
(a) The OWNER warrants that at the time of DELIVERY the VESSEL shall be seaworthy and, in every respect, ready in tanks, hull, machinery and equipment for the service intended under this AGREEMENT and in accordance with the specifications provided in Exhibit A. Should any latent defect, that could not be reasonably discovered, pre-existing DELIVERY render the VESSEL unseaworthy within one (1) year of VESSEL DELIVERY, the VESSEL shall be deemed offhire until OWNER, at its sole cost and expense, resolves the issue and makes the VESSEL in every respect ready in tanks, hull, machinery and equipment for the service intended under this AGREEMENT and the VESSEL returned to the location where the VESSEL was put offhire, unless otherwise agreed.

(b) Prior to and following execution of this AGREEMENT, CHARTERER shall have reasonable opportunity to inspect the VESSEL to confirm the OWNER's work to repair/rectify the known outstanding maintenance items listed in Schedule A hereto, and to make the VESSEL seaworthy and, in every respect, ready in tanks, hull, machinery and equipment for the intended service.

(c) Prior to DELIVERY and REDELIVERY, CHARTERER and OWNER shall appoint a mutually acceptable qualified marine surveyor to determine and provide written reports on the condition of the VESSEL (including exterior hull and internal inspection of the void tanks to establish the existence, or lack thereof, of any significant indentations; and, tank compartments to establish the condition of the tank-bottom of the VESSEL) together with its equipment, appliances, machinery, spares and all consumable stores on board at the times of delivery and redelivery hereunder. It is agreed between the parties hereto that the survey reports shall be taken as conclusive evidence of the condition of the VESSEL and its equipment on DELIVERY and REDELIVERY.

(d) The CHARTERER and the OWNER respectively shall at the time of DELIVERY and REDELIVERY take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores in and on the VESSEL at the then current market prices at the points of DELIVERY and REDELIVERY, respectively. The CHARTERER shall ensure that all spare parts listed in the inventory and used during the TERM are replaced at its expense prior to REDELIVERY of the VESSEL. OWNER shall have the right at any time after giving reasonable notice to CHARTERER and without unduly interfering with the VESSEL's commercial operations, to inspect or survey the VESSEL or to instruct a duly authorized surveyor to carry out such survey on its behalf.

(e) In the event that the survey conducted in preparation for DELIVERY under Article 7(c), and/or the inspections of OWNER's and/or CHARTERER's employees and agents conducted simultaneously thereto, discover a condition that is unacceptable to CHARTERER, then the OWNER shall repair or correct such condition at its expense. However, if the cost to repair or correct such condition is so onerous as to materially affect the OWNER's anticipated financial return, then OWNER shall, at its sole option, have the right, but not the obligation to terminate this AGREEMENT without further liability. In like manner, if the repair or correction as proposed or as executed by OWNER is not in accordance with generally accepted marine standards or is not approved by the applicable regulatory body or OWNER's classification society, then CHARTERER shall have the right, but not the obligation, to terminate this AGREEMENT without further liability.

8. **DELIVERY AND ACCEPTANCE:**
(a) The VESSEL shall be delivered by OWNER and accepted by CHARTERER at the place indicated in Article 3. DELIVERY of the VESSEL by OWNER to the CHARTERER and the acceptance of the VESSEL by CHARTERER at the time of DELIVERY, subject to any reasonably undiscoverable latent defect as described in Article 7(a), shall establish conclusively that CHARTERER has inspected or has caused to be inspected (or has elected to waive inspection) the VESSEL and has found the VESSEL to be clean, tight, staunch, strong, and in all respects seaworthy, and in all respects fit for the work and service intended by CHARTERER.

(b) CHARTERER shall make no structural or substantial changes to the VESSEL without the OWNER's prior written approval. If the OWNER agrees to such changes, the CHARTERER shall, if the OWNER so requires, restore the VESSEL, prior to REDELIVERY of the VESSEL, to its former condition provided that such structural changes are subject to Class approval, if applicable, before same are made. All requested and approved structural or substantial changes, and restorations to original condition shall be at the sole time, cost and expense of CHARTERER.

9. **OPERATION, MANAGEMENT AND CONTROL:** OWNER, upon DELIVERY, shall relinquish complete possession, direction, control and risk of loss of the VESSEL over to CHARTERER; and throughout the TERM of this AGREEMENT, CHARTERER shall have the full use and exclusive possession, direction, control and risk of loss of the VESSEL. This AGREEMENT shall not constitute a

transfer of OWNER's ownership of the VESSEL, but CHARTERER shall be regarded as the owner *pro hac vice* with respect to liability to any third party.

10. **MAINTENANCE AND PARTIAL LOSS:**
    (a) During the TERM of this AGREEMENT, CHARTERER, at its sole cost and expense, shall maintain, service, repair and preserve the VESSEL and its equipment in accordance with good commercial maintenance practices, in compliance with any currently existing and currently required Class, Flag or U.S. Coast Guard or other U.S. governmental authorities, or other Port State Control requirements, and in substantially the same condition as when received from the OWNER at the time of DELIVERY, ordinary wear and tear excepted. In the event that, during the TERM of this AGREEMENT, the VESSEL requires either an engine overhaul or a routine shipyard periods (intermediate and special survey) as required by class rules, then in those cases, the costs of such overhaul and/or shipyard expenses shall be for the account of the OWNER and be considered off-hire. For the avoidance of doubt, VESSEL is off-hire for all engine overhauls and routine shipyard periods required by class rules which are for OWNER's account.

    (b) In the event of partial loss (or loss short of actual or constructive total loss) of either the Tug or the Barge, CHARTERER shall arrange for the repair of such damage to the VESSEL, and CHARTERER shall pay the cost thereof and all other expenses incidental thereto. Further, CHARTERER shall continue to make or cause to be made all payments due and provided for in this AGREEMENT during the period of such repair, including the payment of CHARTER HIRE, without any deduction whatsoever. Any omission or delay of insurers in making loss payments shall not relieve CHARTERER of its obligations to pay CHARTER HIRE due or to make necessary repairs and restore the VESSEL to the same condition as at the time of DELIVERY, ordinary wear and tear excepted.

11. **NAVIGATION LIMITS:** Under the VESSEL's current classification, the VESSEL shall be employed only in lawful trades and for lawful purposes and only in the carrying of lawful merchandise in the U.S. coastwise trade, including upon the waters of the U.S. East Coast, Gulf Coast, and West Coast of the United States. For international voyages, CHARTERER must obtain DOCs and any other required documents to operate the VESSEL for such voyages, at CHARTERER's sole cost and expense.

12. **TOTAL LOSS OF VESSEL:** In the event that either the Tug or the Barge shall become an actual total loss or shall be declared to be a constructive total loss under the terms of any applicable insurance policy thereon, CHARTERER shall pay OWNER the amount stated in Article 2 above, allowing reasonable time, not to exceed ninety (90) days from the date the Tug and/or Barge is declared a Total Loss or Constructive Total Loss, for hull underwriters to make such payment. CHARTER HIRE due hereunder shall continue without setoff until such payment is made by the hull underwriters. In the event that either the Tug or Barge becomes a wreck and requires compulsory removal, CHARTERER shall, in addition to providing the insurance coverages set forth in Article 14 of this AGREEMENT, including wreck removal and liability coverage, indemnify OWNER against all sums whatsoever which the OWNER shall become liable to pay and shall pay in consequence of the VESSEL becoming a wreck. OWNER shall not, under any circumstance, contribute to general average. In the event of a total loss of the either the Tug and/or the Barge, OWNER shall have the option, at its sole discretion, to substitute another Tug or Barge of similar characteristics to finish out the TERM of this AGREEMENT. The substitute VESSEL will be subject to the approval of the CHARTERER, but such approval shall not be unreasonably withheld. If OWNER chooses not to replace the wrecked Tug and/or Barge, this AGREEMENT shall be terminated as of the date of the loss.

13. **CONFIDENTIALITY:** Any and all pricing terms contained in this AGREEMENT, and any related correspondence between the OWNER and the CHARTERER, shall be considered confidential

information. OWNER and CHARTERER agree to hold such information in strict confidence and not to disclose it to any third parties, except to the extent that may be required by any court order. Notwithstanding the foregoing, CHARTERER may disclose such information only to the extent necessary to fulfill the obligations set forth herein. OWNER and CHARTERER agree to take all reasonable measures to protect the confidentiality of and avoid disclosure, or use of such confidential information, which measures shall include the highest degree of care that it utilizes to protect their own confidential information of similar nature.

14. **INSURANCE:** Without prejudice to or otherwise diminishing CHARTERER's obligations under the INDEMNITY Clause hereto (Article 15), CHARTERER, at its sole cost and expense, shall procure and maintain from the time of DELIVERY and throughout the TERM of this AGREEMENT the following insurances on forms and with underwriters approved by OWNER:

    (a) Hull Insurance on the VESSEL, including collision liability, in the American Institute Hull Clauses form or equivalent, equal to or in excess of the full stated value of the VESSEL (as reflected in Article 3 above), with geographical and navigation extensions of coverage to the areas and waters in which the VESSEL may operate or work under this AGREEMENT, and with the deductible not to exceed $100,000.00 per accident or occurrence. If Collision Liability is excluded as primary coverage from the P&I Insurance, it shall be included by specific Endorsement or Clauses under the Hull Insurance which shall also include a Running Down Clause, Strikes, Riots, (SRCC) Terrorism (TRIA) and War Risks.

    (b) Protection and Indemnity (P&I) Insurance on the VESSEL, from a recognized International Group of P&I Club Member, with a minimum limit of $500,000,000.00 applicable to any one accident or occurrence, and with the deductible not to exceed $100,000.00 per accident or occurrence which insurance shall include compulsory wreck removal liability and sue and labor coverages.

    (c) Pollution Liability Insurance, either by endorsement to the appropriate insurances named above, or by separate insurance, in the P&I Club form and amount of not less than $1,000,000,000.00, including full limits for Defense Fines & Penalties, State Acts Other Substances and Firefighting/Salvage with the deductible not to exceed $100,000.00 per accident or occurrence, and providing insurance coverage for and against liability for pollution damages and pollution clean-up expenses as provided for under the Oil Pollution Act of 1990 (OPA), the Federal Water Pollution Control Act (Clean Water Act), the Act for Prevention of Pollution From Ships (APPS), the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), and under any other applicable federal regulations, and as provided for under appropriate state law or municipal law where applicable.

The Hull Insurance policy required in subparagraph (a) shall name OWNER and JMB Shipping, LLC as named insureds and loss payee, as their interests may appear herein, and as joint named assureds in accordance and in compliance with the P&I Club rules and requirements for joint assureds in respect to P&I coverage for the VESSEL, including Misdirected Arrow coverage, for the policies under subparagraphs (b) and (c).

To the extent as may be or become applicable, any Lender/Mortgagee of the VESSEL shall be named as loss payee under the insurance policy required under sub-paragraph (a), as its interests may appear, and shall be named as an additional assured and provided with Misdirected Arrow coverage for the policies under subparagraphs (b) and (c), above. The aforementioned policies of insurance shall each contain a waiver of all underwriters' rights of subrogation against the named Lender/Mortgagee.

6

The CHARTERER shall be responsible for the payment of all deductibles provided for in each of the above policies of insurance.

Excepting circumstances under which the P&I Club may invoke immediate termination (i.e., circumstances of breach of sanctions or illegal trading), the insurance policies required above shall each provide for ten (10) days' prior written notice of material change or advance notice of cancellation to OWNER and the additional named assureds. If insurer will not provide such notice directly to OWNER, CHARTERER shall immediately forward any such notice it receives to OWNER.

Certificates of insurance evidencing compliance with the foregoing insurance requirements shall be provided to OWNER prior to the DELIVERY of the VESSEL to the CHARTERER.

15. **INDEMNITY:**
(a)   OWNER shall have no responsibility or liability for the consequences of CHARTERER's use, employment, possession, control, charter, operation, navigation, manning, maintenance, repair, management and work of the VESSEL; and notwithstanding the insurance requirements in Article 14, CHARTERER assumes all risk of liability in connection with its use, employment, possession, control, charter, operation, navigation, manning, maintenance, repair, management and work of the VESSEL. OWNER shall have no responsibility or liability for any personal injury, illness, death or occupational disease suffered by any person, including crewmembers assigned to the VESSEL, employees of the CHARTERER, CHARTERER's third party contractors, invitees and the like, on account of any involvement with the VESSEL, and OWNER shall have no responsibility or liability for any property damage or loss (including pollution damages and pollution clean-up expenses) caused in whole or in part by or on account of the VESSEL; CHARTERER assumes all risk of liability for personal injury, illness, death or occupational disease suffered or sustained by any person on account of the VESSEL, and CHARTERER assumes all risk of liability for property damage or loss (including pollution damages and clean-up expenses) caused in whole or in part by or on account of the VESSEL.

(b)   CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNER and the VESSEL from and against any and all claims, demands, causes of action (including challenges to CHARTERER's coastwise privileges), liabilities, judgments, liens, losses, damages, expenses, taxes, fines and penalties, of every kind and character, arising out of or in any way connected with or in consequence to CHARTERER's use, employment, operation, navigation, manning, maintenance, repair, management or work of the VESSEL, regardless of whether caused in whole or in part by the negligence or other actionable fault of OWNER or the unseaworthiness of the VESSEL except as otherwise provided herein, for and on account of (a) personal injury, illness, death and occupational disease suffered by any person; (b) property damage or loss to the VESSEL or its equipment, (c) property damage or loss to CHARTERER or third parties, (d) damage or loss or contamination or expense to cargo carried aboard the VESSEL, (e) salvage and/or wreck removal of the VESSEL, and (f) pollution damages and pollution clean-up expenses, pollution penalties and fines, and damage to the environment resulting from pollution.

(c)   OWNER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) CHARTERER and the VESSEL from and against any and all claims, demands, causes of action, liabilities, judgments, liens, losses, damages, expenses, taxes, fines and penalties, of every kind and character, arising out of or in any way connected with or in consequence of any third party challenge, of any type or nature, to CHARTERER's possession, control, or charter of the VESSEL. This Article shall not be applicable and shall be of no force or effect if the challenge to the

CHARTERER's possession, use or control of the VESSEL is as a result of CHARTERER's actions, omissions, negligence, violations or failure to abide by any governmental regulations or Class requirements or any other breach of this AGREEMENT.

16. **REDELIVERY:** Upon expiration or termination or cancellation of this AGREEMENT, or upon default of CHARTERER resulting in termination of this AGREEMENT, CHARTERER shall, at its sole cost and expense, redeliver the VESSEL to OWNER at OWNER's designated place of REDELIVERY or at such location mutually agreed by the parties hereto, and the VESSEL shall be rediliverd to the OWNER in the same good order and condition as they were at the time of DELIVERY, ordinary wear and tear excepted. Necessary cleaning of the VESSEL, and the removal and disposal of all debris and pumpable cargo from the VESSEL, shall be the responsibility of CHARTERER at CHARTERER's sole cost and expense. For the avoidance of any doubt, notwithstanding any terms herein to the contrary, on REDELIVERY, the VESSEL tanks to be returned in substantially the same condition as they were at the time of DELIVERY, ordinary wear and tear excepted.

17. **COMPLIANCE WITH LAWS, TAXES, FINES, ETC.:** During the term of this AGREEMENT, CHARTERER, at its sole cost and expense, shall cause the VESSEL to, at all times, comply with all applicable federal, state, regional, county and municipal statutes, ordinances, rules and regulations pertaining to the use, employment, possession, operation, navigation, maintenance, management or the work of the VESSEL, and CHARTERER shall have on board the VESSEL, when required thereby, valid certificates showing such compliance. CHARTERER shall pay and discharge all taxes except those taxes which are specifically and directly applicable to OWNER by virtue of its receipt of CHARTER HIRE hereunder, assessments, excises, levies, duties, port charges, wharfage charges, waterway tolls, pilotage and harbor fees, fines, penalties and any other governmental charges (whether federal, state, regional, county or municipal) lawfully imposed upon CHARTERER or upon the VESSEL; and CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNER and the VESSEL against any and all claims, demands, causes of action, judgments, liens, and liabilities for such taxes, assessments, excises, levies, duties, port charges, wharfage charges, waterway tolls, pilotage and harbor fees, fines, penalties or other governmental charges in any way connected with the VESSEL or its use, employment, possession, operation, navigation, maintenance, management or work by CHARTERER. The CHARTERER hereby represents and warrants to, and covenants and agrees with, the OWNER that it is as of the date of this AGREEMENT, and shall continue to remain throughout the Charter Term, a "citizen of the United States" within the meaning of 46 U.S.C. § 50501, and the regulations promulgated thereunder, eligible and qualified to own and operate vessels in the U.S. coastwise trade. CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNER and the VESSEL against any and all claims, demands, causes of action, fines, penalties or judgments relating to CHARTERER's breach of this Article 17.

18. **ASSIGNMENT AND SUBCHARTER:** CHARTERER shall neither assign nor novate this AGREEMENT nor sub-bareboat charter the VESSEL other than to an affiliated company without the consent of OWNER. CHARTERER may time, voyage or spot charter the VESSEL, and issue contracts of affreightment, provided the CHARTERER remains fully responsible for the obligations of this AGREEMENT.

19. **LIENS AND MORTGAGES:**
    (a) Neither CHARTERER nor any other person shall have the right, power or authority to create, incur or permit to be placed or imposed upon the VESSEL any lien or encumbrance whatsoever. CHARTERER shall not cause or permit any lien or encumbrance against the VESSEL or any arrest or seizure or

detainment of the VESSEL, and CHARTERER, at its sole cost and expense, shall immediately remove or cause to be removed any such lien, arrest, seizure or detainment, unless such claim of lien is reasonably challenged and substitute security posted to permit the release of the VESSEL from such arrest, seizure or detainment. Any substitute security required shall be posted by CHARTERER at its sole cost and expense. During the period of any arrest, seizure or detainment as a result of CHARTERER's breach of this Article 19 (a), the VESSEL shall remain fully on hire.

(b) If the VESSEL (either Tug or Barge) is now or later becomes financed and subject to a first preferred ship mortgage loan. CHARTERER undertakes to comply and provide such information and documents to enable OWNER to comply with all instructions, operation, repairs and maintenance of the VESSEL as set forth in the mortgage. OWNER and/or its secured creditors shall have a lien upon any cargoes carried in the VESSEL during the term for any claims under this AGREEMENT exercisable upon Default of the CHARTERER.

20. **TERMINATION AND DEFAULT:**
(a) If CHARTERER shall fail to pay any CHARTER HIRE due for more than three (3) banking days after OWNER's under Article 6(a), or, if CHARTERER shall fail to perform or comply with any other material provision of this AGREEMENT, particularly, but not limited to CHARTERER's obligations under Articles 14, 15 and 17 (upon Notice and ten (10) calendar days' cure period), then OWNER may, at its option, withdraw the VESSEL from the service of the CHARTERER and terminate this AGREEMENT by giving written notice to CHARTERER, without prejudice to any claim for damages suffered or to be suffered by reason of the CHARTERER's default (including reimbursement of attorneys' fees and costs) which OWNER might otherwise have had against CHARTERER in the absence of such withdrawal; and upon giving such notice or at any time thereafter, OWNER may retake possession of the VESSEL, wherever found, without prior demand and without legal process, and for that purpose OWNER and/or its authorized representatives, including any court appointed custodians or substitute custodians, may enter upon any dock, pier, fleet or other premises where the VESSEL may be or may take possession thereof.

(b) If OWNER shall fail to perform or comply with any provision of this AGREEMENT, particularly, but not limited to OWNER's obligations under Article 15 herein, then CHARTERER may, at its option, after written notice to OWNER and an opportunity for OWNER to cure the default within ten (10) days of such notice, redeliver or abandon the VESSEL and terminate this AGREEMENT by giving written notice to OWNER, without prejudice to any claim for damages suffered or to be suffered (including reimbursement of attorneys' fees and costs) by reason of the OWNER's default which CHARTERER might otherwise have had against OWNER in the absence of such redelivery or abandonment.

21. **BENEFIT OF LIMITATIONS:** This AGREEMENT is not a personal contract, and OWNER shall have the benefit of all limitations of and exemptions from all liabilities accruing to the owners of vessels by any statute, regulation or rule of law for the time being enforced, and CHARTERER shall have the benefit of all limitations of and exemptions from liability accruing to demise chartered owners or demise charterers of vessels by any statute, regulation or rule of law for the time being enforced; provided, however, that such limitations of and exemptions from liability shall not in any way effect the obligations of the CHARTERER to the OWNER under this AGREEMENT.

22. **CARGO:** CHARTERER shall employ the VESSEL to carry lawful cargoes, as listed by the carriage authority of the Barge's Certificate of Inspection, always within the design and structural capabilities of the VESSEL. CHARTERER releases OWNER and OWNER's agents and their affiliated companies, from and against any and all liability for loss of or damage to or expense to cargo which may be aboard the

9

VESSEL; and CHARTERER agrees to fully protect, defend, hold harmless and indemnify (including reimbursement of attorneys' fees and costs) OWNER and OWNER's agents, affiliated companies and the VESSEL from and against any and all claims, demands, causes of action, judgments, liens, liabilities, loss, damage, expense, taxes, excises, duties, or fines and penalties of every kind and character arising out of or connected with or in consequence to the loss or damage or expense to cargo carried aboard the VESSEL, regardless of whether caused in whole or in part by the negligence of OWNER or the unseaworthiness of the VESSEL. CHARTERER warrants that all documents issued during the Term of this AGREEMENT evidencing the terms and conditions agreed in respect of carriage of goods shall contain a clause paramount incorporating the Carriage of Goods By Sea Act as well as the New Jason Clause and Both-to-Blame Clause.

23. **OPTION TO PURCHASE:**

(a) CHARTERER shall have the option to purchase the VESSEL (being both the Tug Rubia and the Barge UMS 284 as a unit) ("PURCHASE OPTION") exercisable on delivery of written notice from CHARTERER to OWNER in accordance with Article 24 of this AGREEMENT on or before ninety (90) days prior to the date of termination of the term.

(b) If CHARTERER exercises the PURCHASE OPTION, the price of the VESSEL shall be the agreed fair market value of the VESSEL as of the date of exercise of the PURCHASE OPTION, less the sum of ONE MILLION THREE HUNDRED FIFTY THOUSAND U.S. DOLLARS (US$1,350,000.00) ("PURCHASE OPTION PRICE"). Fair market value shall be determined by mutual agreement, but if the parties cannot agree, shall be determined by referral to a mutually agreed ship broker whose fair market value estimate shall be binding on the parties, absent manifest error or fraud. If the parties cannot agree to a ship broker, then each party shall retain their own independent ship broker and each will provide their fair market estimates to an arbitrator in accordance with HMAA "Fast Track Arbitration Rules" as provided in Article 25.

(c) If CHARTERER exercises the PURCHASE OPTION, ownership of the VESSEL shall be transferred to CHARTERER on the relevant date upon (i) exchange of such documents and protocols of delivery as may be reasonably required to facilitate the sale to and registration of the VESSEL by CHARTERER under the U.S. Flag and (ii) payment of the full PURCHASE OPTION PRICE by CHARTERER to OWNER, without discount or setoff, together with any unpaid CHARTER HIRE and any other amounts due and payable by CHARTERER to OWNER under this AGREEMENT. The parties warrant that they shall provide such documents and take such actions as may be reasonably required to accomplish such transfer of ownership.

(d) OWNER warrants that the VESSEL at the time of transfer of ownership shall be free of any of encumbrance or mortgage and that OWNER have not committed any act or omission which would impair title to the VESSEL.

(e) The VESSEL will be sold "as is, where is" on the date of transfer of ownership, and OWNER makes no representation or warranty as to the seaworthiness, value, condition, design, merchantability or operation of the VESSEL, or as to the quantity or quality of the material, equipment or workmanship in the VESSEL, or as to the fitness of the VESSEL for any particular purpose or trade.

(f) Upon payment and transfer of ownership as aforesaid, this AGREEMENT and all rights and obligations of the parties thereunder shall terminate, without prejudice to any and all rights accrued as between the parties under the AGREEMENT prior to the date of termination and any claim that either

10

party may have against the other.

24. **NOTICES:** All Notices and other communications under this AGREEMENT shall be in writing and shall be by email and also by mail (certified-return receipt requested) addressed as follows:

    If notice is to CHARTERER:

        Bunker Barge 2020 LLC
        910 SW Spokane St.
        Seattle, WA 98134
        Attn. Matt Godden
        Email: mgodden@centerlinelogistics.com

    If notice is to OWNER:

        JMB Shipping ATB 284, LLC
        205 South Martel Avenue
        Los Angeles, CA 90036
        Attn: Steven Shenker
        Email: sshenker@pppllc.com

CHARTERER shall report to OWNER as soon as practical, but in no event to exceed two (2) calendar days following the occurrence, any marine casualty or accident or loss involving the VESSEL, including but not limited to, damage to the VESSEL, damage to the property of third persons caused by or involving the VESSEL, and personal injuries or death sustained on or otherwise involving the VESSEL; and such report shall include the date, time and place of the occurrence giving rise to the casualty, a brief description of the facts of the casualty, and the nature and extent of any damage, loss or injury.

25. **APPLICABLE LAW/DISPUTE RESOLUTION:** The terms and conditions of this AGREEMENT, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the general maritime law of the United States; and any controversy, claim, dispute, or demand arising out of this AGREEMENT shall be brought in arbitration in accordance with the rules of the Houston Maritime Arbitrators Association (HMAA) in Houston, TX before a panel of three (3) arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send a notice of appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days after receipt of the notice. The two (2) arbitrators so chosen shall choose a third arbitrator. The award of two (2) of the three (3) arbitrators so chosen shall be binding on both parties. No prior written or oral understanding shall control, and this AGREEMENT contains the entire understanding between the parties hereto regarding the charter memorialized herein. Disputes with less than $50,000 in controversy shall proceed under the HMAA "Fast Track Arbitration Rules".

26. **DUE DILIGENCE:** OWNER shall have the right to conduct a financial and safety management system due diligence examination of CHARTERER to ensure that CHARTERER has the financial wherewithal to meet its financial and safety management obligations under this AGREEMENT for a period of thirty (30) days after entering into this AGREEMENT. CHARTERER agrees to cooperate in such examination and produce and provide all reasonable, non-propriety documentation or other information requested.

27. **EMPLOYMENT OF JMB CREW MEMBERS:** CHARTERER agrees to offer employment to JMB crewmembers to man and operate the VESSEL on the following basis. CHARTERER will solicit and

11

accept applications for employment from JMB crewmembers, particularly those with experience on the VESSEL. CHARTERER will review and process all such applications received by it in accordance with its standard hiring practices and protocols. Applicants who are deemed to be qualified and acceptable to CHARTERER will be offered employment. For all such hired former-JMB employees, CHARTERER shall be responsible to pay the wages, benefits and health, disability and unemployment insurances of such crewmembers at the same levels and under the same terms as CHARTERER provides to its current similarly situated employees.

28. **ADDITIONAL CLAUSES:**

(a) The scheduled Intermediate Survey for the VESSEL in May of 2022 will commence in or around November 2021 ("Next Intermediate") due to CHARTERER'S request and customer requirements. The terms in this clause (28(a)) supersede any conflicting terms elsewhere in this CHARTER AGREEMENT.
  i. CHARTERER to commence CHARTER HIRE on November 15, 2021 per article 6.
  ii. In consideration for CHARTER HIRE payment during the Next Intermediate Survey, CHARTERER to receive 30-days free CHARTER HIRE in calendar year 2022, paid to CHARTERER via a discount to the daily CHARTER HIRE rate for calendar the year 2022 of $643.84, regardless of the length of the Next Intermediate Survey.
  iii. In addition to the general Intermediate Survey shipyard and engine overhaul costs for OWNER's account pursuant to Article 10 herein, OWNER to pay for all repairs for return to service, limited to the repairs listed in Schedule A, during the Next Intermediate Survey.
  iv. CHARTERER to appoint a dedicated Port Engineer to oversee and manage the Next Intermediate Survey.
  v. Costs to paint the VESSEL to a different color or change the name of the VESSEL at CHARTERER's direction and cost (account). For the avoidance of doubt, all painting required by law or regulation to be on OWNER's account.
  vi. OWNERS are only responsible to complete repairs during Next Intermediate shipyard period to meet Classification and USCG requirements and those outlined in 28(a)(iii) above. Both OWNERS and CHARTERERS and their representatives to have complete access to the shipyard and VESSEL during the duration of all the shipyard periods.
  vii. OWNER shall have final approval of all vendor material / service purchases, such approval not to be unreasonably withheld.
  viii. CHARTERER to accept Delivery of the VESSEL at 12:01AM ET on November 1, 2021.

(b) OWNER and CHARTERER to work together in good faith to negotiate the shipyard contract with Caddell Dry Dock & Repair Co. for the Next Intermediate Survey works and additional works pursuant to Article 28(a)(iii) and Schedule A, which shall be by and between JMB Shipping ATB 284, LLC and Caddell Dry Dock & Repair Co. with CHARTERER as manager. CHARTERER shall be responsible for movement of the VESSEL from its current location to Caddell Dry Dock & Repair Co. Contract with Caddell Dry Dock & Repair Co. shall include:
  i. Unit pricing;
  ii. Project management & reporting requirements;
  iii. Critical Path Method Scheduling (Delineation of Owner work and Operator requested items);
  iv. Change Order Management (specifically the approval process for changes affecting overall price in a timely manner);
  v. Access to the shipyard and VESSEL, provision of any required Safety Training at CHARTERER expense for OWNER Personnel; and
  vi. Copy of final signed contract.

(c) All shipyard periods during the term of this AGREEMENT following DELIVERY to be managed by CHARTERER at CHARTERER's expense (except shipyard work expressly for OWNER's account provided in Article 10 shall be at OWNER's expense);

(d) OWNER to provide initial deck, engine and steward supplies that are currently onboard the VESSEL. OWNER shall not be responsible to provide any additional supplies to the VESSEL;

13

(e) CHARTERER shall obtain the proper insurance coverage for the VESSEL prior to DELIVERY;

(f) CHARTERER shall incorporate the VESSEL into its safety management system prior to DELIVERY;

(g) OWNER to deliver the VESSEL with classification from Bureau Veritas (BV) and maintain such class at OWNER's expense. If CHARTERER choses to change the VESSEL classification to American Bureau of Shipping (ABS), costs associated with such change shall be for the account of the CHARTERER, with the exception of the repair items listed in Schedule A, which shall be for the account of OWNER. After the change is complete, ongoing classification costs for account of the OWNER;

(h) CHARTERER to operate the VESSEL under its Document of Compliance (DOC);

(i) CHARTERER shall supply copies of all Class and USCG document submissions and responses to OWNER and its representatives;

(j) CHARTERER shall provide access to its maintenance system for the VESSEL to OWNER and its representatives;

(k) CHARTERER shall have a right to re-name the VESSEL and to re-paint the VESSEL to match the colors of the CHARTERER's other vessels at its sole expense. CHARTERER, at its sole cost and expenses shall repaint the VESSEL to its original colors upon REDELIVERY under this AGREEMENT;

(l) CHARTERER shall have the option to reassign or re-couple tugs and/or barges chartered hereunder to other tugs and/or barges on charter to CHARTERER by OWNER or OWNER's affiliated company(ies) with the consent of OWNER and OWNER's affiliated companies, such consent not to be unreasonably withheld; provided always that such reassigned tug-barge combinations shall be compatible with each other in all respects, including but not limited to horsepower and compatibly sized notches and pins.

(m) If within 180-days of the date of this AGREEMENT, the Tug Morena and Barge UMS 220 become available to JMB Shipping ATB 220, LLC to charter to another charterer, JMB Shipping ATB 220, LLC hereby agrees to offer to charter the Tug Morena and Barge UMS 220 to CHARTERER on the same terms of this AGREEMENT.

(n) If within 180-days of the date of this AGREEMENT, the Tug Frederick E. Bouchard and the Barge UMS 205 become available to JMB Shipping ATB 205, LLC to charter to another charterer, JMB Shipping ATB 205, LLC and JMB Shipholding, LLC hereby agree to offer to charter the Tug Frederick E. Bouchard and Barge UMS 205 to CHARTERER on the same terms of this AGREEMENT.

(o) If within 180-days of the date of this AGREEMENT, the Tug Bella (FKA Linda Lee Bouchard) becomes available, JMB Shipping ATB 205, LLC hereby agrees to offer to sell the Tug Bella (FKA Linda Lee Bouchard) to CHARTERER for $5,000,000 with owner financing at 10% annual interest on the same terms as the purchase of the other eight tugs and barges in the Vessel Sale and Purchase Agreement dated September 30, 2021 (and associated documentation) by and between JMB Shipholding, LLC and Bunker Barge 2020 LLC.

(p) Financial Security. CHARTERER shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or

municipal or other division or authority thereof, including, but not limited, to Certificates of Financial Responsibility (COFRs) to enable the VESSEL, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this AGREEMENT without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The CHARTERER shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the CHARTERER's sole expense and the CHARTERER shall indemnify the OWNER against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(q) Anti-Corruption

  (i) The parties agree that in connection with the performance of this AGREEMENT they shall each:

   1. Comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organization and/or by any person providing services for it or on its behalf; and

   2. Make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this AGREEMENT.

  (ii) If either party fails to comply with any applicable ant-corruption legislation, it shall defend and indemnify the other party against any fine, penalty, liability loss, or damage and any related costs (including, without limitation, court costs and legal fees) arising from such breach.

  (iii) Without prejudice to any of its other rights under this AGREEMENT, either party may terminate this AGREEMENT without incurring any liability to the other party if:

   1. At any time, the other party or any member of its organization has committed a breach of any applicable anti-corruption legislation in connection with this AGREEMENT; and

   2. Such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

   Any such right to terminate must be exercised without undue delay.

   Each party represents and warrants that in connection with the negotiation of this AGREEMENT neither it nor any member of its organization has committed any breach of applicable anti-corruption legislation. Breach of this subclause (d) shall entitle the other party to terminate this AGREEMENT without incurring any liability to the other.

(r) Sanctions and Designated Entities

  (i) The provisions of this clause shall apply in relation to any sanction, prohibition or restriction imposed on any specified persons, entities or bodies including the designation

       of specified vessels or fleets under United Nations Resolutions or trade or economic sanctions, laws or regulations of the United States of America.

   (ii) The OWNER and CHARTERER respectively warrant for themselves, shippers, receivers, or cargo interests that at the date of this AGREEMENT and throughout the duration thereof they are not subject to any of the sanctions, prohibitions, restrictions or designation referred to in subclause (a) which prohibit or render unlawful any performance under this AGREEMENT. The OWNER further warrants that the VESSEL is not a designated vessel.

If at any time during the performance of this AGREEMENT either party becomes aware that the other party is in breach of warranty in this Clause, the party not in breach shall comply with the laws and regulations of any Government to which that party or the VESSEL is subject and follow any orders or directions which may be given by any body acting with powers to compel compliance, including where applicable the OWNER's Flag State. In the absence of any such orders, directions, laws or regulations, the party not in breach may, at its option, terminate this AGREEMENT forthwith.

   (i) If, in compliance with the provisions of this Clause, anything is done or is not done, such shall not be deemed a deviation but shall be considered due fulfilment of this AGREEMENT.

   (ii) Notwithstanding anything in this Clause to the contrary, the OWNER or the CHARTERER shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

   (iii) The OWNER or the CHARTERER shall be liable to indemnify the other party against any and all claims, losses, damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty in this Clause.

(o)    Parent Guarantee. On the date hereof, the OWNER shall have received from Centerline Logistics Corporation (the "GUARANTOR"), a parent company of the CHARTERER, a Parent Guarantee, pursuant to which the GUARANTOR agrees to irrevocably and unconditionally guarantee all of the obligations of the CHARTERER to the OWNER under this Agreement, in form and substance mutually agreed by the parties.

*(Signature page to follow)*

16

*(Signature page to Charter Agreement)*

Agreed and accepted, this 31st day of October, 2021.

OWNER:                                         CHARTERER:

JMB SHIPPING ATB 284, LLC                      BUNKER BARGE 2020 LLC

By: _____                    By: _____

Its: President                                 Its: Matt Godden / President and CEO

CONFIDENTIAL

P-02915E-00000047

JMB_00006429

## SCHEDULE A

List of known outstanding maintenance or inspection items to be repaired, rectified and paid by OWNER. OWNER and CHARTERER shall agree to all items deferred to next shipyard period, if applicable:

a. Barge
   i. #2 cargo pump out of service
   ii. Three expired, untested cargo hoses
   iii. Expired safety equipment, barge
      1. Two expired line throwing guns
   iv. GMDSS, SASS, NAVTEX recertification required. Radio certificate expired; EPIRB in wrong name (CHARTERER needs to provide new vessel name)
   v. Forward Mooring Winch Drum Guard has wastage (evaluating potential for deferral)
   vi. Starboard Ballast Pump Exhaust Vent requires new gasket
   vii. 120V panel door replacement required, location outside accommodation space, aft bulkhead
   viii. Ballast Tank 4P has an inset on the 2nd transverse between 5th and 6th frames. ABS has marked this down as a possible C/R. It is above the waterline (work with ABS to determine required action, if any)
   ix. Ballast Tank 4P in Bay 2 (aft from fwd), Crop and Renew three (3) SSL 5, 6, 7 (bottom to top).
   x. Ballast Tank 4P has an inset on the 2nd transverse bulkhead (aft from fwd) between longitudinals 3 & 4 (bottom to top) in way of cargo tank.
   xi. Aft peak has an inset on rake on rolled steel turn of bilge. Crop and renew sharp inset.
   xii. Four (4) crane wires are improperly & unsafely secured to headache balls and hooks. Wire must be pulled, cut and re-secured using 5/8" wire clamp and new 5/8" crane blocks.
   xiii. Radiators for three generator engines and two cargo pump engines are severely fouled with grease and other materials completely covering radiator fins. Must be removed & cleaned.
   xiv. Three generators are dirty & fouled with grease and other materials and should be cleaned by means of washing, dipping & baking.
   xv. Remove (12) PV valves from vessel
      1. Open, clean & inspect valves in presence of ABS
      2. Replace all seals & gaskets, re-assemble valves
      3. Test valves in presence of ABS before re-installing on board.
   xvi. Open all ballast tank ball vents from one side to allow ABS inspection of balls flame screens and vent piping. Reassemble as original upon approval from ABS.

b. Tug
   i. EMI Alarm Panel not functioning
   ii. Expired safety equipment, Tug
      1. Medical and first aid kit, supplies
      2. Eye saline wall station replacement 16 oz. bottles
   iii. Oily water separator must be functioning and calibration within required periodicity
   iv. There are 25,311HRS on SME and 25,292HRS on PME. EMD710 Series engines have been identified by OEM to have defective/inferior material on piston rings. These engines are at higher hours than the 20,000HR OEM Warranty for warranty power pack replacement; however the ring gap clearances should be inspected and recorded for future

CONFIDENTIAL
JMB_00006430

      wear readings. Any readings greater than 0.18" air gap clearance on piston ring should result in replacement of respective power pack. Perform maintenance in accordance with OEM Recommended Maintenance Interval (OEM RMI) for 16,000 HRS if documentation cannot be provided indicating satisfactory completion of OEM RMI. If 16,000HR Maintenance Interval has been completed, next available maintenance interval to be performed shall be completed for an 8,000HR service.

  v. There are 19,913HRs on port generator engine, 21,729HRs on center generator engine and 21,245HRs on STBD generator engine. Perform 20,000 HR Service on John Deere 4045 Engines to include new injectors.
  vi. There are three generators (alternators) that are thoroughly fouled with grease and other matter – they should be removed, washed, dipped & baked before being reinstalled.
  vii. Open, lap & inspect all overboard gate valves in accordance with ABS LL requirements.
  viii. Open, clean & inspect all overboard check valves in accordance with ABS LL requirements.
  ix. Open and inspect all inverted ball check vents in accordance with ABS LL requirements.
  x. FAST MSD System is inoperable in current state. The chlorinator tanks and associated chlorinator pumps are inoperable and the agitating system is not functioning. System must be gone through and functioning for treatment of sewage.